Matthew N. Evans (7051)
Whitney Hulet Krogue (15184)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah  84145-0385
Telephone:  (801) 532-1500
Facsimile: (801) 532-7543
mevans@rqn.com
wkrogue@rqn.com
*Attorney for Defendants Kent Anderson, Mike Howard & AKA Partners, LC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NATHAN W. HANKS and REALSOURCE EQUITY SERVICES, LLC,<br><br>     Plaintiffs,<br><br>v.<br><br>MICHAEL S. ANDERSON, AKA PARTNERS, LC, KENT ANDERSON and MICHAEL HOWARD,<br><br>     Defendants. | **DEFENDANTS AND COUNTERCLAIMANTS KENT ANDERSON'S AND MICHAEL HOWARD'S AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT TO THE SECOND AMENDED COMPLAINT**<br><br>Case No. 2:19-cv-00999-DBB-DAO<br><br>Judge David Barlow<br><br>Magistrate Daphne Oberg |
| MICHAEL S. ANDERSON, AKA PARTNERS, LC, KENT ANDERSON and MICHAEL HOWARD,<br><br>     Crossclaim Plaintiffs,<br><br>v.<br><br>NATHAN W. HANKS and REALSOURCE EQUITY SERVICES, LLC,<br><br>     Hanks and RSES, | |

v.

MICHAEL S. ANDERSON,

     Crossclaim Defendant,

v.

REASLSOURCE BROKERAGE SERVICES,
L.C., REALSOURCE PROPERTIES, LLC,
STEVEN W. MOREIRA and JOHN DOES 1-
100,

     Third-Party Defendants.

Defendants and Counterclaimants Kent Anderson ("**Anderson**") and Michael Howard ("**Howard**") (collectively "**Counterclaimants**"), by and through their counsel of record, hereby submit this Amended Counterclaim and Third-Party Complaint to the Second Amended Complaint. Nothing in this Amended Counterclaim and Third-Party Complaint constitutes a waiver of the Counterclaimants' rights to relief under the causes of action found in the Crossclaim and Third-Party Complaint already on file with the Court. Counterclaimants amend the Counterclaim and Third-Party Complaint and aver as follows:[1]

## **AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT**[2]

Counterclaimants Kent Anderson and Michael Howard hereby assert this Amended Counterclaim against Counterclaim Defendants Nathan W. Hanks ("**Hanks**"), RealSource Equity Services, LLC ("**RSES**"), RealSource Brokerage Services, L.C. ("**RSBS**"), RealSource Properties,

---

[1] Counterclaimants file under seal pursuant to DUCivR 5-3(b)(4).
[2] As the original Counterclaim and Third-Party Complaint were identical in their causes of action, Counterclaimants seek to amend both the Counterclaim and the Third-Party Complaint through just one filing.

LLC ("**RSP**"), Steven W. Moreira ("**Moreira**"),[3] and John Does 2-100, all Counterclaim and Third-Party Defendants referred to collectively as the "**RealSource Parties**" and allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1.       Anderson is a resident of Madison County, Idaho.

2.       Howard is a resident of El Paso County, Colorado.

3.       Hanks is a resident of Wasatch County, Utah.

4.       RSES is a Utah limited liability company with its principle place of business in Salt Lake County, Utah.

5.       M. Anderson is a resident of Salt Lake County, Utah.

6.       RSBS is a limited company with its principal place of business in Salt Lake County, Utah.

7.       RSP is a Utah limited liability company with its principal place of business in Salt Lake County, Utah.

8.       Upon information and belief, Moreira is an individual domiciled in Florida who conducts business in Utah.

9.       John Does 2-100 are other entities who own the properties that are the subject of this action, or who own interests in business entities that own the properties that are the subject of this action. Counterclaimants are not yet exactly aware of the ownership makeup of each property

---

[3] John Does 1-100 were named by the Counterclaimants in the original Counterclaim, Crossclaim, and Third-Party Complaint. In ¶ 9 of the original Counterclaim, Crossclaim, and Third-Party Complaint, Counterclaimants stated that they would seek to amend the Counterclaim to include the specific names and actions of John Does 1-100 when they became known through discovery. Counterclaimants now identify previously unknown John Doe: Moreira.

that is the subject of this action. The RealSource Parties, M. Anderson, and their related entities own an interest in some or all of John Does 2-100. Discovery will reveal those facts, and Counterclaimants will seek to amend this Amended Counterclaim and Third-Party Complaint when the specific information about each John Doe is identified.

10.     This Court has personal jurisdiction over Hanks as he is domiciled in Utah and has affirmatively asserted claims in this Court.

11.     This Court has personal jurisdiction over RSES as it is a Utah limited liability company and has affirmatively asserted claims in this Court.

12.     This Court has personal jurisdiction over M. Anderson as he is domiciled in Utah and has petitioned the Court for relief in this case.

13.     This Court has personal jurisdiction over RSBS as it is a limited company with its principal place of business in Salt Lake County, Utah, and RSBS has answered pleadings in this case.

14.     This Court has personal jurisdiction over RSP as it is a Utah limited liability company with its principle place of business in Salt Lake County, Utah, and RSP has answered pleadings in this case.

15.     This Court has personal jurisdiction over Moreira as he has conducted business dealings and performed brokerage services for in in relation to RSBS, RSES, RSP, and/or Hanks.

16.     This Court has supplemental jurisdiction over the Amended Counterclaim and Third-Party Complaint as all causes of action arise out of the same nucleus of operative facts as those giving rise to the underlying Second Amended Complaint. Thus, the claims asserted in the Amended Counterclaim and Third-Party Complaint "are so related to claims in the action within

such original jurisdiction that they form party of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a).

17. Venue in this Court is proper pursuant to 28 U.S.C. §1391.

## FACTUAL ALLEGATIONS

18. RSBS was formed in 1989 to make real estate investing easier by helping investors purchase shared equity investments in target acquisition markets instead of disposition markets.

19. The shared equity investments, which RSBS began in mid-2002, are passive investment opportunities, which do not require the investors to be actively involved in RSBS day-to-day management activities.

20. Hanks is a principal of RSBS and manages the day-to-day operations.

21. RSBS's business model is built on hiring independent contractors to locate and acquire real estate investment opportunities all across the United States.

22. Independent contractors and all members of the acquisition team hold real estate licenses that are placed with RSBS.

23. RSES and RSP are entities related to RSBS. Each of these entities are used by Hanks to invest in real estate properties, act as the general partner of those real estate properties, receive revenue from the generation of funds from the properties and receive funds from the properties to pay expenses, including amounts owed to Counterclaimants.

24. Upon information and belief, Moreira is one of the brokers that assists and/or has assisted Hanks in closing on certain properties. Moreira is associated with and is a part of the RealSource Parties that have engaged in the pattern of conduct described in this Amended

Counterclaim and participates as a broker and received funds from the entities in exchange for his services.

25.     Upon information and belief, M. Anderson is also one of the brokers that have assisted Hanks in closing on certain properties. M. Anderson is associated with and is a part of the RealSource Parties that have engaged in the pattern of conduct as described in this Amended Counterclaim and participates as a broker and receives funds from the entities in exchange for his services.

26.     In the Utah state court case, filed in the Third Judicial District Court as Case No. 190909916, Hanks argued for dismissal based on Utah Code Ann. § 61-2f-409(2) and alleged that Anderson and Howard failed to sue the "principal broker[s]" involved in the real estate transactions that underline the causes of action at issue in this case. *See* Case No. 190909916, Dkt No. 12, Defs.' Mot. to Dismiss 7.

27.     M. Anderson is named as a Crossclaim Defendant and Moreira is named as a Counterclaim Defendant in this case to satisfy Utah Code Ann. § 61-2f-409(2), to the extent the Court determines the statute applies.  Upon information and belief, Hanks has acted as a de facto broker for a number of transactions as well.

28.     Upon information and belief, John Does 2-100 may also be "principal brokers" involved in the real estate transactions at issue in this case and/or may be additional entities holding real property that is the subject of this action. Upon the discovery of each John Doe, Counterclaimants will seek leave to amend this Amended Counterclaim and Third-Party Complaint as applicable to add them to the case.

A.     *RealSource Parties Contracts for Anderson's Services.*

29.     In 2003, the RealSource Parties hired Anderson as an independent contractor to help Hanks expand investment opportunities and raise equity.

30.     Anderson provided considerable value to the company by, among other things, rewriting and significantly enhancing the company's underwriting and investor operating materials and by presenting new opportunities to investors on buying tours.

31.     As a direct result of Anderson's efforts in 2003, the company acquired several more properties—that were much larger in both size and quality—than it had the year before.

32.     Over the next few years, the RealSource Parties continued to expand and grow as a result of Anderson's efforts. Over the last 17 years, Anderson helped the RealSource Parties raise nearly $281 million in equity and acquired over $1.02 billion in multifamily real estate properties.

B.     *The Original Income Pool.*

33.     The RealSource Parties developed an income pool (the "**Original Pool**") through which the RealSource Parties agreed that the independent contractors, including Anderson, who helped acquire properties, could share in the different revenue streams coming from the RealSource Parties' properties.

34.     The RealSource Parties had other staff who worked on asset management or other property related tasks, but only those who helped acquire the properties were allowed to be members of the Original Pool.

35.     The Original Pool consisted of six individuals.

36.     Four of these individuals—Anderson, Jeff Rosenbloom, Kelly Randall, and Joe Mackey—each held one share in the pool and two others—Hanks and Mike Anderson—each held .75 shares in the pool.

37.     The agreed upon allocation of commissions, property income, operating income, and back-end income that would be paid when the property was refinanced or sold (collectively, the "Original Pool Income") amongst pool members is formulaic and transparent. For example, 50% of operating income (e.g. asset management income and cash flow) and back-end income (e.g. equity appreciation values) goes to the pool and is split by pool members according to the number of shares held by each.

38.     Hanks acknowledged to the members of the Original Pool and agreed on numerous occasions that they would share in the upside of the business they were all creating and continue to receive their share of the Original Pool Income as long as they did not voluntarily terminate their services to the RealSource Parties.

39.     Accordingly, Anderson is entitled to receive and has an interest in at least 11.11% of the operating income and back-end income funneled into the Original Pool (i.e. 50% of the pool's operating and back-end income allocations from all properties divided by 4.5 pool shares).

C.     *Original Pool Income Locked.*

40.     When Hanks became president of the RealSource Parties in 2009, the Original Pool Income allocation was locked in on the current portfolio of properties at that time (the "Original Pool Portfolio") and the formula changed for all prospective properties acquired after that date (the "New Portfolio").

41.     Hanks has been the president and/or CEO of the RealSource family of entities since that time and over those years has made decisions and, upon information and belief, also acted as a de facto principal broker of any and all transactions and deals.  Hanks made the decisions to refuse to perform under the agreements identified herein.

42.     Hanks had a working relationship with Anderson and Howard and had a duty as part of that relationship to act in accordance with Utah law.

43.     Despite that Anderson's work was almost exclusively based on generating upfront commissions by raising equity to acquire properties, his percentage of the upfront income went down.

44.     Instead of the 11.11% he had been receiving on operating income and back-end income, the agreed-upon amount varied between three to four percent.

45.     The RealSource Parties agreed to pay three to four percent on new deals ever since.

46.     When Anderson expressed concern to Hanks in February of 2019 about the RealSource Parties not acquiring properties and about Anderson's income becoming inadequate, he was assured by Hanks that if he continued to do his job well he would continue to receive income at the higher end of the 3% to 4% income allocation range in addition to the amount of Original Pool Income owed to him.

D.      *The RealSource Parties Contracts for Howard's Services.*

47.     Howard joined the RealSource Parties in December 2010, and officially started in January 2011 as an independent contractor.

48.     Like Anderson, Howard had his real estate licenses placed with the RealSource Parties.

49.     During the time Howard was with the RealSource Parties he helped it acquire approximately 21 properties for total purchase price of $426.3 million and was solely responsible for four properties he underwrote and brought to the RealSource Parties totaling $114.75 million.

50.     A similar agreement to the one that already existed for the Original Pool Income was put in place whereby both Anderson and Howard were promised that they would receive ongoing payments from up-front and back-end income streams when the properties were refinanced or sold from the New Portfolio properties in varying amounts depending on whether they originated the deal or not.

51.     Anderson and Howard are each owed approximately 4% of the total amount of operating income and 4% each of the total amount of equity appreciation for the New Portfolio properties (the "New Pool Income").

52.     In other words, Anderson is entitled to and has an interest in the Original Pool Income and the New Pool Income, and Howard is entitled to and has an interest in the New Pool Income (collectively, the "Legacy Income").

53.     The Legacy Income is income for services already rendered by Anderson and Howard since they already fulfilled their front-end responsibilities required to receive this income including by locating properties, conducting due diligence and proforma underwriting, and raising equity for all the properties currently held by the RealSource Parties.

Plaintiffs are owed Legacy Income from the following properties:

      a)     Ashford Place Apts. 107 Ashford Dr. West Monroe, LA 71291;

      b)     Autumn Ridge Apts. 6100 Barrowood Dr. Raleigh, NC 27612;

      c)     Belle Grove at Custer Apts. 800 Custer Rd. Richardson, TX 75080;

      d)     Morgan Ridge Apts. 100 Morgan Way Winston-Salem, NC 27127;

      e)     Stratford Place Apts. 1140 Stafford Pl. Cir. Winston-Salem, NC 27127;

      f)     Timber Ridge Apts. 6700 Wall St. Mobile, AL 36695;

      g)     Alkire Glen Apts. 4075 Alkire Glen Way Columbus, OH 43228;

h)      Antero Apts. 1432 Sandalwood Dr. Colorado Springs, CO 80916;

i)      Breckinridge Square Apts. 203 Breckinridge Square Louisville, KY 40220;

j)      Creekside On The Green Apts. 1702 N. Jupiter Rd. Dallas, TX 75042;

k)      Lake St James Apts. 50 St. James Dr. Conyers, GA 30094;

l)      The Park at Midtown Apts. 4958, 1 St. Croix Pl. A Greensboro, NC 27410;

m)      The Mill At Georgetown Apts. 115 Magnolia Dr. Georgetown, KY 40324;

n)      The Park at Oak Ridge Apts. 5856 Old Oak Ridge Rd. Greensboro, NC 27410;

o)      The Park at River Crest Apts. (formerly St. Andrews Pointe Apts.) 1510 St. Andrews Rd. Columbia, SC 29210;

p)      RealSource Storage Circle Self-Storage 2 1225 N. Circle Dr. Colorado Springs, CO 80909

q)      Steepleway Downs Apts. 11910 Thoroughbred Dr. Houston, TX 77065;

r)      Summerwood Cove Apts. 9821 Summerwood Cir. Dallas, TX 75243;

s)      Timber Hollow Apts. 201 Parkland Hills Dr. Fairfield, OH 45014.

54.      The Properties listed in a–f in ¶ 53 are the properties that continue to generate the Original Pool Income, which Anderson is entitled to Legacy Income from in amount proportionate to his one share in the Original Pool. The Properties listed in g–s are the properties comprising the New Pool Income, which both Anderson and Howard are both entitled to.

55.      As of the date of this filing, Anderson is entitled to approximately $2,117,757 in Legacy Income from both the Original Pool Income and the New Pool Income.

56.      As of the date of this filing, Howard is entitled to approximately $2,316,618 in Legacy Income from the New Pool Income.

57.     Using 3rd party sources (appraisals, broker opinion of value, 3rd party provided market cap rates) the RealSource Parties estimate the current value of their portfolio is $630,400,000, as detailed in a report provided to Anderson on July 16, 2019. This amount includes $131,267,000 in appreciation of which the RealSource Parties reported to Anderson that the RealSource Parties' share of appreciation is $34,734,494. This report was made by the RealSource Parties' COO, Kelly Randall and approved by Hanks. This report was also provided by the RealSource Parties, Randall, and Hanks to the RealSource Parties' lenders as an accurate and current assessment of property value and appreciation. Thus, the amounts due to the Plaintiffs as shown in ¶¶ 55 and 56 are based on the accuracy of the RealSource Parties' own report.

58.     2017 was the last good year of acquisitions for the RealSource Parties, acquiring five properties for $127.3 million with $74.6 million in equity.

59.     Hanks and the RealSource Parties were advised by Anderson and Howard to shift their resources and focus to the acquisition of self-storage properties, which had much more attractive cap rates and prospects for growth.

60.     Hanks insisted the company would not head down that road.

61.     From 2018 through until June of 2019, the RealSource Parties acquired only one small multifamily residential property.

62.     Given the RealSource Parties' poor performance and results for these two years and inability to replace income lost when properties were sold, Anderson and Howard told Hanks that because the RealSource Parties had not been able to underwrite new acquisitions, the resulting cuts in their income were a concern.

63.     Anderson and Howard would need more acquisitions to replace the lost income from properties already sold and underperformance of ongoing properties due to poor property management, among other things.

64.     Given the apparent lack of improving income for the RealSource Parties, Anderson met with Hanks in February of 2019 and explained that as an independent contractor, Anderson would need to supplement the monthly RealSource Parties' income he received by finding income from doing work outside the company.

65.     Hanks said that they hoped to acquire more deals soon, but Anderson told Hanks that the RealSource Parties' must acquire more properties to regain an acceptable minimum monthly income level.

66.     As of March of 2019, the RealSource Parties had not acquired any new properties and had nothing viable in the pipeline.

67.     Anderson told Hanks that Anderson would be forced to do services outside of the RealSource Parties for additional income as he had stated in their meeting the month before.

68.     Finally, in June of 2019, the RealSource Parties closed on a piece of property in Colorado Springs, Colorado, upon which a commercial self-storage facility was to be built.

69.     Howard brought the deal to Hanks in the fall of 2018—after Howard had already done the due diligence, put the property in contract with earnest money which he had raised, and hired a developer.

70.     Howard asked the RealSource Parties to joint venture with him to raise the remaining equity, which Hanks and the RealSource Parties agreed to in December 2018.

71.     When Hanks could not get the equity finalized and because the deal needed to be reworked to provide adequate upfront income to the RealSource Parties, Hanks asked Anderson to rework all the underwriting and offering materials to be consistent with company branding that Anderson had developed, put it back out to the RealSource Parties' clients and then firm up the commitments.

72.     Anderson did all of this and collected the equity investments for the RealSource Parties.

73.     The closing on the real property in Colorado took place in June 2019 despite the debt not being arranged for the construction of the property.

74.     The RealSource Parties instructed the closing agent to close on the real property in Colorado in the RealSource Parties' name instead of the joint venture entity named in the contract.

75.     This was done without Howard's consent or prior knowledge and despite the terms of the purchase agreement, thereby fraudulently taking Howard out of the deal and stealing his interest in the joint venture.

76.     Moreover, despite the RealSource Parties receiving approximately $473,294 for the closing, Anderson was never compensated for reworking the deal for the self-storage property in Colorado, and is owed at least $18,932 in commissions for that deal.

77.     To supplement his income, Howard began working with Mike Anderson's new company, called AKA Partners ("AKA").

78.     AKA's primary business is to acquire self-storage properties, and it has numerous properties in the pipeline.

79.     The same month, Howard was advised that his services to the RealSource Parties were being terminated for sending self-storage deals to AKA, even though he has always been an independent contractor for the RealSource Parties, and despite Hanks stating numerous times that the RealSource Parties was not interested in self-storage and that AKA was not a competitor.

80.     The RealSource Parties and Hanks claimed to take and have the right to all of Howard's legacy income and unpaid commissions.

81.     In September of 2019, when Hanks discovered that Anderson was assisting AKA by advising on its offering materials he told Anderson he could not provide services to AKA.

82.     Jeff Hanks, CFO for the RealSource Parties, told Anderson numerous times during 2019 that the RealSource Parties would not be changing focus to self-storage acquisitions, as did Kelly Randall, the COO.

83.     The RealSource Parties had no employment agreement with either Anderson or Howard that would preclude them assisting AKA as independent contractors.

84.     Anderson and Howard have always been independent contractors for the RealSource Parties.

85.     On September 3, 2019, Hanks turned off Anderson's access to Anderson's RealSource Parties email account and cloud file access to his files.

86.     Despite not having access to his files, Anderson continued to find ways to create income for the RealSource Parties.

87.     Since AKA was finding properties to acquire and the RealSource Parties had access to equity with nothing in the pipeline to sell, Anderson suggested a joint venture, which Hanks agreed to.

88.     Anderson made substantial effort to put together the joint venture since AKA needed a source for equity and the RealSource Parties needed income since they still had nothing in their acquisition pipeline.

89.     Despite Anderson's efforts to help the RealSource Parties gain income they needed, the RealSource Parties and Hanks, in an email to Anderson dated October 16, 2019, terminated Anderson's services to the RealSource Parties, allegedly as a consequence of Anderson providing consulting services to AKA, and wrongfully claimed a right to all of Anderson's Legacy Income.

E.      *Additional Damages.*

90.     The RealSource Parties and Hanks have also failed to pay Howard approximately $57,381 in commissions that Howard earned for his up-front work as an independent contractor for the RealSource Parties.

91.     Upon information and belief, the RealSource Parties and Hanks have sold, and/or are in the process of selling several of the properties listed in ¶ 53, *supra*, for which Anderson and Howard have an interest in and are owed and/or will be owed their respective percentages of the appreciation of these properties. At a bare minimum, Howard, who has not been paid any of the Legacy Income owed to him pursuant to the agreement he had with the RealSource Parties and Hanks when Howard started in 2011, is owed for the sales of the Heron Walk and St. Andrews Pointe Apartment properties in 2018, and the sale of the Park at Boulder Creek Apartments in 2019.

92.     Anderson developed sophisticated, proprietary models that the RealSource Parties and Hanks have continued to use without authorization or paying for the models.

93.     Specifically, Anderson developed a Property Underwriting Model and an Economic Target Market Model that the RealSource Parties and Hanks have continued to use without a license, which models belong to Anderson.

**FIRST CAUSE OF ACTION**
**(Theft/Liability Under Utah Code Ann. § 76-6-408(2) and Utah Code Ann. § 76-6-412(2))**

94.     Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

95.     As set forth above, the RealSource Parties have committed theft by, among other things, unlawfully retaining Legacy Income and commission payments belonging to Counterclaimants, and selling properties in which Counterclaimants have an interest without paying them what is owed.

96.     The RealSource Parties know that Counterclaimants have an interest is the Legacy Income, commission payments, and the properties that have been sold, and have unlawfully retained Counterclaimants' money and sold properties with the intent to deprive Counterclaimants of Counterclaimants' property.

97.     As a direct and proximate result of the RealSource Parties' theft, the RealSource Parties are civilly liable for three times the amount of actual damages in an amount to be proved at trial, plus costs of suit and reasonable attorney's fees incurred.

98.     At a minimum, Anderson is owed at least $2,136,689 consisting of approximately $2,117,757 in Legacy Income and $18,932 in unpaid commissions for the Colorado self-storage property.

99.     At a minimum, Howard is owed at least $2,373,999 consisting of approximately $2,316,618 in Legacy Income and $57,381 in unpaid commissions plus money from the sales of

the Heron Walk and St. Andrews Pointe Apartment properties in 2018, and the sale of the Park at Boulder Creek Apartments in 2019, listed in ¶ 91, *supra*.

## SECOND CAUSE OF ACTION
### (Conversion)

100.     Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

101.     As set forth above, the RealSource Parties have unlawfully exercised dominion and control over property belonging to Counterclaimants, including money. In doing so, the RealSource Parties have intentionally interfered with property and assets belonging to Counterclaimants and has deprived Counterclaimants of the possession and use of that property causing damage to Counterclaimants in an amount to be proved at trial—but is no less than the amounts listed in ¶¶ 98 and 99 above—plus court costs and prejudgment interest. Counterclaimants are also entitled to punitive damages as a result of the RealSource Parties' willful, wanton and fraudulent acts.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty, Theft)

102.     Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

103.     The RealSource Parties owed a fiduciary duty to Counterclaimants to not steal or convert any assets belonging to Counterclaimants and to not engage in any acts that would create a conflict of interest between the RealSource Parties and Counterclaimants and to refrain from engaging in undisclosed transactions for the RealSource Parties' benefit.

104.     As set forth above, the RealSource Parties have breached their fiduciary duties to Counterclaimants by stealing money from Counterclaimants—not the least of which is their Legacy Income and commission payments; by engaging in acts that create a conflict of interest with their duties to Counterclaimants; and through undisclosed transactions and self-dealing.

105.     As a direct and proximate result of the RealSource Parties' acts, Counterclaimants have been damaged in an amount to be proved at trial—but is no less than the amounts listed in ¶¶ 98 and 99 above —plus court costs, prejudgment interest and attorney's fees as allowed by common law.

106.     Counterclaimants are also entitled to punitive damages as a result of the RealSource Parties' breaches of their fiduciary duties.

### FOURTH CAUSE OF ACTION
### (Breach of Contract)

107.     Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

108.     Counterclaimants fully performed under the agreements they made with the RealSource Parties.

109.     As set forth above, the RealSource Parties have breached their agreements with Counterclaimants, including their agreement to pay Legacy Income on an ongoing basis and their agreements regarding commissions.

110.     As a direct and proximate result of the RealSource Parties' breach of contract, Counterclaimants have been damaged in an amount to be proved at trial—but is no less than the amounts listed in ¶¶ 98 and 99 above —plus court costs and prejudgment interest.

**FIFTH CAUSE OF ACTION**
**(Accounting)**

111.      Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

112.      Counterclaimants are entitled to an accounting of the total amount of the money owed to Counterclaimants, but held by the RealSource Parties.

113.      The RealSource Parties received and continue to receive all monies earned under their agreements with Counterclaimants and kept and continue to keep the one-sided accounts that hold those monies.

114.      The total amount of receipts, disbursements, and profits, including equity valuations and amounts that should have been paid out but were invested into other properties without authorization, is within the knowledge of the RealSource Parties and are unknown to Counterclaimants.

**SIXTH CAUSE OF ACTION**
**(Breach of the Duty of Good Faith and Fair Dealing)**

115.      Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

116.      Each contract includes a duty of good faith and fair dealing that the parties will not engage in conduct or acts that will destroy the benefits of the contract to the other party.

117.      As set forth above, the RealSource Parties have breached the duty of good faith and fair dealing included in the agreements that it made with Counterclaimants.

118.      As a direct and proximate result of the RealSource Parties' breach of the duty of good faith and fair dealing, Counterclaimants have been damaged in an amount to be

proved at trial—but is no less than the amounts listed in ¶¶ 98 and 99 above—plus court costs, prejudgment interest and attorney's fees.

### SEVENTH CAUSE OF ACTION
### (Unjust Enrichment/Quantum Meruit)

119.        Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

120.        Through meeting the conditions of receiving legacy income and through the theft of monies as identified in ¶¶ 98 and 99 above, Counterclaimants knowingly and unknowingly conferred a benefit on the RealSource Parties.

121.        The RealSource Parties had an appreciation or knowledge of the benefits conferred.

122.        It would be inequitable and unjust for the RealSource Parties to retain the benefits of this unjust enrichment.

123.        As a direct and proximate result of the RealSource Parties' unjust enrichment, Counterclaimants have been damaged in an amount to be proved at trial—but is no less than the amounts listed in ¶¶ 98 and 99 above—plus court costs and prejudgment interest.

### EIGHTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Relations)

124.        Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

125.        The RealSource Parties have intentionally interfered with Counterclaimants' relationships with its clients and future clients through theft of money and by

using improper means to interfere with Counterclaimants' roles as independent contractors generally and specifically with Counterclaimants' relationships with AKA.

126.     The RealSource Parties' use of improper means to interfere with Counterclaimants business opportunities has deprived Counterclaimants of revenue and business relationships.

127.     As a direct and proximate result of the RealSource Parties' actions, Counterclaimants have been damaged in an amount to be established at trial—but is no less than the amounts listed in ¶¶ 98 and 99 above.

128.     The RealSource Parties' conduct is willful and malicious entitling Counterclaimants to punitive damages as a result of the RealSource Parties' actions.

## NINTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

129.     Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

130.     Anderson's Property Underwriting Model and an Economic Target Market Model are compilations and formulaic programs that derive independent economic value, actual or potential, from not being known to, and not being readily ascertainable the RealSource Parties.

131.     Anderson exerted reasonable efforts to maintain its secrecy.

132.     The RealSource Parties misappropriated these trade secrets by continuing to use them without express or implied consent of Anderson.

133.     As a direct and proximate result of the RealSource Parties' actions, Anderson has been damaged in an amount to be proved at trial, which damages include both the

actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

134.     In the alternative, Anderson is entitled to a reasonable royalty for the RealSource Parties' unauthorized use of his proprietary models.

135.     The RealSource Parties' conduct is willful and malicious, entitling Counterclaimants to reasonable attorneys' fees under Utah law.

### TENTH CAUSE OF ACTION
### (Declaratory Relief Including But Not Limited to Preliminary and Permanent Injunction)

136.     Counterclaimants incorporate the allegations set forth above as if fully set forth herein.

137.     An actual controversy has arisen and now exists between the RealSource Parties and Counterclaimants concerning their rights and duties under the agreements regarding the Legacy Income and common law.

138.     Counterclaimants desire a judicial determination of their rights and duties.

139.     A judicial declaration is necessary and appropriate at this time under all circumstances so that the disputes between the parties can be brought to a resolution.

140.     Counterclaimants are entitled to a declaration from this Court ordering the RealSource Parties to return any and all Legacy Income and other owed payments belonging to Counterclaimants and order the RealSource Parties from refraining from selling any property, or property interests in the LLCs who may own the properties listed in ¶ 53 above.

141.     Counterclaimants are entitled to a preliminary and permanent injunction enjoining the RealSource Parties from retaining any Legacy Income or other money owed whatsoever belonging to Counterclaimants.

142.        Counterclaimants are also entitled to a preliminary and permanent injunction enjoining the RealSource Parties from violating their agreements with Counterclaimants.

143.        Anderson is entitled to a declaration from this Court ordering the RealSource Parties to cease and desist from using Anderson's proprietary models and to compensate Anderson for the unauthorized use of his proprietary models.

144.        Anderson is entitled to $5,000 for each property that the RealSource Parties put into his Property Underwriting Model, $25,000 for each property that the RealSource Parties have taken to market using his Property Underwriting Model, and 10% of all upfront income on properties that the RealSource Parties have closed using the Property Underwriting Model.

145.        Anderson is also entitled to compensation for the RealSource Parties unauthorized use of his Economic Target Market Model in a pro-rated amount of the yearly licensing fee, which is $100,000 per year.

### REQUEST FOR RELIEF[4]

Counterclaimants request the following relief:

1.        Damages in the amount of at least $4,510,688 and continuing damages as discovered through discovery of this matter;

2.        For three times the amount of actual damages and attorney's fees as permitted by Utah Code Ann § 76-6-412(2);

---

[4] Counterclaimants hereby incorporate by reference the Request for Relief in their original Counterclaim, Crossclaim, and Third-Party Complaint.

3.      For attorney's fees under any agreement between Counterclaimants and the RealSource Parties, under common law, and the Utah Code;

4.      For an order from this Court ordering the RealSource Parties to return any and all legacy income belonging to Counterclaimants;

5.      For an order instructing the RealSource Parties not to sell any property in which Counterclaimants have an interest;

6.      For an order instructing the RealSource Parties not to use the Property Underwriting Model and the Econometric Target Market Model and to pay Anderson for its unauthorized use to date;

7.      For damages caused by the RealSource Parties' breaches of their agreements and fiduciary duties and theft of Counterclaimants' assets;

8.      Pursuant to Utah Code Ann. § 25-6-303, Counterclaimants are entitled to an avoidance of any transfer of any asset related to this lawsuit from any of the RealSource Parties to Moreira so that the Counterclaimants may recover the amounts due and owing from the RealSource Parties, and any other available remedies as set forth in § 25-6-303.

9.      For prejudgment interest and court costs;

10.     For punitive damages; and

11.     For such other and further relief as the Court deems just.

DATED this 27th day of January, 2022.

                     RAY QUINNEY & NEBEKER P.C.

                     */s/Matthew N. Evans*
                     Matthew N. Evans
                     *Attorney for Defendants Kent Anderson,*
                     *Mike Howard & AKA Partners, LC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of January, 2022, a true and correct copy of the foregoing **DEFENDANTS AND COUNTERCLAIMANTS KENT ANDERSON'S AND MICHAEL HOWARD'S AMENDED COUNTERCLAIM** was filed electronically with the Court and therefore automatically served the following:

Mark A. Larsen
Lisa C. Rico
LARSEN & RICO, PLLC
mlarsen@larsenrico.com
lrico@larsenrico.com
*Attorneys for Plaintiffs Nathan W. Hanks; RealSource Equity Services, LLC; RealSource Brokerage Services, L.C.; and RealSource Properties, LLC*

Scott Young
M. David Steffensen
SNOW CHRISTENSEN & MARTINEAU
rsy@scmlaw.com
mds@scmlaw.com
*Attorneys for Plaintiffs Nathan W. Hanks; RealSource Equity Services, LLC; RealSource Brokerage Services, L.C.; and RealSource Properties, LLC*

Evan S. Strassberg
Richard F. Ensor
MICHAEL BEST & FRIEDRICH, LLP
esstrassberg@michaelbest.com
rfensor@michaelbest.com
*Attorneys for Defendant Michael S. Anderson*


*/s/ Natalie Bottema*

1560654v4