MARK A. LARSEN (3727)
mlarsen@larsenrico.com
LISA C. RICO (8901)
lrico@larsenrico.com
LARSEN & RICO, PLLC
230 South 500 East, Suite 260
Salt Lake City, UT 84106
Telephone: (801) 364-6500

<u>*Attorneys for Plaintiffs*</u>

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |  |
|---|---|---|
| NATHAN W. HANKS and REALSOURCE EQUITY SERVICES, LLC, | : : : | |
| Plaintiffs, | : : | Case No. 2:19-cv-00999-DBB |
| vs. | : : | **THIRD AMENDED COMPLAINT** **(Jury Trial Demanded)** |
| MICHAEL S. ANDERSON, AKA PARTNERS, LC, KENT ANDERSON, MICHAEL HOWARD, and GREENFILL WOODLAND CREEK APTS, LLC, | : : : : | Judge David B. Barlow |
| Defendants. | | |

Plaintiffs allege the following:

**<u>PARTIES</u>**

1.      Plaintiff Nathan W. Hanks ("Mr. Hanks") is a resident of Wasatch County,

Utah.

2.      Plaintiff RealSource Equity Services, L.L.C. ("RealSource"), is a Utah

limited liability company with its principal place of business in Salt Lake County, Utah.

3.      Defendant Michael S. Anderson is a resident of Salt Lake County, Utah.

4.      Defendant AKA Partners, LC, is a limited liability company organized and formed under the laws of the State of Utah, with its principal place of business in Salt Lake County, Utah

5.      Defendant Kent Anderson is a resident of Salt Lake County, Utah.

6.      Defendant Michael Howard is a resident of Colorado Springs, Colorado.

7.      Defendant GreenFill Woodland Creek Apts, LLC ("GreenFill Woodland"), is a limited liability company is a limited liability company organized and formed under the laws of the State of Utah, with its principal place of business in Salt Lake County, Utah

## BACKGROUND

8.      Mr. Anderson, as seller, and Mr. Hanks, as buyer, entered into a Membership Interests Purchase Agreement effective as of January 1, 2018 (the "Agreement").

9.      Messrs. Hanks and Anderson each owned 50% of the issued and outstanding membership interests in RealSource.   Pursuant to the Agreement, Mr. Hanks purchased Mr. Anderson's 50% interest in RealSource, as well as certain membership interests in other RealSource related limited liability companies.

10.      As of the effective date of the Agreement, RealSource was, and continues to be, in the business of sponsoring and managing diversified real estate investments for investors and institutions seeking strong stable returns. Relying on its 30 year track record in commercial real estate investing, RealSource and its clients

have acquired more than $950 million of real estate in conjunction with its investors via direct real estate transactions.

11.     RealSource has confidential client lists (referred to as the "Client Lists") of approximately 900+ investors who participate in RealSource's direct investments in real estate.

### JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over this action based on the parties' agreement that the exclusive jurisdiction for any dispute relating to the Agreement shall be the state and federal courts located in Salt Lake County, Utah.  Agreement ¶ 10.9(c).

13.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

14.     The parties agreed that the exclusive jurisdiction for any dispute relating to the Agreement shall be the state and federal courts located in Salt Lake County, Utah. Agreement ¶ 10.9(c).

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### FIRST CLAIM FOR RELIEF
**(Against Michael Anderson for Breach of the Non-Competition and Non-Solicitation Provisions of the Agreement)**

16.      Plaintiffs incorporate by reference paragraphs 1 through 14, inclusive, of this Second Amended Complaint.

17.     Paragraph 7.4 of the Agreement, entitled, "Non-Competition; Non-Solicitation," states:

> (a)     **For a period of five (5) years** commencing on the Closing Date (the "Restricted Period"), **Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly,** *(i)*

*engage in or assist others in engaging in any business that would be directly or indirectly competitive with any RS Entity as of the Closing Date (the "Restricted Business")* *in areas in which any RS Entity conducted business as of the Closing Date* (the "Territory"); (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or *(iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between any RS Entity and clients or investors of any RS Entity.* Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of (i) any of the RS Entities acquired by the Seller after the Closing or (ii) any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)      During the Restricted Period, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit any employee of any RS Entity or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 7.4(b) shall prevent Seller or any of its Affiliates from hiring (i) any employee whose employment has been terminated by a RS Entity or Buyer or (ii) after one (1) year from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c)      During the Restricted Period, **Seller shall not**, and shall not permit any of its Affiliates to, *directly or indirectly*, *solicit or entice*, or attempt to solicit or entice, *any clients of or investors in any RS Entity or potential clients of or investors in any RS Entity* with the intention of diverting their business or services from any RS Entity or **for any other purposes the effect of which is to divert their business or services from any RS Entity.**

(d)      **Seller acknowledges that a breach or threatened breach of this Section 7.4 would give rise to irreparable harm to Buyer**, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, *Buyer shall*, in addition to any and all other rights and remedies that may be available to it in respect of such breach, *be entitled to equitable*

***relief, including a temporary restraining order, an injunction, specific performance*** and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(e)    ***Seller acknowledges that the restrictions contained in this Section 7.4 are <u>reasonable and necessary to protect the legitimate interests of Buyer</u> and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement***. In the event that any covenant contained in this Section 7.4 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by Applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by Applicable Law. The covenants contained in this Section 7.4 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

(Emphasis added.)

18.    RealSource is a third-party beneficiary of these provisions of the Agreement.

19.    Mr. Anderson breached the Non-Competition Provisions of the Agreement in the following ways, among others, and continues to breach the Agreement:

    a.  By establishing an entity, AKA Partners, LLC, (referred to as "AKA") to compete directly with RealSource for investment funds for projects – *see* https://www.aka.partners/msa-bio;

    b.  By soliciting investments from RealSource clients in projects which Paragraph 7(a) defines as "Restricted Business[es]";

c.   By trading on his experience with RealSource to induce investment in

AKA projects to the exclusion of RealSource projects.  His "bio"

provides in relevant part:

Mike is the Chairman, founder, and co-owner of AKA
Partners, the general partner to Greenfill Storage. He was
the Founder, Co-Owner, former President and Chairmen of
RealSource companies. While under his leadership
RealSource built a 950 million dollar cumulative multi-family
investment portfolio, with over a billion dollars of investment
transaction, all under self-management and private
ownership.  He sold his interest to his partner of 30 years in
January 2018.

(Emphasis added).

d.      By surreptitiously recruiting two independent contractors employed

by RealSource to conduct business on behalf of AKA while they continued to

work for RealSource – Kent Anderson and Michael Howard;

e.      By surreptitiously securing a copy of RealSource's Client Lists from

Michael Howard while Mr. Howard continued to provide services to RealSource;

f.      By securing RealSource's marketing materials from Michael

Howard, while Mr. Howard continued to provide services to RealSource, and

using those forms to create marketing materials for competing AKA projects;

g.      By distributing AKA projects on RealSource forms to RealSource's

Client Lists via email;

h.      By distributing the AKA projects via email so that the identities and

contact information for all of RealSource's investors is disclosed to everyone in

the investor pool.

      i.      By soliciting RealSource's Client Lists to make investments in AKA projects, thereby absorbing investment funds that could be utilized by RealSource for its projects;

      j.      By causing confusion amongst RealSource investors regarding the source of the solicitation for investment;

      k.      By causing Mike Howard to surreptitiously transfer a project RealSource was working on to AKA for closing;

      l.      By encouraging Kent Anderson and Michael Howard to engage in acts contrary to their duties to RealSource.  *See* https://www.aka.partners/about;

      m.      By engaging Kent Anderson as VP of Investor Relations for AKA, https://www.aka.partners/ka-bio, in which Mr. Kent Anderson reportedly performs for AKA the same functions he previously performed for RealSource.

      n.      By engaging Mr. Howard as VP of Acquisitions. https://www.aka.partners/mdh-bio in which Mr. Howard reportedly performs for AKA the same functions he previously performed for RealSource, and trading on RealSource's reputation and experience to compete with RealSource.  Mr. Howard's "bio" on the AKA website states in relevant part:

> Mike has over 30 years' experience in Commercial Real Estate. The last 10 years have been with RealSource Properties, LLC (www.realsource.net) as a Senior Multifamily Acquisitions Analyst. Mike is also a principle in C&H Development, LLC which specializes in Self-Storage construction and development.
>
> His experience includes investment feasibility and financial analysis, development, as well as sales for both commercial and residential projects.  He has been actively involved in many real estate projects in various capacities, including;

> Investor, Project Fundraising, Consultant, Project Manager,
> Developer, Asset Acquisitions, and Marketing and Sales.

(Emphasis added).

20.     Paragraph 10.10 of the Agreement, entitled, "Specific Performance," states: "The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity."

21.     Paragraph 10.9(a) of the Agreement, entitled, "Governing Law; Dispute Resolution; Submission to Jurisdiction; Waiver of Jury Trial," states:  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Utah without giving effect to any choice or conflict of law provision or rule (whether of the State of Utah or any other jurisdiction).

22.     Pursuant to Fed. R. Civ. P. 65, without a bond, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Anderson and any of his affiliates,  jointly and severally, and other persons who are in active concert or participation with them, from competing with RealSource, or soliciting RealSource's clients on such terms as the court deems reasonable.

23.     To the extent Mr. Anderson or his affiliates have competed with RealSource or solicited its clients, Plaintiffs are entitled to damages including disgorgement of Mr. Anderson's or his affiliates' gross profits, unjust enrichment or a reasonable royalty or such other damage theory as may be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Against Michael Anderson for Breach of

**the Confidentiality Provision of the Agreement)**

24.     Plaintiffs incorporate by reference paragraphs 1 through 14, inclusive, and 16 through 22, inclusive, of this Second Amended Complaint.

25.     Paragraph 7.3 of the Agreement, entitled, "Confidentiality," states:

> From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the RS Entities, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. . . .

26.     RealSource is a third-party beneficiary of this provision of the Agreement.

27.     The confidential information in Paragraph 7.3 of the Agreement includes, but is not limited to, RealSource's Client Lists.  The Client Lists include the names and email addresses, among other information, of current and past investors in direct investment real estate projects.

28.     Mr. Anderson used the names and email addresses on RealSource's confidential Client Lists to solicit and, in some cases, obtain business from current or past RealSource investors.

29.     Pursuant to Fed. R. Civ. P. 65, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Anderson and any of his affiliates,  jointly and severally, and other persons who are in active concert or participation with them, from any actual or threatened misappropriation

of RealSource's confidential Client Lists on such terms as the court deems reasonable. Michael Anderson also should be enjoined from conducting any business with any of the individuals on RealSource's confidential Client Lists.

30.     To the extent Mr. Anderson or his affiliates have used RealSource's confidential Client Lists to obtain any investments in any of their projects, Plaintiffs are entitled to damages, at their election, for disgorgement of Mr. Anderson's or his affiliates' gross profits, unjust enrichment or, alternatively, to Plaintiffs' lost profits or such other damage theory as may be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Against Mr. Howard and Kent Anderson for Tortious Interference with the Agreement and Prospective Economic Relations)**

31.     Plaintiffs incorporate by reference paragraphs 1 through 14, inclusive, and 16 through 22, inclusive, and 24 through 29, inclusive, of this Second Amended Complaint.

32.     Over the years, using degreed economists, RealSource developed a market ranking report program tracking thirty different variables in 200+ real estate markets across the United States (the "Market Ranking Spreadsheet").  Michael Anderson developed the original Market Ranking Spreadsheet.

33.     The data in the Market Ranking Spreadsheet changes regularly, with adjustments to the weight associated with each variable, and the program utilizes the data to rank metropolitan statistical areas.  Mike Madsen, who has a degree in economics, is responsible for gathering the data entered into this spreadsheet for RealSource.

34.     Kent Anderson and Mr. Howard were not involved in the development of the Market Ranking Spreadsheet.  Kent Anderson, however, working with Mr. Madsen, made some cosmetic adjustments to it and added a few sources of data.

35.     All rights to the Market Ranking Spreadsheet were transferred to Mr. Hanks under the Agreement.

36.     Kent Anderson assisted in the development of a property analysis and *pro forma* computer software for RealSource, which is an excel spreadsheet (the "Property Analysis Spreadsheet").  The employees of RealSource collaborated in the construction of the Property Analysis Spreadsheet, which is a working document.  RealSource modifies this Property Analysis Spreadsheet regularly.[1]

37.     The Property Analysis Spreadsheet is used to evaluate different real estate markets.  It contains an underwriting model that may be shared with lenders or institutional investors. The number of lenders is limited, and these lenders keep the Property Analysis Spreadsheet confidential. Institutional investors sign non-disclosure agreements to maintain the confidentiality of the Property Spreadsheet Analysis. RealSource paid Kent Anderson for work he performed on the Property Analysis Spreadsheet in conjunction with other RealSource employees.  RealSource owns the Property Analysis Spreadsheet.

38.     RealSource uses reasonable efforts to keep the Market Ranking Spreadsheet and the Property Analysis Spreadsheet confidential.

---

[1] Kent Anderson claims he developed both the Market Ranking Spreadsheet and Property Analysis Spreadsheet.  *Kent Anderson and Mike Howard v. RealSource Brokerage Services, L.C., and Nathan Hanks*, filed in the Third Judicial District Court as Case No. 190909916.

39.     All rights to and interests in the Property Analysis Spreadsheet were transferred to Mr. Hanks under the Agreement.

40.     Kent Anderson has no legitimate ownership interest or claim in the Property Analysis Spreadsheet.

41.     Kent Anderson and Michael Howard shared the Property Analysis Spreadsheet and Market Ranking Spreadsheet with Michael Anderson and AKA, and the they are now using RealSource's confidential information, contained in the Property Analysis Spreadsheet and the Market Ranking Spreadsheet, for the benefit of AKA.

42.     Mr. Howard and Kent Anderson were agents of RealSource and were under an obligation to keep RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet confidential.  This duty included but was not limited to not sharing those documents with third parties or competitors of RealSource.

43.     While working with RealSource, Mr. Howard and Kent Anderson acquired RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet.  They knew these documents were confidential.

44.      Mr. Howard and Kent Anderson provided RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet to Michael Anderson.

45.     Mr. Howard and Kent Anderson were aware that Michael Anderson intended to use RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet to compete with RealSource.

46.     Michael Anderson used the names and email addresses on RealSource's confidential Client Lists to solicit and, in some cases, obtain business from current or past RealSource investors.

47.     Mr. Howard and Kent Anderson breached their obligations to keep RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet confidential and enabled Michael Anderson to compete with RealSource in breach of the Agreement.

48.     Mr. Howard and Kent Anderson shared the Market Ranking Spreadsheet with Mike Anderson, and the three of them are now using RealSource's confidential information, contained in the Market Ranking Spreadsheet, for the benefit of AKA.

49.      Mr. Howard's and Kent Anderson's breach of their obligation to keep RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet confidential interfered with RealSource's existing and prospective economic relationships.

50.     Mr. Howard's and Kent Anderson's interference with the Agreement was unexcused and unjustified.  They did not have RealSource's consent to disclose the confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet to any third party or provide any confidential information to Michael Anderson to assist Michael Anderson in competing with RealSource.

51.     Pursuant to Fed. R. Civ. P. 65, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Howard and Kent Anderson, and any of their affiliates, jointly and severally, and other

persons who are in active concert or participation with them, from retaining or using

RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property

Analysis Spreadsheet or from soliciting RealSource's clients, on such terms as the court

deems reasonable.

52.     To the extent Mr. Howard or Kent Anderson, or their affiliates, have

competed with RealSource or solicited its clients, or used the Market Ranking

Spreadsheet or used the Property Analysis Spreadsheet to compete with RealSource,

Plaintiffs are entitled to damages including disgorgement of Mr. Howard's, Kent

Anderson's or their affiliates' gross profits, unjust enrichment or a reasonable royalty.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**(Against Mr. Howard and Kent Anderson for Breach of Fiduciary Duty)**

53.     RealSource incorporates by reference paragraphs 1 through 14, inclusive,

and 16 through 22, inclusive, and 24 through 29,inclusive, and 31 through 51, inclusive,

of this Second Amended Complaint.

54.     Mr. Howard and Kent Anderson were agents of RealSource.

55.     As agents of RealSource, Mr. Howard and Kent Anderson owed

RealSource fiduciary duties to keep its information confidential, including RealSource's

Client Lists, which includes the names and email addresses, among other information,

of current and past investors in direct investment real estate projects, the Market

Ranking Spreadsheet and the Property Analysis Spreadsheet. In breach of his fiduciary

duties, Mr. Howard and Kent Anderson provided to Michael Anderson RealSource's

confidential Client Lists, Market Ranking Spreadsheet and Property Analysis

Spreadsheet. Mr. Howard and Kent Anderson were aware that Michael Anderson

intended to use RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet to compete with RealSource.

56.     Mr. Anderson used the names and email addresses on RealSource's confidential Client Lists to solicit and, in some cases, obtain business from current or past RealSource investors.

57.     Mr. Howard's and Kent Anderson's breach of their fiduciary obligations to keep confidential RealSource's Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet enabled Michael Anderson to compete with RealSource.

58.     Pursuant to Fed. R. Civ. P. 65, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Howard and Kent Anderson, and any of their affiliates, jointly and severally, and other persons who are in active concert or participation with them, from retaining or using RealSource's Client Lists or Market Ranking Spreadsheet or Property Analysis Spreadsheet, or from soliciting RealSource's clients, on such terms as the court deems reasonable.

59.     To the extent Mr. Howard or Kent Anderson, or their affiliates, have competed with RealSource or solicited its clients, or used the Market Ranking Spreadsheet or the Property Analysis Spreadsheet to compete with RealSource, Plaintiffs are entitled to damages including disgorgement of Mr. Howard's and Kent Anderson's gross profits, or their affiliates' gross profits, unjust enrichment or a reasonable royalty or such other relief as may be proven at trial.

60.     As a result of their breach of fiduciary duties, RealSource is entitled to recover its attorney fees from Mr. Howard and Kent Anderson.

## FIFTH CLAIM FOR RELIEF
### (All Defendants – Violation of Economic Espionage Act)

61.     Plaintiffs incorporate by reference paragraphs 1 through 13, inclusive, and 15 through 21, inclusive, 23 through 28, inclusive, 30 through 50, inclusive, and 52 through 59, inclusive, of this Second Amended Complaint.

62.     RealSource's confidential Client Lists, Market Ranking and Property Analysis Spreadsheets, distribution system and business plan constitute trade secrets under the Economic Espionage Act, 18 U.S.C. § 1832(a).

63.     Based on Paragraph 7.3 of the Agreement, entitled, "Confidentiality," Mr. Hanks has a vested economic interest in RealSource's confidential trade secrets.

64.     RealSource uses reasonable efforts to keep its Client Lists confidential and to prevent clients, to the extent possible, from knowing the names of other RealSource clients.

65.     While Mr. Howard continued to provide services to RealSource, Mr. Howard surreptitiously provided a copy of RealSource's Client Lists to Mr. Anderson, and Mr. Anderson both accepted and used the confidential Client Lists to market AKA and related projects to current, former and potential RealSource investors.

66.     Mr. Anderson used that Client Lists to solicit investments in AKA's projects.  AKA is Mr. Anderson's affiliate. AKA used the Client Lists.

67.     The Agreement transferred all rights in the confidential Client Lists, the Property Analysis Spreadsheet and the Market Ranking Spreadsheet to RealSource and Mr. Hanks.

68.     While Mr. Howard and Kent Anderson continued to provide services to RealSource, or shortly afterwards, they surreptitiously provided a copy of the Property Analysis Spreadsheet and the Market Ranking Spreadsheet to Michael Anderson. Michael Anderson both accepted, and in conjunction with Mr. Howard and Kent Anderson, used the Property Analysis and Market Ranking Spreadsheet for the benefit of AKA.

69.     AKA provided all or a portion of RealSource's confidential Client Lists to GreenFill Woodland.  AKA is the manager of GreenFill Woodland.

71.     70.     AKA provided all or a portion of RealSource's confidential Client Lists to GreenFill Woodland and used all or a portion of RealSource's confidential Client Lists to solicit investments in GreenFill Woodland Creek Apts, LLC.The preceding acts constitute the conversion of a trade secret in violation of the Economic Espionage Act.

72.     Under the Economic Espionage Act, 18 U.S.C. § 1836(3)(B), Plaintiffs are entitled to damages for actual loss caused by the misappropriation of the trade secret and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss or such other damage theory as may be proven at trial.

73.     Because the trade secrets were willfully and maliciously misappropriated, RealSource is entitled to exemplary damages in an amount not more than two times the amount of the damages awarded under the preceding paragraph of this Complaint.

74.     Further, and in addition to damages under the Economic Espionage Act, 18 U.S.C. § 1836(3)(A)(i), pursuant to Fed. R. Civ. P. 65, RealSource is entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Anderson, AKA, Mr. Howard and Kent Anderson together with any of their affiliates, jointly and severally, and other persons who are in active concert or participation with them, from any actual or threatened misappropriation of Plaintiffs' trade secrets on such terms as the court deems reasonable.  Michael Anderson also should be enjoined from conducting any business with any of the individuals in RealSource's confidential Client Lists.

WHEREFORE, Plaintiffs request the following relief against Defendants as follows:

A.   On the First Claim for Relief, pursuant to Fed. R. Civ. P. 65, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Anderson, and any of his affiliates,  jointly and severally, and other persons who are in active concert or participation with them, from competing with RealSource or soliciting RealSource's clients on such terms as the court deems reasonable.

B.   On the First Claim for Relief, to the extent Mr. Anderson or his affiliates have competed with RealSource or solicited its clients, for a judgment in favor of

Plaintiffs for the disgorgement of Mr. Anderson's or his affiliates' gross profits, unjust enrichment, a reasonable royalty or to Plaintiffs' lost profits or such other damage theory as may be proven at trial.

C.  On the Second Claim for Relief, pursuant to Fed. R. Civ. P. 65, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Anderson and any of his affiliates,  jointly and severally, and other persons who are in active concert or participation with them, from any actual or threatened misappropriation of RealSource's confidential Client Lists on such terms as the court deems reasonable. Michael Anderson also should be enjoined from conducting any business with any of the individuals in RealSource's confidential Client Lists.

D.  On the Second Claim for Relief, to the extent Mr. Anderson or his affiliates have used RealSource's confidential Client Lists or models to obtain any investments in any AKA projects or projects for related entities, Plaintiffs are entitled to damages, at their election, including disgorgement of Mr. Anderson's and his affiliates' gross profits, unjust enrichment, a reasonable royalty or to Plaintiffs' lost profits or such other damage theory as may be proven at trial.

E.  On the Third Claim for Relief, pursuant to Fed. R. Civ. P. 65, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Howard and Kent Anderson, and any of their affiliates,  jointly and severally, and other persons who are in active concert or

participation with them, from using or distributing RealSource's clients list and Market Ranking and Property Analysis Spreadsheets on such terms as the court deems reasonable.

F. On the Third Claim for Relief, for a judgment in favor of Plaintiffs and against Mr. Howard and Kent Anderson, jointly and severally, for the disgorgement of Mr. Howard's, Kent Anderson's or their affiliates' gross profits from using or distributing RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet in an amount to be proven at trial or such other damage theory as may be proven at trial, including a reasonable royalty.

G. On the Fourth Claim for Relief, pursuant to Fed. R. Civ. P. 65, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Howard and Kent Anderson, and any of their affiliates,  jointly and severally, and other persons who are in active concert or participation with them, from using or distributing RealSource's confidential Client Lists, Market Ranking Spreadsheet and Property Analysis Spreadsheet on such terms as the court deems reasonable.

H. On the Fourth Claim for Relief, to the extent Mr. Howard or Kent Anderson, or their affiliates, have competed with RealSource or solicited its clients, for a judgment in favor of Plaintiffs and against Mr. Howard and Kent Anderson, jointly and severally, for the disgorgement of Mr. Howard's, Kent Anderson's

or their affiliates' gross profits in an amount to be proven at trial or such other damage theory as may be proven at trial, including a reasonable royalty.

I.  On the Fifth Claim for Relief, for a judgment in favor of Plaintiffs and against Defendants, jointly and severally, as follows:

a.  For damages for actual loss caused by the misappropriation of the trade secret and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss or such other damage theory as may be proven at trial, including a reasonable royalty.

b.  Because the trade secret was willfully and maliciously misappropriated, for a judgment in favor of RealSource for exemplary damages in an amount not more than two times the amount of the damages awarded under paragraph 41 of this Complaint.

c.  Further, and in addition to damages, under the Economic Espionage Act, 18 U.S.C. § 1836(3)(A)(i), and pursuant to Fed. R. Civ. P. 65, for a temporary restraining order, preliminary injunction and permanent injunction prohibiting Mr. Anderson, Mr. Howard and Kent Anderson, and their affiliates, jointly and severally, and other persons who are in active concert or participation with them, from any actual or threatened misappropriation of RealSource's trade secrets on such terms as the court deems reasonable.  Michael Anderson also should be enjoined

from conducting any business with any of the individuals in

RealSource's confidential Client Lists.

J.  On all Claims for Relief, for a judgment in favor of Plaintiffs and against

Defendants for all of Plaintiffs' attorney fees and costs incurred in this action.

K.  For a judgment in favor of Plaintiffs and against Defendants for such other

and further relief as the Court may deem appropriate.

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b) & (c), on the Third, Fourth and Fifth Claims for

Relief, Plaintiffs demand a jury trial on any issue triable of right by a jury.

Dated: November 23, 2022.

LARSEN & RICO, PLLC

/s/ Mark A. Larsen

_____

Mark A. Larsen
Lisa C. Rico
*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on November 23, 2022, a true and correct copy of the foregoing proposed Third Amended Complaint (Jury Trial Demanded) was served upon the following by email:

Richard F. Ensor (rfensor@michaelbest.com)
Brad R. Jacobsen (brjacobsen@michaelbest.com)
MICHAEL BEST & FRIEDRICH, LLP
170 South Main Street, Suite 1000
Salt Lake City, Utah 84101
Attorneys for Defendant Michael Anderson

Matthew N. Evans
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Attorneys for Defendants Kent Anderson & Michael Howard

/s/ Mark A. Larsen
_____