THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| NATHAN W. HANKS and REALSOURCE EQUITY SERVICES, LLC,<br><br>        Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>MICHAEL S. ANDERSON; AKA PARTNERS, LC; KENT ANDERSON; and MICHAEL HOWARD,<br><br>        Defendants/Crossclaim Plaintiffs,<br><br>v.<br><br>MICHAEL S. ANDERSON,<br><br>        Crossclaim Defendant,<br><br>v.<br><br>REALSOURCE BROKERAGE SERVICES, L.C.; REALSOURCE PROPERTIES, LLC; and DOES 1–100,<br><br>        Third-Party Defendants,<br><br>v.<br><br>REALSOURCE RESIDENTIAL, LLC,<br><br>        Additional Counterclaim Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [208] REALSOURCE'S MOTION FOR SUMMARY JUDGMENT AGAINST KENT ANDERSON'S AFFIRMATIVE CLAIMS**<br><br>Case No. 2:19-cv-00999-DBB-DAO<br><br>District Judge David Barlow |

Before the court is Plaintiffs Nathan Hanks ("Mr. Hanks") and RealSource Equity

Services, LLC's ("RS Equity"), and Third-Party Defendants RealSource Brokerage Services,

LLC ("RS Brokerage") and RealSource Properties, LLC's ("RS Properties") (collectively "RealSource") Motion for Summary Judgment Against Kent Anderson's Affirmative Claims.[1] RealSource moves for summary judgment against Defendant Kent Anderson's ("Mr. Anderson") ten counterclaims. Having reviewed the briefing and relevant law, the court finds oral argument unnecessary.[2] For the reasons below, the court grants RealSource's motion.

## BACKGROUND

RealSource is comprised of three entities: RS Brokerage, RS Equity, and RS Properties. Michael S. Anderson ("Mike Anderson") founded RS Brokerage in 1989.[3] Initially, the company received referral commissions from brokers as part of a buying tour circuit.[4] When RealSource stopped going on tour in 2008,[5] RS Brokerage's importance lessened.[6] Mr. Hanks and Mike Anderson started RS Equity around 2002.[7] RS Equity's purpose is to attract investors to raise equity and buy property.[8] Mr. Hanks has controlled the entity's daily operations since its founding. His responsibilities increased between 2011 and 2013.[9] In 2018, Mr. Hanks became the sole owner and manager.[10] Mr. Hanks and Mike Anderson jointly own RS Properties.[11]

---

[1] Mot. for Summ J. Against Kent Anderson's Affirmative Claims ("MSJ"), ECF No. 208, filed Jan. 10, 2023.
[2] *See* DUCivR 7-1(g).
[3] Am. Countercl. & Third-Party Compl. to the Second Am. Compl. ("Am. Countercl.") ¶ 18, ECF No. 168, filed Jan. 27, 2022; Dep. of Nathan Hanks ("Hanks Dep.") 27:14–15, ECF No. 213-2, filed Feb. 14, 2023.
[4] Hanks Dep. 120:6–14.
[5] *Id.* at 241:2–4.
[6] *Id.* at 119:20–22 (RS Brokerage now does "[v]ery little.").
[7] Hanks Dep. 30:15–25.
[8] *Id.* at 30:24–31:6.
[9] *Id.* at 238:22–239:4.
[10] *Id.* at 116:24–25.
[11] *Id.* at 94:8–16.

In late 2002, Mr. Anderson started working for RealSource.[12] He was a licensed real estate agent who worked as an independent contractor.[13] Michael Howard ("Mr. Howard") also worked as an independent contractor for RealSource.[14] Mr. Anderson never had a written employment agreement with RealSource. Instead, he had an oral agreement that the two parties periodically referenced.[15]

From 2003 to about 2007, Mr. Anderson represented RS Equity on buying tours where he presented to potential investors.[16] He fostered relationships with investors and tracked those investors who were accredited.[17] During this time, Mr. Anderson was the main contact between investors and RealSource.[18]

Mr. Anderson's primary duty at RealSource was to raise equity for property deals.[19] He did so as part of an acquisitions team.[20] The team had broad responsibilities to find, underwrite, present, purchase, manage, and close on properties.[21] To fulfill his role, Mr. Anderson created offering materials such as executive summaries, prescription agreement templates, brochures, and cover emails.[22] He designed performance reporting documents for RS Equity, gathered

---

[12] Anderson Dep. 33:3–4.
[13] *Id.* at 90:19; 98:12–18. Mr. Anderson never held a real estate broker's license. *Id.* at 98:19–21.
[14] Hanks Dep. 32:25–33:5.
[15] Anderson Dep. 90:14–91:20; 91:4–8; ECF No. 224-4, filed Mar. 7, 2023; ECF No. 224-3; ECF No. 224-5.
[16] Anderson Dep. 79:2–9; 88:5–89:8.
[17] *Id.* at 78:10–79:16.
[18] *Id.* at 79:2–16 ("I think he did the first one and I did all the others . . . . I would meet and determine whether or not they were accredited investors first and then get their contact information . . . . I would develop those relationships with those investors at that time to get them accredited and determine their level of interest in working with RealSource Equity Services.").
[19] *Id.* at 91:22–23.
[20] Dep. of Michael Howard ("Howard Dep.") 25:14–20, ECF No. 213-4, filed Feb. 14, 2023; Anderson Dep. 172:9–173:12.
[21] Howard Dep. 25:14–20.
[22] Anderson Dep. 71:18–73:4; 91:21–92:7 ("I would put together all the documents using all the tools that I created for that to raise the equity needed to close the deal."); 116:17–19 ("The land was acquired at that time exactly according to the offering materials that I had put together."); 205:2–8 ("I need a tool . . . that I could then take and put into my offering materials that I created so I could get that out to the investors to advertise it to them.").

information on portfolio diagnostics for RS Equity's investments, created a RealSource customer list, and communicated with investors as RealSource's main point of contact.[23]

To help perform his duties at RealSource, Mr. Anderson developed two tools: a "Property Underwriting Model" and an "Economic Target Model."[24] These tools helped him evaluate specific properties and markets to raise equity.[25] RealSource never signed a licensing agreement or any other formal agreement as to Mr. Anderson's creation of the models.[26] Employees and independent contractors would enter data into the models,[27] and Mr. Anderson would use the data to create executive summaries.[28] The Economic Target Model included RealSource's weighting formula.[29] Employees used parts of the Economic Target Model to develop other market ranking spreadsheets.[30] Mr. Anderson later added other capabilities in response to feedback.[31] He removed the underwriting model's password protection between 2014 and 2015 so that RealSource underwriters would have easier access.[32] And he saved the models to RealSource's server; he did not retain them when he left the company.[33]

RealSource paid Mr. Anderson for raising equity and the "income streams [he] helped create."[34] He received income from acquisition fees, management or operating income, and

---

[23] *Id.* at 73:5–20; 74:2–19; 78:7–16; 92:2–24.
[24] *Id.* at 171:17–173:12.
[25] *Id.* at 39:25–40:9.
[26] Anderson Dep. 39:21–25.
[27] He designed the models to permit "data entry of those who were finding and putting properties under contract." *Id.* at 172:12–16.
[28] *Id.* at 172:3–8.
[29] *Id.* at 187:7–13.
[30] *Id.* at 191:9–12; 192:10–12 ("[T]hey were using elements of my model in his market ranking spreadsheet.").
[31] Anderson Dep. 39:16–18 ("They would give me suggestions and things like that to go in the model and I would go in and write it."); 172:12–16; 202:1–11.
[32] *Id.* at 40:10–20.
[33] *Id.* at 188:9–12.
[34] *Id.* at 89:17–18; 90:12–13.

closing fees on properties from what was termed the "Old Pool."[35] Mr. Anderson received Old

Pool income until his termination from RealSource in 2019.[36]

Around 2009 to 2011, newly acquired properties became part of the "New Pool."[37] On

January 8, 2014, Mr. Hanks informed Mr. Anderson and other RealSource personnel:

> [W]e all need to chat. I remember very clearly what happened with Pinehurst, and
> it sounds like we need to revisit it and clear the air again. The [Old] pool died right
> before Pinehurst.[38] We have discussed this numerous times. Things have changed.
> The pool has changed. And you keep wanting it to hang together. The old days of
> sharing everything are past. We have to look to the future and . . . paying team
> members for their specific efforts and not for the efforts of other pool members.
> Right now we have a pool for the acquisition process and that is it. No pool for
> ongoing asset management fees or backend profits. Sounds like we are not all on
> the same page. Let's meet again and discuss.[39]

Mr. Hanks described the New Pool as "based on peoples' efforts . . . who worked on this, who

helped out, who did this . . . and what their efforts were would be what they got paid."[40] In short,

"[i]f you do the work, you're going to get paid."[41]

Mr. Anderson confirmed two days later in email that "the pool died with Pinehurst and

the transition to allocating income by task."[42] He also stated: "[i]t was never agreed to that there

would be a loss of [the revenue streams]"[43] and "I did not object to sharing the larger

commission because I incorrectly thought I would share in the ongoing and backend income."[44]

Later, Mr. Anderson spoke with Kelly Randall ("Mr. Randall"), RealSource's Chief Financial

---

[35] *Id.* at 89:20–90:13; 107:19–22; 110:17–111:2.
[36] Anderson Dep. 112:25–114:7.
[37] *Id.* at 107:24–109:10.
[38] The Pinehurst property closed in Spring 2012. Howard Dep. 21:21–23.
[39] ECF No. 208-1, at 97. Anderson Dep. 135:25–136:20 (email sent to Mr. Anderson, Mr. Randall, Mike Anderson, and Jeff Rosenbloom); 167:5–11.
[40] Hanks Dep. 146:18–25.
[41] Anderson Dep. 118:1–2.
[42] ECF No. 208-1, at 91.
[43] Anderson Dep. 133:20–23.
[44] ECF No. 208-1, at 91.

Officer ("CFO").[45] Mr. Randall stated that Mr. Anderson's "percentage in all acquisition income and all the income [he] had been receiving was the same, whether or not it was front end or backend."[46]

In Spring 2019, Mike Anderson told his brother, Mr. Anderson, about his new company, AKA Partners ("AKA").[47] Mr. Anderson signed a partnership agreement with AKA a few months later.[48] On October 16, 2019, Mr. Hanks emailed Mr. Anderson a termination notice.[49] Mr. Hanks specified that RealSource had not asked Mr. Anderson to do any work since September 5, 2019.[50] He stated that Mr. Anderson had promised in February 2019 not to work for AKA and RealSource at the same time, but later admitted that he had been doing exactly that.[51] Mr. Hanks further noted that the "policy has always been that a person receives compensation in [three] areas and the person has to be currently working for [RealSource] to earn and be paid this compensation."[52] "It is company policy and practice that when an independent contractor . . . is no longer performing services or works for [RealSource], their pay stops. Acquisition fees and relative bonuses are earned when a property is acquired and the loan closes."[53] Mr. Hanks said that Mr. Anderson had "been paid for all [RealSource] properties [he] performed services for and that have closed during [his] time at [RealSource]."[54]

---

[45] Dep. of Kelly Randall ("Randall Dep.") 16:14–23; 25:24–25; 82:8–10, ECF No. 213-3, filed Feb. 14, 2023.
[46] Anderson Dep. 137:7–11.
[47] *Id.* at 15:6–21; 21:25–23:20; Dep. of Michael Anderson 39:5–15, ECF No. 224-1, filed Mar. 7, 2023.
[48] Anderson Dep. 11:7–14; 15:4–5 ("**Q: So are you a member of AKA?** A: Yes. I'm a partner."); 17:9–17.
[49] ECF No. 224-5, at ¶ 8, filed Mar. 7, 2023.
[50] *Id.* ¶ 1.
[51] *Id.* ¶ 5.
[52] *Id.* ¶ 6.
[53] *Id.* ¶ 7.
[54] ECF No. 224-5, at ¶ 7.

Mr. Hanks and RS Equity filed their Complaint on December 27, 2019 against Mike Anderson.[55] On February 13, 2020, they amended the Complaint to include Mr. Anderson and Mr. Howard as defendants.[56] On September 4, 2020, Mr. Anderson and Mr. Howard filed their Amended Answer and Counterclaim, alleging ten causes of action.[57] The two defendants amended their filing on January 27, 2022.[58] RealSource moved for summary judgment on January 10, 2023 against Mr. Anderson only.[59] Mr. Anderson filed a response on February 14, 2023.[60] RealSource submitted a reply on March 7, 2023.[61] A week later, Mr. Anderson filed evidentiary objections.[62]

## STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[63] "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[64] The court "view[s] the evidence and draw[s] all reasonable inferences" in favor of the nonmoving party.[65]

---

[55] ECF No. 2.
[56] ECF No. 4.
[57] ECF No. 72.
[58] ECF No. 168.
[59] *See* MSJ.
[60] Opp'n to RealSource's Mot. for Summ. J. ("Opp'n"), ECF No. 212, filed Feb. 14, 2023.
[61] Reply Mem. in Support of RealSource's Mot. for Summ. J. ("Reply"), ECF No. 223, filed Mar. 7, 2023.
[62] Evid. Obj. & Resps. to Evid. Objs. ("Evid. Obj."), ECF No. 226, filed Mar. 14, 2023.
[63] Fed. R. Civ. P. 56(a).
[64] *Janny v. Gamez*, 8 F.4th 883, 898 (10th Cir. 2021), *cert. dismissed sub nom. Carmack v. Janny*, 142 S. Ct. 878 (2022).
[65] *Brigham v. Frontier Airlines, Inc.*, 57 F.4th 1194, 1196 (10th Cir. 2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[66] "The movant may carry this burden 'by "showing"—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case.'"[67] "The burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'"[68] Such facts may include citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."[69]

## DISCUSSION

RealSource contends the court should grant it judgment as a matter of law on Mr. Anderson's ten counterclaims. Before turning to RealSource's arguments, the court addresses two evidentiary objections.

### I.   Evidentiary Objections

"[I]t is well settled in this circuit that [courts] can consider only admissible evidence" in deciding a motion for summary judgment.[70] Parties do not have to "produce evidence in a form that would be admissible at trial[.]"[71] But the underlying "content or substance of the [evidence] must be otherwise admissible[.]"[72] For instance, "any hearsay contained in a summary judgment

---

[66] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).
[67] *In re Rumsey Land Co.*, 944 F.3d 1259, 1271 (10th Cir. 2019) (quoting *Celotex*, 477 U.S. at 325).
[68] *Id.* (quoting *Anderson*, 477 U.S. at 248 (1986)).
[69] Fed. R. Civ. P. 56(c)(1)(A).
[70] *Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 936 (10th Cir. 2022) (citation omitted).
[71] *Celotex*, 477 U.S. at 324.
[72] *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1272 (10th Cir. 2021) (emphasis removed) (quoting *Johnson v. Weld County*, 594 F.3d 1202, 1210 (10th Cir. 2010)).

affidavit remains hearsay, beyond the bounds of the court's consideration."[73] With the standard in mind, the court turns to the evidentiary issues.

### A.   The Compensation Worksheets

One RealSource exhibit consists of compensation worksheets showing money paid to employees and independent contractors on various properties. Mr. Anderson contends the worksheets are inadmissible hearsay. RealSource responds that Mr. Anderson could access the worksheets "early in this lawsuit" and that the business record exception applies.[74]

Hearsay is a statement "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[75] Unless federal statutes or rules provide otherwise, hearsay is inadmissible.[76]

The worksheets are hearsay. They are out-of-court statements offered to prove the truth of the matter asserted: Mr. Anderson's compensation at RealSource. Accordingly, the worksheets "must either qualify as nonhearsay or conform to an exception to the hearsay rule."[77]

RealSource argues Federal Rule of Evidence 803(6) applies. "To satisfy th[is] exception, the business record must have been prepared in the normal course of business, made near the time of the events at issue, based on the knowledge of someone with a business duty to transmit such information, and there must be an indication that the methods, sources, and circumstances of preparation were trustworthy."[78] "[A]ll these conditions [must be] shown by the testimony of

---

[73] *Id.* (quoting *Johnson*, 594 F.3d at 1210).
[74] Reply 6.
[75] Fed. R. Evid. 801.
[76] Fed. R. Evid. 802.
[77] *Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1211 n.4 (10th Cir. 2022).
[78] *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018).

the custodian or another qualified witness, or by a certification . . . ."[79] "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[80] The opposing party is "under no obligation to affirmatively disprove the applicability of the business records exception."[81]

RealSource argues the compensation worksheets "were produced to [Mr. Anderson] early in this lawsuit" and that the worksheets qualify under the business records exception.[82] For the exception to apply, RealSource must show that the worksheets were prepared in the normal course of business, that someone made them at or near the time of the events at issue, and that the worksheets were created with the knowledge of a person with a business duty.

It has not done so. None of the worksheets indicate a date of origin or their creator.[83] Mr. Hanks said he believed Mr. Randall or "someone in the accounting department" prepared the income distribution worksheets.[84] Mr. Randall stated he made payments based on spreadsheets[85] and produced certain worksheets.[86] But Mr. Randall did not testify as to when, how, or why he or someone else created the worksheets. While he confirmed RealSource kept some records,[87] Mr. Randall did not say if doing so was a regular business practice.

---

[79] Fed. R. Evid. 803(6)(D).
[80] *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 999 n.15 (10th Cir. 2019) (quoting Fed. R. Evid. 803(6) adv. comm. cmt.).
[81] *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012).
[82] Reply 6; Fed. R. Evid. 803(6).
[83] *See* ECF No. 224-2.
[84] Hanks Dep. 149:1–10; 152:12–15.
[85] Randall Dep. 139:13–23.
[86] *Id.* at 138:14–17 (Income Distribution Worksheet, Property: Stratford Apartments); 140:6–8 (Income Distribution—AMF, Period: Jun-16); 141:6–9 (Income Distribution—Monthly, Period: 2005); 143:11–13 (Heron Walk Disposition Compensation Schedule).
[87] *Id.* at 126:3–7.

In sum, RealSource has not met its burden to show admissibility for the compensation worksheets. For this reason, the court will not consider the worksheets here.[88]

### B.    Mr. Hanks's January 8, 2014 Email

Mr. Anderson argues a January 8, 2014 email from Mr. Hanks about compensation is inadmissible hearsay.[89] RealSource contends it does not offer the email to prove the truth of the matter asserted, but rather as evidence of Mr. Anderson's knowledge or notice.[90]

"An out-of-court statement is not hearsay, and a . . . court may properly admit it 'if the statement is offered not for the truth of the matter asserted in the statement but merely to show that a party had knowledge of a material fact or issue.'"[91] The email in question is a response from Mr. Hanks to Mr. Anderson's email sent earlier that day. In his email, Mr. Anderson stated he "was surprised to learn that the . . . annual asset management fees will not be allocated to the pool monthly distributions . . . . [He] was not aware of [sic] this income was not being distributed."[92] Thus, Mr. Hanks's email response several hours later is evidence that Mr. Anderson knew about the revised income distribution model. The email stated: "Sounds like we all need to chat. . . . [I]t sounds like we need to revisit it and clear the air again. . . . We have discussed this numerous times. Things have changed. The pool has changed. . . . Sounds like we

---

[88] Mr. Anderson seeks to admit one compensation worksheet. ECF No. 226-1. He argues that if the court allows RealSource's worksheets, the rule of completeness allows him to introduce other worksheets. ECF No. 226, at 3; Fed. R. Evid. 106. "The rule of completeness, both at common law and as partially codified in Rule 106, functions as a defensive shield against potentially misleading evidence proffered by an opposing party." *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001). But "[o]nly the portions of a statement that are relevant to an issue in the case and necessary to explain or clarify the already-admitted portions need be admitted." *United States v. Williston*, 862 F.3d 1023, 1038 (10th Cir. 2017). Since the court does not consider RealSource's worksheets, the court need not address Mr. Anderson's proffered worksheet.

[89] ECF No. 208-1, at 97.

[90] Reply 15–16.

[91] *Walker v. Bd. of Trustees*, 69 F. App'x 953, 963 (10th Cir. 2003) (unpublished) (quoting *Echo Acceptance*, 267 F.3d at 1090).

[92] ECF No. 208-1, at 97.

are not all on the same page—let's meet again and discuss."[93] As a result, RealSource may offer

the email to show Mr. Anderson's knowledge and notice.[94]

## II.   Counterclaims

Mr. Anderson brings ten counterclaims against RealSource. The counterclaims comprise

three categories: compensation claims, a trade secret claim, and what the parties refer to as

"housekeeping" matters. Compensation counterclaims include actions for theft, conversion,

breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing,

unjust enrichment, and intentional interference with prospective economic relations. Mr.

Anderson asserts one count of misappropriation of trade secrets. Last, the "housekeeping" counts

include demands for an accounting and declaratory relief. The court first analyzes whether

summary judgment is proper on the compensation counterclaims.

### A.   Compensation Counterclaims

RealSource offers several arguments as to why summary judgment is proper on the

compensation counterclaims. The court first addresses the argument that the economic loss rule

precludes several causes of action.

#### 1.   Economic Loss Rule

RealSource contends the economic loss rule bars Mr. Anderson's counterclaims for theft,

conversion, intentional interference with economic relations, and unjust enrichment. It argues an

alleged contractual duty existed to pay Mr. Anderson for his work—not an independent duty to

---

[93] *Id.*
[94] Because the court accepts RealSource's primary argument for admission, it does not consider RealSource's alternative arguments for admission. *See* Reply 15.

compensate him. As such, it asserts Mr. Anderson can pursue an action for breach of contract, but not tort claims implicating the same facts.

Mr. Anderson offers two responses. He contends RealSource's argument fails because the company has not admitted that a contract existed between the two parties. And he contends RealSource owed him an independent duty "not to take property that belongs to another."[95]

"The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care."[96] The rule has "two complementary yet distinct applications."[97] If there is no contract between two parties, the rule "bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury."[98] Should a contract exist, "the economic loss rule requires that 'when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort.'"[99] "[W]here the party's tort claim is a mere duplication of its breach of contract claim, there is no exception to the economic loss rule."[100] But "if the tort claim alleges a breach of a duty that is separate and

---

[95] Opp'n 24 (quoting *AAAG-Cal., LLC v. Kisana*, 439 F. Supp. 3d 1265, 1276 (D. Utah 2020)).
[96] *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, 28 P.3d 669, *holding modified by Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2010 UT 6, 230 P.3d 1000.
[97] *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶ 12, 435 P.3d 193.
[98] *Sunridge Dev.*, 2010 UT 6, ¶ 28.
[99] *Rain Int'l, LLC v. Cook*, No. 2:20-cv-00537, 2023 WL 1954526, at *3 (D. Utah Feb. 10, 2023) (quoting *HealthBanc Int'l*, 2018 UT 61, ¶ 12).
[100] *HealthBanc Int'l*, 2018 UT 61, ¶ 10.

distinct from any contractual duty existing between the parties, the . . . plaintiff can proceed with that separate, non-contract claim."[101]

Mr. Anderson had an agreement with RealSource. The company paid Mr. Anderson as an independent contractor.[102] His main duties included contacting clients, raising money for deals, and producing executive summaries.[103] While Mr. Anderson notes there was no written employment contract, he affirms there was an oral agreement[104]—one that he confirmed through email, compensation worksheets, and commissions.[105]

In support, Mr. Anderson cites a Utah case where the court found no contract between the husband of the plaintiff and the defendant because the husband was not a party to the settlement agreement.[106] Indeed, courts have not applied the contract prong of the economic loss rule if there is "no allegation that [an individual] is a party to the contract[.]"[107] Here, the evidence shows the opposite—that Mr. Anderson formed an agreement with RealSource[108] that created "express or implied contractual dut[ies]."[109]

And as noted earlier, even where there is no contract, the economic loss rule "bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage

---

[101] *KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶ 72, 436 P.3d 151 (citing *Gables*, 2018 UT 04, ¶ 48, 417 P.3d 95).
[102] Hanks Dep. 32:25–33:5.
[103] *Id.* at 123:1–124:10.
[104] Anderson Dep. 90:14–91:4.
[105] *Id.* at 91:4–10; 162:6–163:21.
[106] *Larson v. Stauffer*, 2022 UT App 108, ¶ 32, 518 P.3d 175.
[107] *BMF Advance, LLC v. Litiscape, LLC*, No. 2:21-cv-00103, 2022 WL 14644642, at *10 (D. Utah Oct. 25, 2022).
[108] Anderson Dep. 139:24–140:2 ("I did create that income stream and I was entitled that according to our original agreement and so I still object to that and I'll probably be adding that to our lawsuit."); 162:2–5 ("I was promised income on that and I was supposed to get all three income streams. That was the agreement and I got paid nothing.").
[109] *Larson*, 2022 UT App 108, ¶ 32.

to other property or bodily injury."[110] Here, there is no allegation or evidence that Mr. Anderson experienced physical damage to other property or bodily injury.

The question is whether the counterclaims for theft, conversion, intentional interference with economic relations, and unjust enrichment relate to Mr. Anderson's contractual duties. The court reviews the counts in order.

### (a)  The Economic Loss Rule Bars the Theft Counterclaim.

Mr. Anderson alleges RealSource committed theft when it "retain[ed] Legacy Income and commission payments belonging to [him], and s[old] properties in which [he] ha[s] an interest without paying [him] what is owed" "with the intent to deprive [him] of [his] property."[111] Under Utah law, theft occurs when a person "receives, retains, or disposes of the property of another knowing that the property is stolen, or believing that the property is probably stolen, or who conceals, sells, withholds, or aids in [such actions], knowing or believing the property to be stolen, intending to deprive the owner of the property."[112] "The gravamen of theft by receiving stolen property in a case such as this is simply possession of the property with the required mental states, i.e., knowledge or belief that the property is stolen and the intent to deprive the owner of the property."[113]

"Utah courts have yet to [specifically] address whether the economic loss rule may preclude statutory civil theft claims."[114] Yet it is clear that "[i]f the tort alleges a breach of a duty

---

[110] *Sunridge Dev.*, 2010 UT 6, ¶ 28.
[111] Am. Countercl. ¶ 95–96. "Legacy Income" is the compensation Mr. Anderson asserts RealSource owes him from the Old Pool income and the New Pool income. *Id.* ¶ 52.
[112] Utah Code Ann. § 76-6-408(2) (West 2022).
[113] *State v. Stevens*, 2011 UT App 366, ¶ 13, 264 P.3d 555.
[114] *Preventive Energy Sols., LLC v. nCap Ventures 5 LLC*, No. 2:16-cv-00809, 2017 WL 87028, at *10 (D. Utah Jan. 10, 2017).

that the contract itself imposes . . . the plaintiff can sue only for contract-based remedies."[115] If Mr. Anderson's contract and theft counterclaims are "inextricably intertwined" so that theft cannot be proven without proving a breach of contract, then the economic loss doctrine prevents Mr. Anderson from pursuing the theft cause of action.[116]

Mr. Anderson alleges RealSource unlawfully retained certain Legacy Income revenues and commission payments and failed to pay him "what is owed."[117] The breach of contract counterclaim requires Mr. Anderson to prove that RealSource owed and failed to pay Legacy Income and various commissions.[118]

The two causes of actions are inextricably intertwined. Mr. Anderson cannot show that RealSource wrongfully refused to pay him without first proving the existence of an agreement and proving RealSource breached that agreement. He has not shown he was entitled to payment for helping acquire properties outside of what the agreement contemplated.[119] Simply put, "the success of [Mr. Anderson]'s theft counterclaim turns on [RealSource's] obligations under the terms of the [agreement]."[120] The fact that everyone may owe a duty "not to take property that belongs to another" does not excuse Mr. Anderson from showing a duty independent from

---

[115] *Ward v. McGarry*, 2022 UT App 62, ¶ 22, 511 P.3d 1213, *reh'g denied* (July 6, 2022), *cert. denied*, 526 P.3d 828 (Utah 2022).

[116] *Preventive Energy Sols.*, 2017 WL 87028, at *10 (quoting *W. Convenience Stores, Inc. v. Thielen*, No. 09–cv–02626, 2011 WL 866755, at *7 (D. Colo. Mar. 14, 2011)); *see Otter Prod., LLC v. Stage Two Nine, LLC*, No. 18-cv-01724, 2019 WL 570642, at *9 (D. Colo. Jan. 15, 2019), *R. & R. adopted*, 2019 WL 568477 (D. Colo. Feb. 12, 2019).

[117] Am. Countercl. ¶ 95.

[118] *Id.* ¶ 109.

[119] *E.g.*, Anderson Dep. 126:1–9 ("As I said before, my job was to raise equity for the deals. By [sic] there was no distinction on any pool member as to whether or not they contributed to the ongoing or backend or anything like that. They were to receive all three income streams. Each person had their responsibilities for the three income streams that they created. And we all shared in those three income streams. That was the deal. *That was the agreement*." (emphasis added)).

[120] *Preventive Energy Sols.*, 2017 WL 87028, at *10.

RealSource's contractual obligations.[121] No rational trier of fact could find an independent duty. The economic loss rule thus bars Mr. Anderson's theft counterclaim.

### (b)    The Economic Loss Rule Bars the Conversion Counterclaim.

Mr. Anderson next brings a counterclaim for conversion. "A conversion is an act of [willful] interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession."[122] Mr. Anderson alleges RealSource has "unlawfully exercised dominion and control over property belonging to [him], including money[,] . . . [and] RealSource . . . ha[s] intentionally interfered with property and assets belonging to [him] and has deprived [him] of the possession and use of that property."[123]

The analysis is similar to the discussion on theft. Here, Mr. Anderson claims RealSource interfered or deprived him of his property and assets. But Mr. Anderson purportedly has a right to such property and assets only through his agreement with RealSource. He has already brought a breach of contract action.[124] His conversion counterclaim is based on the same allegations. Consequently, the economic loss rule bars the action for conversion.

---

[121] *AAAG-Cal*, 439 F. Supp. 3d at 1276. Mr. Anderson's reliance on *AAAG-Cal.* is misplaced. In *AAAG-Cal.*, the plaintiffs delivered a set of cars to the defendants but held the titles to secure payment. The defendants later stole the titles. The court found that the defendants never had legal title to the cars and so they breached an independent duty not to steal. Here, Mr. Anderson claims RealSource owed him money pursuant to an agreement. But no facts support the proposition that RealSource stole money or property from Mr. Anderson. The opposite is true. Mr. Anderson's right to receive payment from RealSource depended on him fulfilling his contractual duties.

[122] *Pinder v. Duchesne Cnty. Sheriff*, 2020 UT 68, ¶ 41, 478 P.3d 610 (quoting *Allred v. Hinkley*, 328 P.2d 726, 728 (Utah 1958)). "Chattel" is any "movable or transferable property" such as money or personal property. *Chattel*, *Black's Law Dictionary* (11th ed. 2019).

[123] Am. Countercl. ¶ 101.

[124] *Id.* ¶¶ 107–10.

(c)   **The Economic Loss Rule Bars the Intentional Interference with Prospective Economic Relations Counterclaim.**

Mr. Anderson also alleges RealSource "intentionally interfered with [his] relationships with [hi]s clients and future clients through theft of money and by using improper means to interfere with [his] roles as [an] independent contractor[] generally and specifically with [his] relationship[] with AKA."[125] His arguments resolve to alleging RealSource improperly terminated him and failed to pay him.[126]

The tort of intentional interference with economic relationships "includes interference with both existing and prospective contracts."[127] "To establish a claim . . . , a plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff."[128]

Traditionally, "the economic loss rule h[eld] that 'economic damages are not recoverable in negligence absent physical property damage or bodily injury.'"[129] Many years ago, the Utah Supreme Court suggested in dicta that "plaintiffs may recover purely economic losses in cases involving intentional torts such as fraud, business disparagement, and intentional interference with contract."[130] Later, the court adopted the independent duty interpretation and stated that its dicta was no longer persuasive.[131] "When an independent duty exists, the economic loss rule

---

[125] *Id.* ¶ 125.

[126] As his co-defendant Mr. Howard contends, RealSource allegedly "kept a good portion of what [Mr. Anderson] and [he] [we]re due." Howard Dep. 87:7–11.

[127] *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 11, 437 P.3d 343.

[128] *Behav. Med. Consulting, LLC v. CHG Cos.*, No. 2:19-cv-00967, 2022 WL 889030, at *6 (D. Utah Mar. 25, 2022) (citing *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015)).

[129] *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208 F. Supp. 3d 1193, 1197 (D. Utah 2016) (quoting *SME Indus.*, 2001 UT 54, ¶ 32).

[130] *SME Indus.*, 2001 UT 54, ¶ 32 n.8 (citing *Am. Towers Owners Ass'n, Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1190 n.11 (Utah 1996), *abrogated by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234).

[131] *See Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 49, 70 P.3d 1.

does not bar a tort claim 'because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.'"[132] And "Utah's common law does not currently recognize a blanket intentional torts exception to the economic loss rule."[133]

The threshold question is whether RealSource allegedly breached a duty separate and distinct from that arising from a contractual relationship. Mr. Anderson proposes no such independent duty and the court can find none. The only independent duty Mr. Anderson argues exists is a duty "not to take property that belongs to another."[134] His allegation is a repackaged breach of contract counterclaim. To this end, there is no dispute of material fact that his agreement with RealSource relates to these very topics.[135]

Even if the evidence showed RealSource breached an independent duty, Mr. Anderson identifies no record evidence of actual improper interference with existing or potential economic relations sufficient for a reasonable jury to find in his favor. "The improper-means requirement 'is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules.'"[136] Such means include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]."[137] Here, Mr. Anderson alleges

---

[132] *Hermansen v. Tasulis*, 2002 UT 52, ¶ 17, 48 P.3d 235 (quoting *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000)).

[133] *HealthBanc Int'l*, 208 F. Supp. 3d at 1198 (citing Utah Code Ann. § 78B–4–513(5) (West 2008)).

[134] Opp'n 24 (quoting *AAAG-Cal.*, 439 F. Supp. 3d at 1276).

[135] ECF No. 224-5 ("When we came to an agreement in February that RS would pay you significantly more each month, we did so in reliance on your representation and promise that you would not perform services for AKA while you were performing services for RS."); Anderson Dep. 61:11–23; 103:16–104:5; 80:3–83:15 (discussing whether client lists created by Mr. Anderson belonged to RealSource); Hanks Dep. 32:2–12 ("Kent [Anderson] was responsible for putting together what we called executive summaries and property packages that we would take to our client base, and he would also contact our clients to raise funds for those projects.").

[136] *SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1083 (10th Cir. 2018) (quoting *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982), *overruled on other grounds by Eldridge*, 345 P.3d at 553).

[137] *C.R. England*, 2019 UT 8, ¶ 42 (citation omitted).

RealSource stole money, acted in a "willful and malicious" manner, and "use[d] improper means to interfere with [his] role as [an] independent contractor generally . . . ."[138] But the record is bereft of evidence as to how RealSource allegedly did so. Unsupported allegations are not enough to survive summary judgment.

Neither does Mr. Anderson offer record evidence of a sufficient injury. "Driving away an individual's existing or potential customers is the archetypical injury [intentional interference with economic relations] was devised to remedy."[139] While Mr. Anderson may allege such facts in his Counterclaim,[140] he identifies no record evidence to support his allegations. He has not shown that he "lost [even] one customer, or suffered financial injury from that lost customer."[141]

No rational jury could find that RealSource intentionally interfered with Mr. Anderson's economic relationships. The court therefore grants summary judgment for RealSource.[142]

### 2.  Mr. Anderson Does Not Show RealSource Owed Him a Fiduciary Duty.

RealSource moves for summary judgment on Mr. Anderson's breach of fiduciary duty counterclaim. Mr. Anderson asserts RealSource owed him three duties: "to not steal or convert any assets belonging to [him,] . . . to not engage in any acts that would create a conflict of interest between the RealSource . . . and [himself,] and to refrain from engaging in undisclosed transactions for the [sic] RealSource['s] benefit."[143] Allegedly, RealSource breached its duties by

---

[138] Am. Countercl. ¶¶ 125–26, 127.
[139] *SCO Grp.*, 879 F.3d at 1082 (quoting *Leigh Furniture*, 657 P.2d at 306).
[140] Am. Countercl. ¶¶ 125–26.
[141] *Park Cityz Realty, LLC v. Archos Cap., LLC*, No. 2:20-cv-00522, 2021 WL 4991717, at *13 (D. Utah Oct. 27, 2021).
[142] RealSource summarily states that the economic loss rule bars Mr. Anderson's unjust enrichment cause of action. *See* MSJ 11. RealSource does not adequately develop this argument. At any rate, because Utah's Real Estate Licensing and Practices Act precludes the unjust enrichment counterclaim, the court need not address this counterclaim further.
[143] Am. Countercl. ¶ 103.

"stealing money" (not paying Mr. Anderson Legacy Income and commissions), creating

conflicts of interest, and engaging in undisclosed transactions and self-dealing.[144]

RealSource argues that as a principal, it owed no fiduciary duties to a sophisticated

independent contractor like Mr. Anderson who was trained and licensed as a real estate agent. It

contends Mr. Anderson's counterclaim fails as a matter of law. Mr. Anderson claims he never

acted as RealSource's real estate agent and so RealSource owes him fiduciary duties. He argues

the unequal power and knowledge disparity between himself and RealSource created a duty. As

such, he contends RealSource breached this duty when they failed to disclose how they allocated

income for the purchase, management, and sale of Old Pool and New Pool properties.[145]

In short, Mr. Anderson argues RealSource owes him these alleged fiduciary duties

separate from its contractual duties to pay him compensation and commissions.[146] "A fiduciary

relationship results from the manifestation of consent by one person to another that the other

shall act on his behalf and subject to his control, and consent by the other so to act."[147] "The

existence of [such] a duty entails a question of law."[148] "To determine whether a duty arises

outside of a contract, we analyze the nature of the parties' relationship. In general, the more

attenuated the relationship, the less likely a duty exists."[149] "[S]ome individuals, such as real

estate agents or real estate appraisers, may assume fiduciary duties pursuant to a statute or a

license."[150] "[R]elationships that involve disparities in knowledge, sophistication, or bargaining

---

[144] *Id.* ¶ 104.
[145] Opp'n 25–26.
[146] *See HealthBanc Int'l*, 208 F. Supp. 3d at 1199.
[147] *City of Grantsville v. Redevelopment Agency of Tooele City*, 2010 UT 38, ¶ 42, 233 P.3d 461 (cleaned up).
[148] *Donner v. Nicklaus*, 778 F.3d 857, 873 (10th Cir. 2015).
[149] *Id.* (citations omitted).
[150] *HealthBanc Int'l*, 208 F. Supp. 3d at 1199.

power may create common-law fiduciary duties on the part of the advantaged party."[151] "Where a disparity in one or more of these circumstances distorts the balance between the parties in a relationship to the degree that one party is exposed to unreasonable risk, the law may intervene by creating a duty on the advantaged party to conduct itself in a manner that does not reward exploitation of its advantage."[152] "[A] fiduciary duty generally does not arise in a business transaction absent extraordinary circumstances."[153]

Even assuming Mr. Anderson did not work as a real estate agent for RealSource, Mr. Anderson cannot prevail on his counterclaim. The facts show that Mr. Anderson and RealSource dealt at arms-length with each other. The parties agree that Mr. Anderson was an independent contractor.[154] In that vein, he had an agreement with Mr. Hanks and RealSource that he confirmed several times.[155] Over the years, Mr. Anderson received compensation and commissions further reflecting his agreement.[156] What is more, he stated in his deposition that "any work product that [he] created as an independent contractor [wa]s [his] unless there [wa]s an agreement otherwise."[157] There is no genuine dispute that Mr. Anderson was knowledgeable as to his rights and sophisticated in his area of expertise.

---

[151] *Id.*; *see KAM Fin. v. Silverleaf Fin.*, No. 2:12-cv-01111, 2015 WL 1432610, at *13 (D. Utah Mar. 27, 2015) ("[A] fiduciary duty can exist where one party has decidedly greater access to information than the other." (quoting *Ong Int'l (USA), Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 454 (Utah 1993))).

[152] *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 16, 143 P.3d 283.

[153] *Behav. Med. Consulting*, 2022 WL 889030, at *5 ("[M]ost business relationships or contractual relationships . . . do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial or business transactions." (quoting 37 C.J.S. *Fraud* § 11 (2008))); *see HealthBanc Int'l*, 208 F. Supp. 3d at 1199 (citing *Grynberg*, 2003 UT 8, ¶¶ 48–56).

[154] Anderson Dep. 90:18–19 ("I was an independent contractor."); Hanks Dep. 32:25–33:9 ("They were paid as independent contractors.").

[155] Anderson Dep. 91:1–10.

[156] *Id.* at 91:8–10.

[157] *Id.* at 32:24–33:2; 188:21–23.

Mr. Anderson was also a member of a revenue pool and received income for properties acquired throughout his tenure with RealSource.[158] He argues Mr. Hanks was "secretive about allocation of income through the pool, solely controlled distributions, and refused to provide details of payments made under the pool."[159] Even if Mr. Hanks did not share with Mr. Anderson the full income allocations, Mr. Anderson could have attempted to obtain the information through Mr. Randall,[160] or his brother and RealSource co-owner, Mike Anderson.[161] Tellingly, Mr. Anderson was not an employee, owner, partner, or manager. He was an independent contractor.[162] In effect, Mr. Anderson contends employers have a duty to tell their contractors what the business is making or what other contractors receive. But "[i]ndependent contractor status is not within the realm of 'certain special' or 'extraordinary' business relationships that Utah has previously determined warrant fiduciary duties, such as in the context of escrow agents, attorney-client relationships, and business partners."[163]

For these reasons, Mr. Anderson's counterclaim for breach of fiduciary duty fails as a matter of law. The court finds summary judgment for RealSource proper on this count.

---

[158] *Id.* at 105:21–109:6.

[159] Opp'n 25; Anderson Dep. 137:11–14 ("And that's also evidenced by the commission worksheets that they kept secret from me that I found out in discovery the house received the normal 50 percent share.").

[160] Anderson Dep. 137:6–10 ("Because Kelly Randall told me right around this time period that my percentage in all acquisition income and all the income I had been receiving was the same, whether or not it was front end or backend. It never changed.").

[161] *Id.* at 140:17–142:17 ("**Q: Did you ever go to your brother and say, like, for instance, this, say, 'Hey, Mike, you're my brother. Nate's got this completely wrong that the new structure isn't just the acquisition process. There's still a pool for ongoing asset management fees or backend profits'?** A: If I talked to him, it was very few times. Mike asked me to try to get along with Nate. And so for the most part I did not include him in any of this correspondence, and his job was oversight as the principal broker, that was the responsibility of Nate and Kelly and principals of the company to do that, to take that to them. It wasn't my job. And Mike wanted me just to work it out with Nate and to try to get along with him.").

[162] *Id.* at 188:21 ("I'm an independent contractor."); Hanks Dep. 32:25–33:2 ("**Q: Were both Kent Anderson and Michael Howard employees or independent contractors?** A: They were paid as independent contractors.").

[163] *Behav. Med. Consulting*, 2022 WL 889030, at *5 n.3 (citations omitted).

      **3.**    **Utah's Real Estate Licensing and Practices Act Bars Mr. Anderson's Compensation Counterclaims.**

RealSource argues Utah's Real Estate Licensing and Practices Act (the "Licensing Act"), Utah Code § 61-2f-409, bars Mr. Anderson from suing anyone other than his principal broker. Section 409(2)(a) states that a "sales agent or associate broker may not sue in [their] own name for the recovery of a fee, commission, or compensation for services as a sales agent or associate broker unless the action is against the principal broker with whom the [individual] is or was affiliated."[164] RealSource argues Mr. Anderson is a "sales agent" because he worked for RS Equity to evaluate properties for acquisition, market the properties to investors, and acquire properties. It also argues Mr. Anderson was not a broker. As such, RealSource contends Mr. Anderson can sue only his principal broker, Mike Anderson.[165]

Mr. Anderson claims he never worked as a real estate agent for RealSource. He argues that he never provided "services as a sales agent" because he received compensation only for raising equity among investors.[166] Mr. Anderson contends the Utah statute exists to protect the public and not an entity "that hired someone to 'raise equity' and now seeks to avoid the compensation owed to that contractor."[167]

The court starts with the statutory text.[168] "A sales agent or associate broker . . . may not sue . . . for the recovery of . . . compensation or services as a sales agent or associate broker unless the action is against the principal broker . . . ."[169] Neither party contends Mr. Anderson is

---

[164] Utah Code Ann. § 61-2f-409(2)(a) (West 2013).
[165] MSJ 13–15 (citing § 61-2f-409).
[166] Opp'n 27–28.
[167] *Id.* at 28.
[168] *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021) ("We begin, as we always do, with the statute's text.").
[169] Utah Code Ann. § 61-2f-409(2)(a) (West 2013).

an associate broker. The question is whether he was a sales agent for purposes of the statute. A "sales agent" is an individual who is licensed as a sales agent and who is "affiliated with a principal broker, either as an independent contractor or an employee . . . , to perform for valuable consideration an act described in Subsection (20)[.]"[170] This subsection sweeps broadly. It includes an individual who "assists or directs in the procurement of prospects for or the negotiation of a [real estate] transaction" or "assists or directs in the closing of a real estate transaction with the expectation of receiving valuable consideration[.]"[171]

Utah courts have held that the statute applies to a "finder" who receives compensation for his "efforts in bringing the parties together" for real estate transactions.[172] "The act of finding or locating a prospective buyer falls within the reach of the broker licensing statutes."[173] Indeed, "[t]he essential feature of a [sales agent]'s employment is to bring the parties together in an amicable frame of mind, with an attitude toward each other and toward the transaction in hand which permits their working out the terms of their agreement."[174] Should an individual without a broker's license seek compensation for activities that helped effect a sale of property, that individual cannot rely on the Licensing Act. "[A]ny action to recover a fee or commission must be instituted and brought by the broker under whom the salesman is employed."[175]

---

[170] *Id.* § 61-2f-102(28).
[171] *Id.* § 61-2f-102(20).
[172] *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1043 (Utah Ct. App. 1994); *see Sachs v. Lesser*, 2008 UT 87, ¶ 11, 207 P.3d 1215 ("The term 'principal real estate broker' includes finders."); *C.J. Realty, Inc. v. Willey*, 758 P.2d 923, 926–27 (Utah Ct. App. 1988).
[173] *Andalex*, 871 P.2d at 1045 & n.6 ("The legislature clearly intended the licensing requirements to apply to 'finders.'" (citing *Diversified Gen. Corp. v. White Barn Golf Course, Inc.*, 584 P.2d 848, 849–50 (Utah 1978))).
[174] *Diversified Gen.*, 584 P.2d at 850.
[175] *Young v. Buchanan*, 259 P.2d 876, 878 (Utah 1953).

There is no genuine dispute of material fact that the statute applies to Mr. Anderson. He directed his efforts at recruiting real estate investors. Broadly speaking, Mr. Anderson's general duty was to raise equity.[176] And a close examination of his specific tasks reveals more. Mr. Anderson "would put together all the documents using all the tools that [he] created . . . to raise the equity needed to close the deal."[177] He raised equity by presenting information to investors in his support role on the RealSource acquisitions team.[178] The acquisitions team's job entailed finding, underwriting, and presenting properties; purchasing properties; facilitating contract negotiations; and exercising due diligence upon closing.[179] To support these efforts, Mr. Anderson put together offering materials such as executive summaries, brochures, and performance reporting worksheets, and presented them to potential investors.[180] He ensured the underwriting data "reflected the . . . costs of acquiring the deal and the sources and uses table."[181]

For several years, Mr. Anderson represented RealSource at buying summits where he presented information to potential investors interested in buying real estate, developed relationships with investors, and tracked accredited investors.[182] Mr. Anderson testified that he served as the main contact for investors: "[a]t the end of the day . . . I was the one that really did

---

[176] Anderson Dep. 24:24–25; 26:13–14; 33:12–13.
[177] *Id.* at 91:24–92:1.
[178] Howard Dep. 25:14–20; Anderson Dep. 172:9–173:12 ("But they gave me data and I put it into the model and I maintained that that *allowed me to then for any new acquisition that we would look at that we would be able to quickly model a potential acquisition.* My intent in creating this is I wanted to make it as simple as possible for any of those individuals *so that we could quickly get through a property.*" (emphases added)); ECF No. 208-1, at 94 ("The following is a summary of the items *we agreed* will be important in the new pool structure . . . . The objective is to fully incentivize *all team members* . . . ." (emphasis added)).
[179] Howard Dep. 25:14–20.
[180] Anderson Dep. 73:12–14; 92:2–93:2.
[181] *Id.* at 92:9–13.
[182] *Id.* at 78:10–79:16.

all the work [on the real estate offerings]."[183] He also had a real estate license and referred to himself as a real estate agent.[184]

In short, Mr. Anderson acted at the very least as a "finder": one who assisted in the "'procurement of prospects for or the negotiation of' the sale or exchange of . . . real estate."[185] He sought to bring investors and RealSource together. And RealSource paid Mr. Anderson for income streams he helped develop when RealSource sold properties.[186] These income streams included acquisition fees, operating income, and closing fees.[187] Because Mr. Anderson is not a broker, the statute bars Mr. Anderson from bringing a compensation counterclaim against RealSource.

Mr. Anderson's policy argument falters. He cites to a case where a plaintiff, a licensed real estate agent, sued a defendant, who held itself out as a licensed broker.[188] The court found that the plaintiff had standing because "a licensed real estate salesman has the right to institute an action against a broker 'with whom (he) is connected' 'for services as a real estate salesman[.]'"[189] The court noted that "[t]he purpose of [the Licensing Act] is . . . [to] protect[] . . . members of the public who rely on licensed real estate brokers and salesmen to perform tasks that require a high degree of honesty and integrity."[190] Even so, the court allowed

---

[183] *Id.* at 92:24–93:2.
[184] *Id.* at 98:12–14; 155:25–156:3 ("And, quite frankly, as a real estate agent, I don't know of any real estate company that isn't completely transparent on what their employees are supposed to get.").
[185] *Andalex*, 871 P.2d at 1045 (quoting Utah Code Ann. § 61-2-2(9), (10) (West 1993)).
[186] *See* Anderson Dep. 126:10–19 (**Q: This sentence, 'The understanding was that you have to be contributing to the team to receive a share,' where did you get that understanding where you say 'the understanding'? A:** It has to do with future income streams that you would be creating. Okay? So if you're there and you're part of the team that helped acquire a property or through the operations, you were to receive the income—any income that came out of that property while you were there.").
[187] Anderson Dep. 89:20–90:13; 107:19–22; 110:17–111:2.
[188] *Glob. Recreation, Inc. v. Cedar Hills Dev. Co.*, 614 P.2d 155, 158 (Utah 1980).
[189] *Id.* (citation omitted); *see* § 61-2f-409(2)(a).
[190] *Glob. Recreation*, 614 P.2d at 158.

the suit to continue because the plaintiffs, a real estate agent and a seller, sued the *broker* involved in the transaction. Here, Mr. Anderson assisted in the procurement of real estate prospects and seeks compensation from RealSource. But he is not a broker. Neither is he suing a broker, which in this case was his brother, Mike Anderson.[191] He is suing the wrong entity.

That the statute is intended to protect members of the public does not change the language of the statute, and it is the language of the statute itself which is the law.[192] Mr. Anderson cites no Utah case exempting someone in his situation from the wide sweep of the statute, and this court will not look past the language of the statute to create such an exemption.[193] And the court rejects Mr. Anderson's argument that the statute cannot protect RealSource. "[N]othing suggests that 'sophisticated' corporate entities such as [RealSource] should not be entitled to the same protections as the general public under the statute."[194]

For these reasons, the court finds that the Licensing Act bars Mr. Anderson's compensation counterclaims.[195]

### B.   The Court Grants Summary Judgment on the Trade Secret Counterclaim.

Mr. Anderson asserts RealSource misappropriated two trade secrets: his Property Underwriting Model and Economic Target Market Model. Mr. Anderson created these tools in

---

[191] Anderson Dep. 102:7–12.

[192] *W. Valley City Corp. v. Salt Lake County*, 852 P.2d 1000, 1003 (Utah 1993) ("In deciding a statute's meaning, we first consider its terms. Only if the statute is ambiguous need we look further.").

[193] *Andalex*, 871 P.2d at 1045 ("If the language of a statute is clear and unambiguous, [courts] will not look beyond the language of the statute to make the language conform to a purpose not expressed.").

[194] *Id.* at 1045 n.6.

[195] Because the Licensing Act bars all ten compensation counterclaims, the court need not address RealSource's arguments concerning Utah's statute of frauds, Utah's statute of limitations for oral agreements, the doctrine of estoppel, or the doctrine of laches. *See* MSJ 15–19.

his capacity as an independent contractor.[196] The tools modeled potential revenue streams for property acquisitions and helped Mr. Anderson prepare executive summaries.[197]

"'To establish a claim for misappropriation of trade secrets' under Utah law, [a plaintiff] [must] 'show (1) the existence of a trade secret, (2) communication of the trade secret to [the defendant] under an express or implied agreement limiting disclosure of the secret, and (3) [the defendant's] use of the secret that injure[s] [the plaintiff].'"[198] To prevail on his counterclaim, Mr. Anderson must prove he held trade secrets and RealSource misappropriated them.[199]

Mr. Anderson contends RealSource used the tools without permission and without paying a licensing fee. RealSource offers two arguments for why the court should grant summary judgment in its favor. It asserts ownership of the trade secrets as an employer and argues RealSource did not acquire the models through improper means. The court need address only the second argument.

RealSource contends it did not use improper means to acquire Mr. Anderson's trade secrets. Mr. Anderson never required RealSource to sign a licensing agreement before using the models or required RealSource to pay a licensing fee for doing so.[200] During Mr. Anderson's tenure, other employees and independent contractors contributed data to the models and freely used them.[201] The models were allegedly not protected by a password and existed on

---

[196] Anderson Dep. 201:7–10.

[197] *Id.* at 172:9–173:22; 181:2–3.

[198] *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1261 (10th Cir. 2022) (quoting *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 44, 372 P.3d 629 (Utah 2016)).

[199] *Sharetown, Inc. v. Hall*, No. 2:21-cv-00742, 2022 WL 1014790, at *2 (D. Utah Apr. 5, 2022) (quoting *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 24, 364 P.3d 1013); *see* Utah Code Ann. § 13-24-2 (West 1989).

[200] MSJ 22 (citing Anderson Dep. 39:21–25; 173:13–22; 189:2–9).

[201] *Id.* (citing Anderson Dep. 39:7–19; Howard Dep. 90:9–91:5; 92:18–93:3).

RealSource's servers.[202] RealSource asserts Mr. Anderson "voluntarily shared these models with RS Equity with no strings attached" and so the trade secrets counterclaim must fail.

Mr. Anderson asserts a genuine dispute of material fact exists as to whether RealSource had permission to use his trade secrets[203] after he left. In particular, he argues RealSource did not dispute ownership of the models and "knew or had reason to know" that access to the models depended on joint use.

The dispute centers on whether RealSource misappropriated trade secrets. One can "misappropriate" such secrets through (1) unlawful disclosure or (2) unlawful acquisition. "Unlawful disclosure encompasses 'disclosure . . . of a trade secret of another without express or implied consent by a person who . . . knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'"[204] "Unlawful acquisition includes 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.'"[205] "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."[206] "The Utah Supreme Court has 'narrowly' defined improper means 'to include only those actions that are

---

[202] *Id.* (citing Anderson Dep. 40:10–20).
[203] Because the parties do not adequately brief the issue, the court assumes without deciding that the two models are trade secrets.
[204] *Surgenex, LLC v. Predictive Therapeutics, LLC*, 462 F. Supp. 3d 1160, 1172 (D. Utah 2020), *on recons. in part*, No. 2:19-cv-295, 2020 WL 8514831 (D. Utah July 17, 2020) (quoting *Mercer*, 2015 UT 80, ¶ 27).
[205] *Id.* (quoting *Mercer*, 2015 UT 80, ¶ 28).
[206] Utah Code Ann. § 13-24-2(1) (West 1989).

contrary to law, such as violations of statutes, regulations, or recognized common-law rules or actions that violate an established standard of a trade or profession.'"[207]

No rational juror could find that RealSource used improper means to acquire knowledge of the Property Underwriting Model or the Economic Target Market Model. Mr. Anderson never asked RealSource to sign a licensing agreement.[208] He never sought patents for the models.[209] To give RealSource employees open access, he removed the models' password protection as early as 2014.[210] Mr. Anderson admitted he took no steps to protect the model other than the models' metadata saying that he was the author.[211] He "never kept a copy on [his] own computer."[212] Instead, he saved the models on RealSource's server so that employees could access them.[213] On one occasion, Mr. Anderson asked RealSource personnel whether they "would like [him] to transfer [their] current data into the new template and email back . . . [a] customized updated template." Other employees and independent contractors would provide feedback and comments.[214] RealSource employees also added a database.[215] And Mr. Anderson relied on data compiled by RealSource to create the Economic Target Market Model.[216] The first time Mr.

---

[207] *Smart Surgical, Inc. v. Utah Cord Bank, Inc.*, No. 2:20-cv-00244, 2021 WL 734954, at *3 (D. Utah Feb. 25, 2021) (internal quotation marks omitted) (quoting *C.R. England*, 2019 UT 8, ¶ 42).
[208] Anderson Dep. 39:21–25; 189:2–9 (**Q: Did you ever go to anyone at RealSource, including Nate Hanks or your brother who was still involved when you created this in 2017, and say, 'Hey, I created this. I want to have a licensing agreement so you can use it'?** A: No. Other than this lawsuit, no.").
[209] *Id.* at 188:19–21; 197:23–198:2.
[210] *Id.* at 40:10–20; ECF No. 224-3, at 2 (emailing nine individuals a password).
[211] *Id.* at 38:23–39:1; ECF No. 224-3, at 2.
[212] *Id.* at 188:3–12.
[213] Anderson Dep. 188:10–22; 201:11–21.
[214] *Id.* at 193:21–194:2; 202:5–14.
[215] *Id.* at 38:12–22.
[216] *Id.* at 177:4–24.

Anderson asserted ownership of the models was when he filed his claims against RealSource in December 2019.[217]

There is no genuine dispute as to whether RealSource acted improperly. An example of acquiring trade secrets by improper means is when a person copies trade secrets onto a thumb drive and absconds after having signed a non-disclosure agreement.[218] That is not the case here. RealSource simply continued using models saved on their servers that lacked a password and were not subject to a licensing agreement or patent. Mr. Anderson offers no authority for a finding of improper means on similar facts.

Next, there is no genuine dispute of material fact as to whether RealSource knew or had reason to know it acquired the models "under circumstances giving rise to a duty to . . . limit its use."[219] There is no evidence of an agreement to limit use of the models.[220] Mr. Anderson contends RealSource had an implied duty to use the models "only in joint efforts with their author, Kent [Anderson]."[221] In support, Mr. Anderson argues RealSource "always respected [his] authorship and ownership of the [models]."[222] Specifically, he asserts that no other RealSource employee made changes,[223] that he created the models without direction from RealSource,[224] and he "had written the whole thing and done all the work on it."[225]

---

[217] *Id.* at 203:18–21; ECF No. 213-5, filed Feb. 14, 2023 (state court action).
[218] *Mercer*, 2015 UT 80, ¶ 30.
[219] Utah Code Ann. § 13-24-2 (West 1989).
[220] Anderson Dep. 39:21–25 ("No. No. There was no formal agreement . . . ."); 201:3–4 ("There was never an agreement to RealSource that I owned that.").
[221] Opp'n 33.
[222] *Id.*
[223] Anderson Dep. 39:2–19.
[224] *Id.* at 40:4–9.
[225] *Id.* at 203:15–17.

Viewing the evidence in the light most favorable to Mr. Anderson, no reasonable fact finder could conclude that RealSource knew or had reason to know it had a duty to limit use of the underwriting or economic target models. While Mr. Anderson worked for RealSource, other employees and independent contractors could freely access and use the models to enter data for properties.[226] On at least one occasion, a RealSource employee added a database to the customized discounted cash flow analysis tool.[227] Another RealSource employee knew exactly where the economic target market model resided so that the employee could edit it.[228]

The underwriting model master template also resided on the RealSource servers.[229] RealSource may well have had notice that Mr. Anderson developed the models.[230] But until he filed a complaint in state court in December 2019, Mr. Anderson never told RealSource to stop using his models, let alone communicated that the models could be used only in joint efforts.[231] During his long tenure at RealSource, Mr. Anderson never objected to others accessing or modifying the models. For instance, when a member of the acquisition team needed to do a property analysis, that member could simply "get th[e] master template" so that "they had the most recent updated version with all the latest variables and they could quickly do a 20-minute analysis . . . ."[232]

Mr. Anderson's assertion that he created the models without direction from RealSource is not enough to show a duty not to use the models. RealSource paid Mr. Anderson to raise equity

---

[226] *Id.* at 38:21–22; 40:10–20 (password protection removed around 2014 or 2015); 189:10–16.
[227] *Id.* at 38:12–22.
[228] Anderson Dep. 189:16–18.
[229] *Id.* at 201:11–21.
[230] *Id.* at 203:15–17 ("And then I had all my email [sic] to them showing them that I had written the whole thing and done all the work on it.").
[231] ECF No. 72 (counterclaim).
[232] Anderson Dep. 201:13–21.

and acquire properties. According to Mr. Anderson, RealSource did not have the right tools to do so. Mr. Anderson states that he had to create the necessary underwriting model and target market models to do the job.[233] That RealSource lacked an agreement giving it ownership of the models does not change the result. In the end, the evidence does not permit a finding that RealSource knew or had reason to know it had a duty not to use the models or to limit their use.

Thus, Mr. Anderson does not have a viable claim for trade secret misappropriation. Summary judgment against Mr. Anderson is proper as a matter of law.[234]

### C.    The Requests for an Accounting and Declaratory Relief Necessarily Fail.

As set forth above, Mr. Anderson has no valid counterclaims that would entitle him to an accounting or declaratory relief. The counts seeking such relief therefore cannot succeed as a matter of law.[235]

### ORDER

Accordingly, the court GRANTS RealSource's Motion for Summary Judgment Against Kent Anderson's Affirmative Claims.[236]

Signed June 22, 2023.

BY THE COURT

_____
David Barlow
United States District Judge

---

[233] *Id.* at 39:21–40:9 ("[W]hen I started there they didn't have the tools I needed to raise equity. I developed these tools without their request, on my own, to do this.").

[234] Because Mr. Anderson does not have a claim for misappropriating trade secrets, the court does not address RealSource's claim that it owns the models in question.

[235] RealSource also argues Mr. Anderson can only assert claims against RS Equity. *See* MSJ 9–10. The court need not reach this argument as summary judgment on all of Mr. Anderson's counterclaims is proper.

[236] ECF No. 208.