THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| NATHAN W. HANKS and REALSOURCE EQUITY SERVICES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL S. ANDERSON, AKA PARTNERS, LC, KENT ANDERSON, MICHAEL HOWARD, and GREENFILL WOODLAND APARTMENTS, LLC,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [329] AND [336] DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00999-DBB-JCB<br><br>District Judge David Barlow |

Before the court are Michael S. Anderson[1] ("Mike Anderson") and Kent Anderson, Michael Howard, AKA LLC ("AKA"), and GreenFill Woodland Creek Apartments, LLC[2] (collectively "Defendants") Motions for Summary Judgment against all five claims asserted by Nathan W. Hanks ("Nathan Hanks") and RealSource Equity Services, LLC ("RS Equity"). Having reviewed the briefing and relevant law, the court finds oral argument unnecessary.[3] For the reasons below, the court grants Mike Anderson's motion on claims one and two, Kent Anderson and Michael Howard's motion on claims three and four and denies all Defendants' motions on claim five.

---

[1] Michael S. Anderson's Motion for Summary Judgment Re: Claims Filed Against Him by Nathan W. Hanks and RealSource Equity Services, LLC ("Anderson MSJ"), ECF No. 329, filed Nov. 17, 2023. Because there are multiple parties with the same first or last names, the court uses full names throughout.
[2] Motion for Summary Judgment Against Plaintiffs' Third, Fourth, and Fifth Causes of Action ("Anderson, Howard, AKA MSJ"), ECF No. 336, filed Nov. 17, 2023.
[3] *See* DUCivR 7-1(g).

## BACKGROUND

RealSource is a family of companies generally engaged in purchasing, managing, and reselling real estate.[4] It is comprised of several entities, including RS Brokerage, RS Properties, and RS Equity.[5] These entities help their clients invest in real estate, primarily multifamily housing projects.[6] Mike Anderson is a real estate broker and investor who founded the first RealSource entity in 1992.[7] Nathan Hanks joined RealSource as a real estate agent in 2002, after which he and Mike Anderson formed RealSource Equity Services.[8] Kent Anderson started working as a real estate agent for RealSource in 2002, and Michael Howard joined RealSource as a real estate agent in 2011.[9]

RS Equity raises funds for its projects through investors who have fractional ownership in its properties.[10] To secure enough investors to purchase a property, RS Equity must have a large client base to draw from, so it maintains lists of hundreds of past investors and potential clients (the "client list"). RS Equity maintains this client list on four separate platforms, including spreadsheets on RealSource's servers and on web-based software including Salesforce, Constant Contact, and IMS Database.[11] Managing and adding clients is key to RS Equity's business, and this responsibility falls to the organization's real estate agents and brokers. Mike and Kent Anderson cultivated lists of investors who were interested in RS Equity and managed

---

[4] Decl. of M. Anderson ¶ 3, ECF No. 30, filed March 3, 2020.
[5] *Id.*
[6] N. Hanks Dep. 11, ECF No. 288-3, filed July 13, 2023.
[7] Decl. of M. Anderson ¶ 3.
[8] Decl. of M. Anderson ¶¶ 4–5; Decl. of N. Hanks ¶ 2–4, ECF No. 6, filed Feb. 13, 2020.
[9] Kent Anderson Dep. 43, ECF No. 288-4, filed July 13, 2023; M. Howard Dep. 13–14, ECF. No. 288-2, filed June 13, 2023. Kent Anderson and Michael Howard were both independent contractors for RealSource, not employees.
[10] Decl. of M. Anderson ¶ 5.
[11] Decl. of N. Hanks 5–6.

relationships with existing clients, adding hundreds of clients to the list over several years.[12] Michael Howard also managed client information, adding contacts from RealSource employees into the larger system.[13]

Nathan Hanks and Mike Anderson each owned a 50% interest in RS Equity until January 1, 2018, when they entered the Membership Interest Purchase Agreement ("Agreement").[14] Through the Agreement, Mike Anderson sold his interest in RS Equity and several other RealSource entities to Nathan Hanks.[15] Mike Anderson agreed not to solicit any Real Source clients with the intention of diverting their business from the company and to keep Real Source's information confidential under the Agreement.[16] After executing the Agreement, Mike Anderson stopped working for Real Source and lost access its servers.[17]

AKA Partners was formed in 2018, in part by Mike Anderson, to invest in self-storage and other real estate projects using a funding model similar to RS Equity.[18] Michael Howard left RealSource in June 2019, joining AKA shortly thereafter.[19] Kent Anderson was terminated from his position at Real Source in September 2019, in part because he had been working for AKA.[20] He became a partner at AKA the next month.[21] Both lost whatever access they had to RealSource's client list after leaving the company.[22]

---

[12] K. Anderson Dep 79:4–16; Decl. of M. Anderson ¶ 7.
[13] M. Howard Dep. 51–52.
[14] Third Am. Compl. ¶ 9; Membership Interest Purchase Agreement ("Agreement") ¶ 2.1, ECF No. 6-1, filed Feb. 13, 2020.
[15] Agreement ¶ 2.1.
[16] Agreement ¶¶ 7.3, 7.4.
[17] Decl. of M. Anderson ¶ 14.; Decl. of N. Hanks ¶ 14.
[18] Decl. of M. Anderson ¶¶ 25–26.
[19] M. Howard Dep. 74–75; Decl. of N. Hanks 5.
[20] ECF No. 224-5 at ¶ 8, filed Mar. 7, 2023.
[21] Dep. of K. Anderson 10–13.
[22] Decl. of N. Hanks ¶ 15 ((1) RealSource's server: Ownership spreadsheet by project. Mike Howard had access to this database until June 15, 2019. Kent Anderson had access until September 5, 2019. (2) Salesforce: Michael

AKA began raising funds for its real estate projects by reaching out to potential investors from Kent and Mike Anderson's client contacts and utilizing commercially available lists.[23] Mike Anderson sent several emails to potential AKA investors about new real estate investment opportunities, many of whom were on RealSource's client list.[24] Plaintiffs allege some of the potential investors contacted in these emails were added to the RealSource client list after Mike Anderson's departure, and he obtained this contact information when Michael Howard sent it to him while he was still working for RealSource.[25] Defendants deny this allegation.[26]

Plaintiffs Nathan Hanks and RS Equity initially filed suit against Mike Anderson and AKA in December 2019, alleging various breaches of the Agreement and misappropriation of trade secrets.[27] On February 13, 2020, Plaintiffs amended their complaint, adding Michael Howard and Kent Anderson as defendants and moving for a temporary restraining order and preliminary injunction against all Defendants, which the court denied.[28] All Defendants filed answers in April 2020.[29]

On February 21, 2023, Plaintiffs filed their Third Amended Complaint, bringing two claims for breach of the Agreement against Mike Anderson, claims against Michael Howard and

---

Howard probably did not have access to this database. Kent Anderson had access until February 10, 2020, at the latest. (3) Constant Contact: Michael Anderson never had log-in credentials. Mike Howard had access until June 15, 2019. Kent Anderson had access until Sep. 5, 2019. (4) IMS Database: Mike Howard never had access to this system. Kent Anderson had access until Sep. 5, 2019.).

[23] *Id.* at 51:18–25, 52:1–18.

[24] ECF No. 20-5; ECF No. 6-5; Dep. of M. Anderson 66–67.

[25] Third Amend. Comp. ¶¶ 65, 66.

[26] Defendants AKA Partners, LC, Kent Anderson, Michael Howard, and Greenfill Woodland Creep Apts, LLC's Answer to Plaintiffs' Third Amended Complaint ¶¶ 65, 66, ECF No. 225, filed Mar. 7, 2023; Michael S. Anderson's Answer to Third Amended Complaint and Counterclaim ¶¶ 65, 66, ECF No. 227, filed Mar. 15, 2023.

[27] Compl., ECF No. 2, filed Dec. 27, 2019.

[28] Amended Compl., ECF. No. 4, filed Feb. 13, 2020; Motion for Temporary Restraining Order and Memorandum in Support and for Preliminary Injunction, ECF No. 5, filed Feb. 13, 2020; Order denying Motion for TRO and Preliminary Injunction, ECF No. 58, filed June 12, 2020.

[29] Answer to Second Am. Compl., ECF No. 53, filed April 10, 2020; Michael S. Anderson's and AKA Partners, LC's Answer, ECF No. 54, filed April 10, 2020.

Kent Anderson for tortious interference and breach of fiduciary duty, and a trade secret misappropriation claim against all defendants.[30] Defendants moved for summary judgment on all five of Plaintiffs' claims.[31]

## STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32] A fact is material if it "might affect the outcome of the suit under the governing law."[33] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[34]

"The movant bears the initial burden to show the absence of a genuine issue of material fact, and, if successful, the burden then shifts to the nonmovant to set forth specific facts showing that there is a genuine issue for trial."[35] "The movant may carry this burden by showing —that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[36] When applying this standard, the court must "view the facts and draw reasonable inferences in the light most favorable to the nonmoving party."[37]

---

[30] Third Amended Compl. 3, ECF No. 214, filed Feb. 21, 2023.
[31] Plaintiffs filed their opposition to the motions on January 26, 2024. Defendants filed their replies on February 16, 2024.
[32] Fed. R. Civ. P. 56(a).
[33] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[34] *Id.*
[35] *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 107 F.4th 1121, 1131 (10th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 2256 (1986)) (internal quotation marks omitted).
[36] *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1271 (10th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)) (internal quotation marks omitted).
[37] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 980 (10th Cir. 2022).

## DISCUSSION

All Defendants argue they are entitled to judgment on each claim against them. The court addresses each claim in turn, first considering Mike Anderson's arguments on the breach of contract claims, then addressing Kent Anderson and Michael Howard's arguments on the tortious interference and breach of fiduciary duty claims, and finally evaluating all Defendants' arguments on the trade secret misappropriation claim.

## I.      Claims Against Mike Anderson (Counts I and II)

Mike Anderson contends the court should grant him summary judgment on Plaintiffs' first claim for breach of the non-competition and non-solicitation provisions of the Agreement and second claim for breach of the confidentiality provision of the Agreement. The breach of contract claims are addressed together, as Mike Anderson claims they both fail for lack of damages. Before turning to Plaintiffs' damages argument, the court addresses Mike Anderson's argument that only Nathan Hanks may enforce the Agreement.

### A.  Parties

Mike Anderson argues that only Nathan Hanks, not RS Equity, may bring the breach of contract claims against him under the Agreement's No Third-Party Beneficiaries clause. Plaintiffs argue the Agreement's non-competition, non-solicitation, and confidentiality provisions show an intent to confer rights on RS Equity so that it may enforce the rights and obligations of the Agreement.

"If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract

may be interpreted as a matter of law."[38] "An ambiguity exists where the language is reasonably capable of being understood in more than one sense."[39] "[W]here a contractual term or provision is ambiguous as to what the parties intended, the question becomes a question of fact to be determined by the fact-finder."[40] "A third party who benefits only incidentally from the performance of a contract has no right to recover under that contract."[41] "Only if the written contract's clear intent is to confer rights upon a third party may that third party enforce rights and obligations of the contract."[42]

The No Third-Party Beneficiaries provision is clear, unambiguous, and can be interpreted as a matter of law.[43] Section 10.7 of the Agreement states that, except as agreed to in the no additional distribution rights and indemnification provisions, "this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this agreement."[44] The parties, which the Agreement identifies as "Michael S. Anderson, an individual" and "Nathan W. Hanks, an individual," agreed that only they may enforce the Agreement. Therefore, only Nathan Hanks may pursue the breach of contract claims.

---

[38] *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599, 605.
[39] *Dixon v. Pro Image Inc.*, 1999 UT 89, ¶ 14, 987 P.2d 48, 52 (quoting *R & R Energies v. Mother Land Indus., Inc.*, 936 P.2d 1068, 1074 (Utah 1997)).
[40] *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395, 407.
[41] *American Towers Owners Ass'n, Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1188 (Utah 1996) (citation and internal quotation marks omitted), abrogated on other grounds by *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶ 55, 221 P.3d 234.
[42] *Wagner v. Clifton*, 2002 UT 109, ¶ 13, 62 P.3d 440, 442.
[43] *Fornazor Int'l, Inc. v. Huntsman*, No. 2:14-CV-291 TS, 2015 WL 6142962, at *8 (D. Utah Oct. 19, 2015) (finding that similar exclusive enforcement clause cut off third party's ability to bring claim).
[44] Agreement ¶ 10.7.

Despite this plain language, Plaintiffs argue Paragraphs 7.3 (Confidentiality) and 7.4 (Non-Competition; Non-Solicitation) of the Agreement give RealSource enforcement rights. While these provisions mention RS Entities, they do not give RS Equity the right to enforce the provisions. Furthermore, these provisions are not included in the exceptions to the No Third-Party Beneficiaries provision, which includes only Section 2.5 (No Additional Distribution Rights Clause) and Article IX (Indemnification). Accordingly, only Nathan Hanks may pursue the breach of the non-compete, non-solicitation, and confidentiality claims.

## B.  Damages

Mike Anderson argues he is entitled to judgment as a matter of law because Nathan Hanks has not shown he was damaged by the breaches of the Agreement. Nathan Hanks responds that he is seeking disgorgement of AKA's profits as calculated in Plaintiffs' expert report, and he would have paid less for Mike Anderson's share of the RS Entities had he known the non-compete, non-disclosure, and non-solicitation provisions would be breached.

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[45] "It is axiomatic under Utah law that a plaintiff alleging a breach of contract claim must prove both the fact of damages as well as the amount of damages."[46] "To establish the fact of damages, the evidence must give rise to a reasonable probability that the plaintiff suffered damage."[47]

---

[45] *Accesslex Inst. v. Philpot*, 2023 UT App 21, ¶ 25, 526 P.3d 1282, 1289 (quoting *America West Bank Members, LC v. State*, 2014 UT 59, ¶ 15, 342 P.3d 244).

[46] *Lifevantage Corp. v. Domingo*, No. 2:13-CV-1037-JNP-PMW, 2017 WL 11639148, at *3 (D. Utah Jan. 19, 2017).

[47] *Stevens-Henager Coll. v. Eagle Gate Coll., Provo Coll., Jana Miller*, 2011 UT App 37, ¶ 16, 248 P.3d 1025, 1030 (quoting *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985) (cleaned up)).

Nathan Hanks has asserted two figures for damages: (1) disgorgement of AKA's profits,[48] and (2) the difference in the price he would have paid for Mike Anderson's share of RealSource had he known the non-compete, non-solicitation, and confidentiality provision would be breached. The court considers each argument in turn.

### i. AKA's Profits

Nathan Hanks asserts he is entitled to damages disgorging Mike Anderson and AKA of their profits.[49] To support his claim for damages, Nathan Hanks relies on the expert report of Brad Townsend ("Townsend Report").[50] The report calculates the amount needed to "disgorge Defendants of the financial gains they have received or will receive due to the alleged improper acts in this case."[51] The report offers calculations of past damages based on distributions from AKA to its partners and future damages based on a distribution projections.[52] Mike Anderson claims he is entitled to summary judgment because Nathan Hanks has not disclosed his own damages based on breaches of the Agreement or shown that he is entitled to AKA's profits.

Under Utah law, lost profits can be an appropriate measure of damages for breach of contractual non-compete, non-solicitation, and non-disclosure provisions.[53] But "[a] plaintiff must do more than merely state a defendant's profits when claiming damages. There must be some correspondence between the two so that the claim of damages is more than mere

---

[48] Plaintiffs' First Supplemental Initial Disclosures on Damage, ECF No. 331-6, filed Nov. 17, 2023.

[49] Third Amended Compl. ¶ 23 ("To the extent Mr. Anderson or his affiliates have competed with RealSource or solicited its clients, Plaintiffs are entitled to damages including disgorgement of Mr. Anderson's or his affiliates' gross profits."); ¶ 30 ("To the extent Mr. Anderson or his affiliates have used RealSource's confidential Client Lists to obtain any investments in any of their projects, Plaintiffs are entitled to damages, at their election, for disgorgement of Mr. Anderson's or his affiliates' gross profits, unjust enrichment or, alternatively, to Plaintiffs' lost profits or such other damage theory as may be proven at trial.")

[50] Expert Report of Brad Townsend ("Townsend Report"), ECF No. 331-7, filed Nov. 17, 2023.

[51] *Id.* at 3.

[52] *Id.* at 5.

[53] *TruGreen Companies, LLC. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 9, 199 P.3d 929, 933.

speculation. Thus, it is the loss sustained by the plaintiff that provides the core measure of damages for the breach of non-compete clauses. The gains enjoyed by the breaching [party] can be relevant to that damage inquiry, but cannot alone support a damage award."[54]

Nathan Hanks has failed to show he has sustained a loss due to the breaches of the non-compete, non-solicitation, and confidentiality provisions. Although he states that RealSource has been unable to raise funds for several projects since 2018, he acknowledges that "whether this is related to AKA's competition is unclear."[55] He does not claim that any RealSource entity has lost business because Mike Anderson breached the agreement—he only speculates that AKA's activities may have diverted funds that could have gone to a RealSource project. He has not claimed that a single RealSource client has stopped investing or even invested less with them because of AKA.[56] Furthermore, Nathan Hanks has failed to establish that he has personally suffered damages, omitting any calculation of how Mike Anderson's breach harmed him personally. At best, he states that "damage to RealSource is damage to its owner, Nathan Hanks."[57] This assertion is not supported by evidence and does not establish that he was personally damaged in any way.[58] Even if his claim is accurate, Nathan Hanks has not stated how much of the single damages calculation he provided he is entitled to as an individual separate from RS Equity.

---

[54] *Id.* at ¶ 17.

[55] Mem. in Opp. 18.

[56] Dep. of K. Randall 13:4–9; Anderson MSJ ¶ 16; Mem. in Opp. to Anderson MSJ (Plaintiffs do not dispute ¶ 16).

[57] Mem. in Opp. 20.

[58] *See Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2013 UT App 146, ¶ 29, 305 P.3d 171, 180 (quoting *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986)) (holding that without evidence to support damages calculation, no fact finder could determine with reasonable certainty the amount of lost net profits and upholding summary judgment for breaching party); *Evans v. Huber*, 2016 UT App 17, ¶ 16, 366 P.3d 862, 866 (upholding summary judgment where party failed to provide calculation of damages).

Accordingly, no reasonable jury could find for Plaintiffs on the non-disclosure, non-competition, and confidentiality provisions. Therefore, claims one and two fail as a matter of law.

### ii.  Purchase Price Difference

Nathan Hanks asserts in his Memorandum in Opposition to Michael Anderson's Motion for Summary Judgment that he was damaged by Mike Anderson's breach of the Agreement because he would have "paid around $1 million less than he actually paid" for ownership of the RealSource entities if he knew Mike Anderson was going to compete with RealSource or use the customer list.[59] He alleges that Mike Anderson's actions have made it more difficult for RealSource to obtain investors, acknowledging that "it is a significant challenge to measure this impact."[60] Mike Anderson responds that the claimed purchase price difference damages are procedurally barred and do not correspond with the damages calculated in the Townsend Report.

Federal Rule of Civil Procedure 26(a)(1)(iii) requires "a computation of each category of damages claimed" as part of a parties' initial disclosures.[61] If a party fails to provide this information, they are "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."[62] "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court."[63] The inquiry for the court depends upon "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure

---

[59] Mem. in Opp. 17.
[60] Decl. of N. Hanks in Opp. to Michael Anderson's MSJ 2, ECF No. 374, filed January 26, 2024.
[61] Fed. R. Civ. P. 26 (a)(1)(A)(iii).
[62] Fed. R. Civ. P. 37 (c)(1).
[63] *Neiberger v. Fed Ex Ground Package Sys., Inc.*, 566 F.3d 1184, 1192 (10th Cir. 2009) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (cleaned up)).

the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."[64]

These factors establish that Nathan Hanks cannot argue he was damaged by allegedly overpaying Mike Anderson. First, allowing this calculation would result in prejudice or surprise to Mike Anderson. Nathan Hanks did not claim these damages in his disclosures or during discovery, but claimed for the first time that he overpaid for the RS Entities by at least $1 million in his Memorandum in Opposition to Mike Anderson's Motion for Summary Judgment.[65] Asserting a new basis for damages long after discovery has closed would significantly prejudice Mike Anderson.[66] Second, Mike Anderson has no opportunity to cure the prejudice. The deadline for parties to serve expert counter disclosures and reports was August 25, 2023. Reopening expert discovery, more than a year after the deadline, so Mike Anderson could address this new category of damages would be both costly and time-consuming, therefore, this does not cure the prejudice.[67] Third, introducing Nathan Hanks' purchase price damages calculation would disrupt the possible trial. Permitting the belated category of damages would require reopening discovery, significantly delaying the time it would take for the claims to get to trial.[68] Fourth, although Nathan Hanks may not have omitted this damages calculation in bad faith, it was not accidental.

---

[64] *HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200 (10th Cir. 2017) (quoting *Woodworker's Supply*, 170 F.3d at 993).
[65] Mem. in Opp. 17
[66] *Sonrisa Holding, LLC v. Circle K Stores, Inc.*, 835 F. App'x 334, 344 (10th Cir. 2020) ("To add an entire new category of damages… on the last day of discovery, would have significantly prejudiced [other party].")
[67] *Id.* (second factor met where curing prejudice would have been "both costly and time[-consuming].")
[68] *Id.*

He did not argue he was damaged by overpaying for the RS Entities until January 26, 2024, more than four years after filing his first complaint, and long after the close of discovery.[69]

These factors show Nathan Hanks' failure to comply with Rule 26 was not justified or harmless. Accordingly, he cannot use the purchase price difference damages calculation to argue against Mike Anderson's motion for summary judgment and his claims for breach of the Agreement fail as a matter of law. The court therefore grants summary judgment for Mike Anderson on the breach of contract claims.

### C. Injunctive Relief

Although Mike Anderson has established he is entitled to summary judgment on Plaintiffs' claim for damages under the Agreement's non-competition, non-solicitation, and confidentiality provisions, he does not address Plaintiffs' request for injunctive relief. For both causes of action, Plaintiffs request a permanent injunction prohibiting Mike Anderson from competing with RealSource, soliciting RealSource's clients, or using RealSource's confidential information.[70]

"For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."[71] "In examining these factors, courts have consistently noted that because a showing of probable irreparable harm is the single most important

---

[69] *Park Cityz Realty, LLC v. Archos Cap., LLC*, No. 2:20-CV-00522-JCB, 2021 WL 4991717, at *11 (D. Utah Oct. 27, 2021) (finding party willfully failed to provide computation of damages).
[70] Third Amend. Compl. ¶¶ 22, 29.
[71] *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quoting *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir.2003)).

prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."[72] An injunction will issue "only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal."[73]

Considering these factors, Nathan Hanks cannot obtain a permanent injunction for either cause of action. The non-competition and non-solicitation clause of the Agreement is limited to five years from the closing date—January 1, 2023. Nathan Hanks has not demonstrated that he continues to be irreparably harmed by breaches of the now expired non-compete and non-solicitation provisions.[74]

Nathan Hanks' first and second causes of action against Mike Anderson for breaches of the Agreement fail as a matter of law. Accordingly, the court grants summary judgment for Mike Anderson on both claims. Next, the court turns to Plaintiffs' third and fourth claims.

## II.    Claims Against Kent Anderson and Michael Howard (Counts III and IV)

In their third and fourth causes of action, Plaintiffs bring claims against defendants Kent Anderson and Michael Howard for tortious interference and breach of fiduciary duty. Kent Anderson and Michael Howard assert they are entitled to summary judgment on both claims because they are preempted by the Utah Trade Secrets Act (the "UTSA"). Plaintiffs concede that

---

[72] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)) (cleaned up).

[73] *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005)) (cleaned up).

[74] *See Keybank Nat'l Ass'n v. Williams*, No. 20-1384, 2022 WL 402379, at *2 (10th Cir. Feb. 10, 2022) (upholding denial of preliminary injunction where employer sought to enforce non-compete days before it expired); *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 92 (Utah 1992) (denying permanent injunction to enforce expired non-compete).

the UTSA preempts these claims.[75] Therefore, there is no genuine dispute of material fact on

these claims, and Kent Anderson and Michael Howard are entitled to judgment as a matter of law

on Plaintiffs' third and fourth causes of action.

## III.   Trade Secrets (Count V)

In their fifth cause of action, Plaintiffs assert all Defendants violated the Defend Trade

Secrets Act ("DTSA").[76] They claim RealSource's client lists, market ranking and property

analysis spreadsheets, distribution system, and business plan are trade secrets that Defendants

misappropriated in their work for AKA.[77] RealSource requests both injunctive relief and

damages for the alleged misappropriation.[78] Defendants argue these materials are not trade

secrets, and even if they are, they did not misappropriate the information.[79]

The DTSA defines a trade secret as "all forms" of information that "(A) the owner

thereof has taken reasonable measures to keep such information secret; and (B) [that] derives

independent economic value, actual or potential, from not being generally known to, and not

being readily ascertainable through proper means by, another person who can obtain economic

value from the disclosure or use of the information."[80] An owner of the trade secret is "the

---

[75] Mem. in Opp. to Anderson, Howard, AKA MSJ 2 ("RealSource concedes that the UTSA preempts its claims against Michael Howard and Kent Anderson for breach of fiduciary duty and interference with economic relationships.")

[76] 18 U.S.C.A. § 1836. Plaintiffs repeatedly refer to the statute as the Economic Espionage Act, however, the civil proceedings section of the statute they bring their claim under is the Defend Trade Secrets Act.

[77] Third Amend. Compl. ¶ 62.

[78] *Id.* at ¶¶ 72, 74.

[79] Although defendants Mike Anderson and Kent Anderson, Michael Howard, and AKA filed separate motions for summary judgment, they make similar arguments on the trade secret issue. Kent Anderson, Michael Howard, and AKA also incorporated Mike Anderson's argument by reference. (Kent Anderson, Michael Howard, and AKA MSJ 20). Where parties have made distinct arguments, they are referred to individually.

[80] 18 U.S.C. § 1839(3).

person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed."[81]

To establish a claim under the DTSA, the owner of a trade secret must show: "(1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means."[82] "Plaintiffs can also satisfy the third element by showing that the trade secret was 'acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.'"[83] "Consequently, the DTSA contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use of a trade secret."[84]

"The plaintiff bears the burden of proving the existence of a trade secret, and there is no presumption in its favor."[85] "Although the existence of a trade secret ordinarily presents a question of fact to be determined by the fact finder from the greater weight of the evidence,

---

[81] 18 U.S.C. § 1839 (4).

[82] *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210 (D. Utah 2023) (quoting *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1175 (D. Colo. 2019)).

[83] *Big Squid, Inc. v. Domo, Inc.*, No. 2:19-CV-193, 2019 WL 3555509, at *12 (D. Utah Aug. 5, 2019) (quoting 18 U.S.C. § 1839 (5)(B)(II)(ii)).

[84] *Smart Surgical, Inc. v. Utah Cord Bank, Inc.*, No. 2:20-CV-00244-JNP, 2021 WL 734954, at *6 (D. Utah 2021) (quoting *Cave Consulting Grp. v. Truven Health Analytics Inc.*, 2017 WL 1436044, *3 (N.D. Cal. 2017)).

[85] *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1262 (10th Cir. 2022). The analysis in cases brought under the Uniform Trade Secrets Act is applied by the court because the elements are substantially similar to those brought under the DTSA. *Applied Predictive Techs., Inc. v. MarketDial, Inc.*, No. 2:19-CV-496-JNP-CMR, 2024 WL 3759894, at *6 (D. Utah 2024) ("As a general matter, because of their substantial similarities, the federal trade secrets statute and state uniform trade secrets statutes are often considered in tandem. This, in part, stems from the fact that the federal statute was expressly modeled on the uniform trade secrets statute."); *Inteliclear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (considering claims brought under the federal trade secrets statute together with a state uniform trade secrets act "because the elements are substantially similar").

summary judgment can still be appropriate when the record does not create a genuine issue of material fact as to the necessary elements."[86]

Defendants argue the court should grant them judgment as a matter of law on Nathan Hanks' and RealSource's fifth claim. Before turning to Defendants' arguments, the court addresses which trade secrets Plaintiffs have proven exist.

### A. Alleged Trade Secrets

"At summary judgment, there is no presumption of a protectable trade secret to a plaintiff's benefit, and to avail itself of the benefits of the instructional jury trial, a plaintiff is obliged to reveal what the trade secret is, what it is not, and why it is valuable."[87] "A plaintiff does not satisfy his burden by identifying something that could qualify as trade secrets, but must also come forward with evidence that these items met the definition of a trade secret."[88] "It is inadequate for plaintiffs to cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information."[89] "Because such elements as independent economic value are inherent to the definition of a trade secret, it necessarily follows that such showings must be made per trade secret."[90]

In their third amended complaint, Plaintiffs claim there are five separate trade secrets all five Defendants misappropriated, including: (1) RealSource's confidential Client Lists, (2) the

---

[86] *Synopsys, Inc v. Risk Based Sec., Inc.*, 70 F.4th 759, 769 (4th Cir. 2023) (quoting *MicroStrategy Inc. v. Li*, 60 1 S.E.2d 580, 589 (2004) (cleaned up)).

[87] *Applied Predictive Techs., Inc. v. MarketDial, Inc.*, No. 2:19-CV-496-JNP-CMR, 2024 WL 3759894, at *9 (D. Utah 2024) (internal quotation marks omitted).

[88] *Synopsys, Inc v. Risk Based Sec., Inc.*, 70 F.4th 759, 769 (4th Cir. 2023) (quoting *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993)) (internal quotation marks omitted).

[89] *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (quoting *X6D Ltd. v. Li-Tek Corps. Co.*, 2012 WL 12952726, at *6 (internal quotations omitted)).

[90] *Applied Predictive Techs., Inc. v. MarketDial, Inc.*, No. 2:19-CV-496-JNP-CMR, 2024 WL 3759894, at *8 (D. Utah Aug. 12, 2024) (quoting *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 773 (4th Cir. 2023)).

Market Ranking Spreadsheet, (3) the Property Analysis Spreadsheet, (4) their Distribution System, and (5) their Business Plan.[91] Despite this, only one alleged trade secret is mentioned in Plaintiffs' argument—the client list. Plaintiffs argue that the motion for summary judgment should be denied to the extent it is based upon misappropriation of the client lists without mentioning the spreadsheets, distribution system, or business plan.[92]

Plaintiffs must establish the five claimed trade secrets meet the statutory definition by coming forward with evidence showing each of the alleged trade secrets meet all statutory elements. They have only attempted to make this showing for the client list, completely omitting the four other alleged trade secrets from their argument. Without this information, Plaintiffs have not met their burden to establish the spreadsheets, distribution system, or business plan are trade secrets.[93] Therefore, the court will only address their fifth claim for misappropriation of the client list.

### B. Client List

Defendants argue RS Equity has failed to establish the client list is a trade secret, arguing (1) the client list is not a valid compilation trade secret, (2) RS Equity has not taken reasonable measures to keep the information secret, and (3) RS Equity has not introduced evidence that the client list derives independent economic value from not being readily ascertainable. Plaintiffs respond that they have taken reasonable measures to protect the list and that AKA itself

---

[91] Third Amend. Compl. ¶ 62.

[92] Mem. in Opp. to Anderson, Hanks, and AKA MSJ at 2. ("RealSource concedes that the UTSA preempts its claim against Michael Howard and Kent Anderson for breach of fiduciary duty and interference with economic relationships. To the extent the Motion for Summary Judgment is premised upon Michael Howard's and Kent Anderson's misappropriation of RealSource's confidential client lists, however, it should be denied.")

[93] See *Applied Predictive Tech*, 2024 WL 3759884 at *11 (granting summary judgment for defendant because plaintiff failed to disclose their trade secret with sufficient clarity in their reply memorandum).

established the list's value by using it to contact investors for its projects. Before turning to the merits of each of Defendants' arguments, the court first analyzes which Plaintiffs may bring a claim under the DTSA.

### i.   Ownership

As a threshold issue, Mike Anderson argues that RS Equity is the only owner of the client list, so Nathan Hanks may not bring a claim under the DTSA. Nathan Hanks contends the Agreement's confidentiality provision directly benefits both himself and RealSource and damage to RealSource is damage to him as the company's owner, so he can bring a claim under the DTSA as an owner of the client list.

The DTSA allows "owners" of trade secrets to a bring a civil action for misappropriation.[94] An owner is "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed."[95] Mike Anderson points to a lack of evidence in the record that Nathan Hanks owns the client list, shifting the burden of proof to Nathan Hanks. In response, Nathan Hanks references the Agreement's confidentiality provision, which does not mention any alleged trade secrets or their ownership. Therefore, the Agreement does not establish that Nathan Hanks meets the ownership requirement under the DTSA.

Nathan Hanks also seems to argue that he owns the list personally because he owns RealSource, stating that he purchased RealSource "plus its confidential information"[96] and that "damage to RealSource is damage [sic] its owner, Nathan Hanks."[97] These claims ignore both

---

[94] 18 U.S.C. § 1836 (a)(1).
[95] 18 U.S.C. § 1839 (4).
[96] Mem. in Opp. to Anderson, Howard, and AKA MSJ 2.
[97] Mem. in Opp to Anderson MSJ 20.

the text of the statute, which includes entities as owners of trade secrets, and the basic principle

that corporate entities exist and own intellectual property independent from their shareholders.[98]

Therefore, Nathan Hanks has failed to show that he owns the client list, and RS Equity is the

only plaintiff that may bring the misappropriation claim.

### ii.   Compilation Trade Secret

RS Equity defines its client list as the collection of contact information for approximately

900 investors who participate in RealSource's direct investments in real estate.[99] This

information is maintained on four separate web-based servers that can be accessed by members

of RealSource's acquisitions team.[100] RS Equity argues that although the information was

gathered from sources in the public domain, its compilation constitutes a trade secret. Defendants

assert the client list was not a single compilation and the information the lists contain is not a

protectable trade secret, therefore, there has been no misappropriation.[101]

"A trade secret can exist in a combination of characteristics and components each of

which, by itself, is in the public domain, but the unified process, design and operation of which,

in unique combination, affords a competitive advantage and is a protectable secret."[102] "Client

---

[98] *Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1088 (10th Cir. 2003) (companies retain their own "independent business existence"); *see also Select Energy Servs., Inc. v. Mammoth Energy Servs., Inc.*, No. CIV-19-28-R, 2019 WL 1434586, at *4 (W.D. Okla. Mar. 29, 2019) (dismissing claim because plaintiffs did not establish they owned trade secrets).

[99] Third Amend. Compl. ¶ 11.

[100] Hanks Decl. ¶ 13 ("RealSource and its related Businesses developed confidential client lists (the "Lists") that includes hundreds of past and current investors and thousands of potential investors in its real estate projects. Current investors, former investors and potential investors are maintained on four separate web-based servers").

[101] Defendants rely on *UHSpro, LLC v. Secure Documents, Inc.*, No. 2:17-CV-00411-JNP, 2017 WL 2729082, at *5 (D. Utah 2017), to support their claim that the client list is not a trade secret. In that case, plaintiffs tried to assert their business plan was a trade secret, despite their admission that no single element of the business was a trade secret. Furthermore, many aspects of the business plan had to be revealed for the company to do business. Defendants have not made similar claims about the client list in this case.

[102] *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (quoting *Rivendell Forest Prod., Ltd. v. Georgia-Pac. Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994)) (internal quotations omitted).

lists or customer information can be considered trade secrets, but this is an inherently fact dependent question."[103] To determine if a compilation is a trade secret, courts consider "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."[104]

Under these factors, the client list may qualify as a compilation trade secret. Although the names on the list were partially gathered from publicly available sources, the information as compiled is not generally known to those outside the business. The undisputed facts indicate that the client lists are available to a limited number of employees on a "need to know" basis, and employees can only access the list by signing into the web-based servers with unique user and password information.[105] Regarding value, no party disputes that a list of individuals who already had invested in real estate would be valuable to any business seeking to raise funds for

---

[103] *Meyer Grp., Ltd. v. Rayborn*, 695 F. Supp. 3d 39, 63 (D.D.C. 2023) (holding that a reasonable juror could find real estate client list contained on index cards was a protectable trade secret, even though some of the information on the cards was publicly available); *see also IHS Glob. Ltd. v. Trade Data Monitor, LLC*, No. 2:18-CV-01025-DCN, 2021 WL 2134909, at *7 (D.S.C. 2021)) ("courts have found with near uniformity that lists compiling customer, pricing, product, or supplier information constitute protectable trade secrets, even where the information they contain is publicly available").

[104] *Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 641 (10th Cir. 2022) (quoting Restatement of Torts § 757 cmt. b (1939)).

[105] Randall Decl. ¶¶ 4, 5; Mem. in Opp. to Anderson, Howard, AKA MSJ 23; Reply in Support of Anderson, Howard, AKA, MSJ 5.

future investments in real estate. Furthermore, it is undisputed that the lists were developed over decades and represent a substantial investment of time and effort.[106]

Defendants suggest an additional factor, arguing the client list is not a trade secret because it is contained in several documents stored on different servers.[107] There is no requirement that a compilation be centrally organized or stored to gain trade secret protection.[108] Therefore, reading the facts in the light most favorable to the non-moving party, RS Equity has adequately demonstrated the client list may be a trade secret.

### iii.   Measures to Keep Information Secret

Next, Defendants argue the client list is not a trade secret because RS Equity did not take reasonable measures to keep the list secret as required by the DTSA. They claim the failure to make individuals with access to the list sign non-disclosure agreements or thoroughly password protect the lists was unreasonable. RS Equity responds that the measures it took were reasonable, so the list qualifies as a trade secret.

The DTSA only protects information that its owners have taken reasonable measures to keep secret.[109] "What measures are reasonable must depend in significant part on the nature of the trade secret at issue."[110] "Reasonable efforts does not mean all conceivable efforts, nor are

---

[106] Randall Decl. ¶¶ 10, 11; Mem. in Opp. to Anderson, Howard, AKA MSJ 24; Reply in Support of Anderson, Howard, AKA, MSJ 5.

[107] Defendants rely on *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 452 (E.D. Pa. 2014) for the proposition that a compilation of client information cannot be a trade secret. There, the court determined during a bench trial that an unrecorded list of clients was not a trade secret. The same claim, however, was sufficiently pled to survive summary judgment.

[108] *USI Ins. Servs. LLC v. Bentz*, No. 1:18-CV-00255, 2023 WL 5670683, at *2 (D.N.D. 2023) (holding a reasonable jury could find that "spreadsheets of various clients' information" are trade secrets); *Centennial Bank v. Holmes*, No. 5:23-CV-044-H, 2024 WL 733649, at *3 (N.D. Tex. 2024) ("various spreadsheets" of customer information could be trade secrets).

[109] 18 U.S.C. § 1839 (3)(A).

[110] *Turret Labs USA, Inc. v. CargoSprint, LLC,* No. 21-952, 2022 WL 701161, at *2 (2d Cir. 2022) (quoting *Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 380 (N.D.N.Y. 2021)) (cleaned up).

heroic measures required. Thus, a plaintiff can meet this requirement even though a defendant

manages to point out aspects of plaintiff's procedures that could have been stronger."[111]

"Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is

not required."[112]

Although reasonable efforts to protect information often include requiring those with

access to sign non-disclosure agreements or storing the information on a password-protected

server,[113] these precautions are not required by the statute.[114] Additionally, "misplaced trust in a

third party who breaches a duty of confidentiality does not necessarily negate efforts to maintain

secrecy."[115] "The fact that a trade secret was successfully misappropriated does not defeat the

fact that there were reasonable efforts to maintain its secrecy."[116] Finally, whether reasonable

measures have been taken to guard the secrecy of a trade secret is ordinarily a question for the

jury.[117]

RealSource points to several measures it took to protect the client list, including limiting

the number of people who could access it to those employees on the acquisitions team, requiring

---

[111] *Graystone Funding Co., LLC v. Network Funding, L.P.*, No. 219-CV-00383-JNP-CMR, 2021 WL 4460113, at *3
(D. Utah Sept. 29, 2021) (quoting *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1296–97 (D.
Utah 2020) (internal citations omitted)); *see also First United Bank Ins. Sols., Inc. v. Inservices, LLC*, No. CIV-22-
682-R, 2023 WL 1483138, at *3 (W.D. Okla. Feb. 2, 2023).
[112] *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011).
[113] *Crumbl LLC v. Dirty Dough LLC*, No. 2:22-CV-318-00HCN-CMR, 2023 WL 5180370, at *5 (D. Utah Aug. 11,
2023).
[114] *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1113 (10th Cir. 2009) ("There always are more security precautions that
can be taken. Just because there is something else that [the owner] could have done does not mean that their efforts
were unreasonable under the circumstances.") (applying identical provision of Uniform Trade Secrets Act); *see also
Phoenix Process Equip. Co. v. Capital Equip. & Trading Corp.*, No. 3:16-CV-024-CHB, 2022 WL 4687025, at *23–
24 (W.D. Ky. 2022) (password protection and need-to-know policy sufficient measures to survive summary
judgment).
[115] *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) (citing *Kewanee Oil Co.
v. Bicron Corp.*, 416 U.S. 470, 475 (1974)) ("Secrecy is not lost, however, if the holder of the trade secret reveals the
trade secret to another in confidence, and under an implied obligation not to use or disclose it.").
[116] *Id.*
[117] *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1114 (10th Cir. 2009).

individuals with access to sign in to their servers with unique user and password information, and relying on those with access to not disclose it as real estate agents with fiduciary duties of loyalty and confidentiality.[118] Defendants counter that these precautions were not reasonable.[119] They argue some, but not all, of the client lists were password protected, that many employees had access to the list, and that real estate agents do not owe a duty to safeguard customer contact information.[120]

Kent Anderson and Michael Howard argue that nobody with access to the client lists was required to sign non-disclosure or confidentiality agreements. However, the Agreement between Nathan Hanks and Mike Anderson contains a confidentiality provision, and there is no categorical requirement that employers execute confidentiality or non-disclosure agreements to reasonably protect their trade secrets.[121] Furthermore, RealSource contends that only real estate

---

[118] Mem. in Opp. to K. Anderson, M. Howard, & Greenfill's MSJ 28.

[119] Kent Anderson and Michael Howard rely on *DM Trans, LLC v. Scott* for the proposition that it is readily apparent that reasonable measures were not taken. 38 F.4th 608, 622 (7th Cir. 2022). In that case, the court upheld the district court's decision that the company failed to show irreparable harm for use of trade secrets when denying their request for a preliminary injunction. The court reasoned there was no irreparable harm because former employees could access company information on personal devices and were not asked to delete this information during exit interviews. The court stated this "could" be a case where judgment as a matter of law is appropriate because "it is readily apparent that reasonable precautions were not taken" but did not reach the merits. *Id.* at n.5. Because it is both procedurally and factually distinct, Defendants' reliance on this case is misplaced.

[120] Defendants also argue that RealSource's property right was "extinguished" because they did not take reasonable steps to maintain the list's secrecy. Reply in Supp. of MSJ 9. However, "providing alleged trade secrets to third parties does not undermine a trade-secret claim, so long as the information was provided on an understanding of confidentiality." *VBS Distribution, Inc. v. Nutrivita Labs, Inc.*, 811 F. App'x 1005, 1009 (9th Cir. 2020) (quoting *United States v. Nosal*, 844 F.3d 1024, 1043 (9th Cir. 2016)) (finding triable issue of fact existed, even where trade secret was provided to third-party vendors).

[121] *Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178, 1186 (D. Utah 2007) (finding there was a triable issue on whether precautions were reasonable, even though customer lists were available without confidentiality or nondisclosure agreement); *see also U.S. v. Chung*, 659 F.3d 815, 825 (9th Cir. 2011) (quoting Unif. Trade Secrets Act § 1 cmt) ("reasonable measure for maintaining secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret to a need to know basis, and controlling plant access.") (cleaned up).

agents could access the list on a "need to know basis" which limited the number of people with access to the list.[122]

Given this conflicting evidence, RealSource has shown there is a genuine issue for trial regarding whether it took reasonable steps to maintain the secrecy of the client list. Defendants have failed to show there is no dispute on whether RealSource's precautions were reasonable, and summary judgment is inappropriate on this issue.

### iv.    Independent Economic Value from Secrecy

Defendants next argue the client list is not a trade secret because it does not derive independent economic value from its secrecy. They claim RS Equity has not offered any evidence demonstrating the client list has independent economic value that it gains from not being generally known or readily ascertainable, pointing to the fact that RS Equity has not offered testimony on the list's value. Defendants also claim the client list does not gain value from its secrecy because it is a compilation of information that is readily available on the open market, sometimes for free. RS Equity counters that the list's value was demonstrated when AKA used it to contact investors and complete projects. It also argues the list is valuable because it was made through years of contacting possible investors and reducing this publicly available information down to a list of people and entities who are likely to invest with the company.

To qualify as a trade secret under the DTSA, information must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the

---

[122] Mem. in Opp. to K. Anderson, M. Howard, & Greenfill's MSJ 23, Decl. of Kelly Randall ¶ 5.

disclosure or use of the information."[123] "Thus, the essence of a trade secret is that it derives its value from secrecy."[124] "This element requires proof not just of value, but of value specifically tied to secrecy."[125] "Proof of value untethered to value derived from secrecy does not show an alleged trade secret's independent economic value."[126]

RS Equity has introduced sufficient facts demonstrating the client list has independent economic value from secrecy to survive summary judgment. Contact lists gain value from secrecy because people are more likely to do business with an established contact in an industry than one of many businesses they are contacted by.[127] The parties agree that real estate investors have limited resources, and investing with one group may lead to decreased investment with the other.[128] The parties also agree the client list was developed over decades, through the investment of a substantial amount of time and effort.[129] These facts, read in the light most favorable to RS Equity as the non-moving party, prevent summary judgment for Defendants.

Defendants try to overcome these facts by imposing two higher standards than the DTSA requires. First, they claim the list does not have independent economic value because RS Equity has not designated an expert to testify to the client list's value. Second, they claim that RS Equity

---

[123] 18 U.S.C. § 1839 (3)(B).

[124] *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004).

[125] *Synopsys, Inc v. Risk Based Sec., Inc.*, 70 F.4th 759, 771 (4th Cir. 2023) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (1984) ("The economic value of that property right lies in the competitive advantage over others that [the plaintiff] enjoys by virtue of its exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge.").

[126] *Id.* at 772 (*citing Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996)).

[127] *See dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023) (customer database was likely trade secret because if list was generally known "the value of that list would decline as its members become inundated with rival offers."); *Albert S. Smyth Co. v. Motes*, No. CV CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (stating that "in a competition for sales, information about potential customers and their buying habits… is a windfall" and holding client list had independent value from secrecy under DTSA); *WWMAP, LLC v. Birth Your Way Midwifery*, No. 5:23-CV-243-MJF, 2024 WL 151411, at *3 (N.D. Fla. 2024) (customer list likely derived value from not being generally known).

[128] Mem. in Opp. to Anderson, Hanks, AKA MSJ 24; Reply in Supp. of Anderson, Howard, AKA MSJ 5.

[129] Mem. in Opp. to Anderson, Hanks, AKA MSJ 24; Reply in Supp. of Anderson, Howard, AKA MSJ 5.

has not made any attempt to monetize the list, so it does not have independent economic value. These proposed requirements are higher than the standard set by DTSA. The law does not require a specific calculation of the client list's potential dollar value or evidence RS Equity has monetized it beyond using it for its own investment projects. Accordingly, Defendants have not established that there is no dispute on the material fact of whether the client list is a trade secret.

### C.  Misappropriation of Trade Secret

Next, Defendants argue that even if the client list is a trade secret, they did not misappropriate it. Mike Anderson claims the Agreement did not prohibit him from using his personal contacts after he left RealSource. For their part, Kent Anderson and Michael Howard argue there is no evidence they misappropriated the client list. RS Equity responds that the Agreement prevented Mike Anderson from using client information and that all parties have misappropriated the client list.

The DTSA defines misappropriation as the acquisition, disclosure, or use of a trade secret.[130] "Any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'"[131]  This includes "soliciting customers through the use of information that is a trade secret."[132]

"Rarely can a plaintiff demonstrate misappropriation through direct evidence."[133] "Instead, a plaintiff may rely on circumstantial evidence, such as proof that the defendants had

---

[130] 18 U.S.C. § 1839 (5); *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017).
[131] *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 436 F. Supp. 3d 1150, 1164 (N.D. Ill. 2020), aff'd, 108 F.4th 458 (7th Cir. 2024) (quoting Restatement (Third) of Unfair Competition § 40, cmt. c (1995)).
[132] *Id.*
[133] *Elmagin Cap., LLC v. Chen*, No. 22-2739, 2024 WL 2845535, at *2 (3d Cir. 2024) (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021)).

access to its trade secret material and that there are similarities between its [materials] and the defendant's [materials]."[134]

Defendants make two arguments supporting the contention that they did not misappropriate the client list, neither of which establishes they are entitled to summary judgment. First, Mike Anderson asserts that he has not misappropriated the client list because the Agreement does not prohibit him from retaining and using "his own" contacts. Whether or not this aggressive reading of the Agreement is accurate, it does not address the substance of the trade secret claim. Mike Anderson does not deny that he used client contact information from his time at RealSource to find investors for his new venture, AKA. Therefore, he has failed to show there is no genuine issue on the material fact of whether he misappropriated the client list.

Defendants' argument that they bought and used another list of potential investors also falls short. Kent Anderson and Michael Howard argue that because they purchased a list of contact information for over 42,000 possible investors, they could not have used the client list to secure AKA investors. While it may be true that they bought another list to find investors, there is record evidence that nearly half the investors for AKA projects were previous RealSource investors.[135] A reasonable jury could conclude that most projects AKA has funded were made possible because of previous RealSource clients, leading to the inference the client list was used for these projects.

---

[134] *Elmagin Cap., LLC v. Chen*, 555 F. Supp. 3d 170, 181 (E.D. Pa. 2021); *see also Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) ("once evidence of access and similarity is proffered, it is entirely reasonable for the jury to infer that the defendant used plaintiff's trade secret.") (cleaned up).
[135] Townsend Report 13 (Schedule 2.0).

Furthermore, the parties dispute whether Michael Howard sent Mike Anderson a copy of the client list that included contact information added after Mike Anderson's departure.[136] Sending the list could be an acquisition by Mike Anderson and AKA, disclosure by Michael Howard, and use of a trade secret by all Defendants. Thus, Defendants have failed to show there is no dispute of material fact on whether the client list was misappropriated, and summary judgment must be denied.

### D. Damages

Finally, Mike Anderson asserts that Plaintiffs' trade secrets claim fails for lack of evidence of damages. Unlike the breach of contract claims brought against Mike Anderson, damages are not a required element of a misappropriation claim under the DTSA. Furthermore, RS Equity seeks injunctive relief as authorized by the statute. Thus, Mike Anderson has not shown he is entitled to summary judgment on RS Equity's trade secrets claim based on a lack of damages.

### ORDER

Accordingly, the court GRANTS Mike Anderson's Motion for Summary Judgment on Plaintiffs' first claim for breach of the non-competition and non-solicitation provisions of the Agreement and Plaintiffs' second claim for breach of the confidentiality provision of the Agreement,[137] GRANTS Kent Anderson and Michael Howard's Motion for Summary Judgment on Plaintiffs' third claim for tortious interference with the Agreement and prospective economic

---

[136] Hanks Decl. ¶ 25; Mem. in Opp to Anderson MSJ 14.
[137] ECF No. 329.

relations and fourth claim for breach of fiduciary duty,[138] and DENIES all Defendant's Motions

for Summary Judgment on Plaintiffs' fifth claim for violation of the Defend Trade Secrets Act.

Signed September 5, 2024.

BY THE COURT

David Barlow
United States District Judge

---

[138] ECF No. 336.