THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| NATHAN W. HANKS and REALSOURCE EQUITY SERVICES, LLC, <br><br> Plaintiffs/Counterclaim Defendant, <br><br> v. <br><br> MICHAEL S. ANDERSON <br><br> Defendant/Counterclaim Plaintiff. | **MEMORANDUM DECISION AND ORDER DENYING [325] NATHAN HANKS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST MICHAEL ANDERSON'S COUNTERCLAIM** <br><br> Case No. 2:19-cv-00999 <br><br> District Judge David Barlow |

Before the court is Plaintiff and Counterclaim Defendant Nathan Hanks'[1] Motion for Partial Summary Judgment Against Michael Anderson on the RS Equity Note.[2] Nathan Hanks moves for summary judgment against Defendant Michael Anderson's ("Mike Anderson") counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing.[3] Having reviewed the briefing and relevant law, the court finds oral argument unnecessary.[4] For the reasons below, the court denies Nathan Hanks' motion.

## BACKGROUND

RealSource is comprised of several entities engaged in real estate, including RealSource Brokerage Services, RealSource Properties, and RealSource Equity.[5] Mike Anderson is a real estate broker and investor who founded the first RealSource entity in 1992 to manage property

---

[1] Because a number of the parties share first or last names, the court uses their full names throughout.
[2] Mot. for Summ J. Against Michael Anderson on the RS Equity Note ("MSJ"), ECF No. 325, filed Nov. 17, 2023.
[3] Answer to Michael Anderson's Countercl., ECF No. 70, filed August 28, 2020; Michael S. Anderson's Answer to Third Amend. Compl. and Counterclaim 13, ECF No. 227, filed March 15, 2023.
[4] *See* DUCivR 7-1(g).
[5] Membership Interest Purchase Agreement ("Agreement") ¶ 2.1, ECF No. 6-1, filed Feb. 13, 2020.

1

investments.[6] Nathan Hanks joined RealSource as a real estate agent in 2002, after which he and Mike Anderson formed RealSource Equity Services, LLC ("RS Equity").[7] RS Equity creates entities that purchase real estate, usually apartment buildings, which it manages until the properties are eventually sold.[8] Nathan Hanks and Mike Anderson each owned a 50% interest in RS Equity until March 28, 2018, when they entered into the Membership Interest Purchase Agreement ("Agreement"), through which Nathan Hanks agreed to purchase Mike Anderson's interest in the company and take over as its sole manager.[9]

The Agreement provides that Nathan Hanks would pay Mike Anderson a downpayment and deliver a promissory note for each RS Operating Entity that Mike Anderson owned, including RS Equity.[10] Payment under the RS Equity Note (the "Note") was to be made every month beginning on February 15, 2018, and continue every month until paid in full.[11] The term of the Note was originally set for five years. However, the parties agreed that if any of the RS Operating Entities had an insufficient cash flow to make a payment to Mike Anderson on the RS Equity Note, Nathan Hanks would not be required to make the payment until sufficient funds were available (the "Deferral Clause").[12] After the Agreement was executed, Mike Anderson stopped working for RealSource.[13]

Payments occurred as planned under the Note from February 2018 to January 2019.[14] On February 10, 2019, Nathan Hanks asked Mike Anderson if he could pause payments under the

---

[6] Decl. of M. Anderson ¶ 3, ECF No. 30, filed March 3, 2020 ("Anderson Decl.").
[7] Id. at ¶¶ 4–5; Decl. of N. Hanks ¶ 2–4, ECF No. 6, filed Feb. 13, 2020 ("Hanks Decl.").
[8] Decl. of N. Hanks ¶ 3.
[9] Third Am. Compl. ¶ 9, ECF No. 214, filed Feb. 21, 2023; Agreement ¶ 2.1; Dep. of N. Hanks 93:3–8, ECF 327-1, filed Nov. 17, 2023 ("Hanks Dep.").
[10] Agreement ¶ 2.3.
[11] Id. at ¶ 2.3(c).
[12] Id. at ¶¶ 2.3(b), 2.3(e).
[13] Anderson Decl. ¶ 14, ECF No. 30.
[14] Redacted Mot. for Summ. J. on RS Equity Note, Ex. 1 at 6689, ECF 327-1, filed Nov. 17, 2023 ("Redacted MSJ").

Agreement until RS Equity's acquisitions picked back up, something he assured Mike Anderson would happen soon.[15] Then, on February 15, 2019, Nathan Hanks emailed Mike Anderson stating "per our discussion and the previous email" he would "hold the monthly RS Equity Service payment until some additional acquisitions are made."[16] Mike Anderson responded "Looks good to me Nate."[17]

On December 27, 2019, Nathan Hanks and RS Equity filed suit against Mike Anderson, alleging various breaches of the Agreement and misappropriation of trade secrets.[18] Soon after, Plaintiffs twice amended their complaint to allege claims against Defendants Kent Anderson and Michael Howard, former real estate agent independent contractors for RealSource, and AKA Partners, LLC ("AKA"), a real estate investment business.[19]

Defendants initially filed their answers in April 2020.[20] Several months later, Mike Anderson and AKA Partners filed an amended answer including a counterclaim against Nathan Hanks for breach of contract, which Nathan Hanks answered on August 12, 2020.[21] The counterclaim asserts that Nathan Hanks stopped making the required monthly payments on the RS Equity note in December 2018.[22] Nathan Hanks answered the counterclaim on August 28, 2020, admitting that he had stopped making payments on the RS Equity note, but claiming this was allowed under the terms of the Agreement, so there was no breach.[23]

---

[15] *Id.* at 6690.
[16] *Id.* at 6691.
[17] *Id.*
[18] Compl., ECF No. 2, filed Dec. 27, 2019.
[19] Third Am. Compl. ECF No. 214, filed February 21, 2023; Dep. of Kent Anderson 98:14, 100:19–22, ECF No. 288-4, filed July 13, 2023; Dep. of Michael Howard, 20:1–9, ECF No. 288-2, filed July 13, 2023; Anderson Decl. ¶¶ 25–26.
[20] Answer to Second Am. Compl., ECF No. 53, filed April 10, 2020; Michael S. Anderson's and AKA Partners, LC's Answer, ECF No. 54, filed April 10, 2020.
[21] Michael S. Anderson's and AKA Partners, LC's Am. Answer & Countercl. ¶¶ 7–8, ECF No. 67, filed August 7, 2020; Answer to Michael Anderson's Countercl., ECF No. 70, filed August 28, 2020.
[22] Answer to Michael Anderson's Countercl. ¶¶ 7–8, 22, ECF No. 70.
[23] *Id.* at ¶ 4.

In 2021, RealSource, then under the control of Nathan Hanks, changed the way it handled investments.[24] RealSource began using a Real Estate Investment Trust ("REIT") to acquire investment properties, taking over for RS Equity as the main operating entity for acquisitions within the RealSource umbrella of companies.[25] After this transition, RealSource stopped using RS Equity for most day-to-day operations and shifted this work to the REIT.

On March 15, 2023, Mike Anderson added a second cause of action to his counterclaim, alleging Nathan Hanks breached the implied duty of good faith and fair dealing by redirecting revenue from RS Equity to other entities, such as the REIT, to avoid making payments under the Agreement.[26] Nathan Hanks answered the amended counterclaim on April 13, 2023, asserting that his actions were done in good faith.[27]

On November 17, 2023, Nathan Hanks moved for partial summary judgment against Mike Anderson on his counterclaim, asserting that he is contractually permitted to defer payments on the Note, and in the alternative, that the contract had been modified because Mike Anderson agreed to have payments paused.[28] Mike Anderson filed his opposition on January 26, 2024, disputing several of Nathan Hanks' facts and arguing that he is not entitled to summary judgment on either ground.[29] Nathan Hanks replied on February 9, 2024.[30]

---

[24] Mem. in Opp. to Mot. for Part. Sum. Judg. against M. Anderson on the RS Equity Note 8–10, ECF. No. 364, filed Jan. 26, 2024 ("Anderson Mem. in Opp."); Reply Mem. in Further Support 3, ECF No. 380 ("Reply Mem.") filed Feb. 2, 2024 ("Nathan Hanks does not dispute Michael Anderson's Statement of Additional Undisputed Facts.").
[25] Dep. of Jeff Hanks 13:21–25, 14:1–11, ECF No. 331-3, filed January 26, 2024 (RS Equity "was the main kind of operating entity that provided kind of the acquisition model, provided kind of all the services to go out and review, research properties and then, you know, present an executive summary to investors, and then go out and work with lenders and buyers to acquire these properties.") (RS Equity now does "very little" because all of its operations have moved to other RealSource entities.").
[26] Michael S. Anderson's Answer to Third Amend. Compl. And Counterclaim 13, ECF No. 227, filed March 15, 2023.
[27] Ans. to Counterclaim 5, ECF No. 232, filed April 13, 2023.
[28] MSJ.
[29] Anderson Mem. in Opp.
[30] Reply Mem.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[31] "A dispute is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way, and it is material if under the substantive law it is essential to the proper disposition of the claim."[32] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[33]

"The movant bears the initial burden to show the absence of a genuine issue of material fact, and, if successful, the burden then shifts to the nonmovant to set forth specific facts showing that there is a genuine issue for trial."[34] "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have evidence to carry its burden of persuasion at trial."[35] "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."[36]

---

[31] Fed. R. Civ. P. 56(a).
[32] *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Tr.*, 744 F.3d 623, 628 (10th Cir. 2014) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted)).
[33] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 245, 255 (1986)).
[34] *Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 107 F.4th 1121, 1131 (10th Cir. 2024) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986) (internal quotation marks omitted)).
[35] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002), as amended on denial of reh'g (Jan. 23, 2003) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1003–4 (9th Cir. 2000)).
[36] *Id.*

When applying this standard, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[37] However, "unsubstantiated allegations carry no probative weight in summary judgment proceedings."[38]

**DISCUSSION**

In his motion for summary judgment, Nathan Hanks argues: (1) he is contractually permitted to pause payments to Mike Anderson until RS Equity generates positive cash flows; (2) Mike Anderson's claim fails because the Agreement has been modified, and (3) the duty of good faith and fair dealing either does not apply or has been fulfilled. Each argument is considered in turn.

I.  **Breach of Contract**

Nathan Hanks argues that he is entitled to summary judgment because the Agreement allows him to pause payments, negating an essential element of Mike Anderson's breach of contract claim. Specifically, he points to the Agreement's Deferral Clause, which states:

> The Notes for RS Equity Services and RS Commercial (but no others) will provide that in the event that if any of the RS Operating Entities cannot make a Distribution to Buyer at least equal to twice the full Monthly Payment that Buyer must make to Seller related to such RS Operating Entity (the "Deferring RS Operating Entity") as a result of insufficient cash flow during such calendar month (any such shortfall, a "Non-Default Monthly Shortfall"), an amount equal to one-half (1/2) of the Non-Default Monthly Shortfall in such Monthly Payment allocated to such RS Operating Entity (only) (the "Deferred Monthly Payment") shall not be required to be made to Seller pursuant to the respective Note until such Deferring RS Operating Entity has sufficient available cash (taking into account projected costs and expenses and reserves), as reasonably determined by the manager of such Deferring RS Operating Entity, and makes a Distribution intended to cover such Non-Default Monthly Shortfall. Any calendar month for which there is a Deferred Monthly Payment for a RS Operating Entity shall be deemed to extend the term of

---

[37] *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1271 (10th Cir. 2019) (quoting *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1128, 1148 (10th Cir. 2014) (quotations omitted)).
[38] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004 (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cit. 1997)).

6

the Notes as to the Deferring RS Operating Entity (only) for an additional calendar month or until such Note is paid in full, whichever first occurs. If a Non-Default Monthly Shortfall occurs, any Distribution by a Deferring RS Operating Entity to Buyer shall be reduced in the same proportion as the Non-Default Monthly Shortfall.[39]

Nathan Hanks asserts that RS Equity has had a negative cash flow since 2018, a condition under which the Agreement allows him to stop making monthly payments without breaching the contract. In support, Nathan Hanks refers to just one document in the record which contains RS Equity's profit and loss statements for 2018.[40] While the document states that RS Equity had a negative net income for the year, it contains no information about profitability, or lack thereof, since 2018. With only this information, Nathan Hanks has not established that RS Equity had a negative cash flow during the months he has failed to make payments, and accordingly cannot show that he did not breach the terms of the Agreement.

Nathan Hanks argues that if he can "demonstrate at trial that RS Equity has not had sufficient cash flow to make the payments on the RS Equity since 2019, then there has been no default or breach."[41] Notwithstanding whatever Nathan Hanks may be able to show at trial, he is moving for summary judgment now and must produce affirmative evidence demonstrating that he is contractually permitted to pause payments.[42] He has not done so.

Furthermore, the Agreement requires a monthly determination on profitability before a payment may be deferred. Nathan Hanks has produced nothing to establish how this determination has been reasonably made every month since February 2019. Without showing that RS Equity has in fact been unprofitable since payments stopped, or that another basis for

---

[39] Agreement ¶ 2.3(e).
[40] Redacted MSJ Ex. 1, 6694–6696.
[41] Reply Mem. 6.
[42] Redacted MSJ Ex. 1, 6689 (showing payment dates and amounts ending on January 1, 2019).

7

reasonably pausing payments under the Agreement exists, there is an insufficient basis for the court to determine whether his performance constitutes a breach of the Agreement.

Nathan Hanks next contends that he has not breached the Agreement because it was modified in February 2019 to pause payments "until acquisitions pick up."[43] Nathan Hanks sent an email to Mike Anderson on February 10, 2019, asking "if we may take a pause until acquisitions pick up? I am confident we are on track with the DST and ReCap of some of the current portfolio – we will be able to get back on track with acquisition fees soon."[44] On February 15, 2019, Nathan Hanks emailed Mike Anderson again stating that "per our discussion and the previous email" they would "hold the monthly RS Equity Service payment until some additional acquisitions are made."[45] Nathan Hanks now argues the emails show an intent by both parties to agree that payments could be deferred for several years.[46] For his part, Mike Anderson asserts that he was promised that "it would be a couple of months" before the payments would resume and believed the pause was "temporary."[47]

"Parties to a written contract may modify, waive, or make new contractual terms, even if the contract itself contains a provision to the contrary. However, the minds of the parties must have met upon an asserted contract modification."[48] "A meeting of the minds must include a clear and mutual understanding of the essential terms, which cannot be indefinite."[49] "The same meeting of the minds is needed that was necessary to make the contract in the first place."[50]

---

[43] Redacted MSJ Note 17.
[44] *Id.*
[45] *Id.* at 6691.
[46] Redacted MSJ Note 17.
[47] M. Anderson Dep. at 88:2–12, ECF 224-1, filed March 7, 2023.
[48] *Provo City Corp. v. Nielson Scott Co.*, 603 P.2d 803, 806 (Utah 1979) (internal citations omitted).
[49] *Osmond v. Litton Loan Servicing, LLC*, No. 1:10-CV-1, 2011 WL 1988403, at *2 (D. Utah May 20, 2011) (citing *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, 94 P.3d 179, 183).
[50] *Scott v. Majors*, 980 P.2d 214, 218 (Ut. Ct. App. 1999) (quoting 17A Am. Jur. 2d *Contracts* § 513 (1991)).

"It is not possible to create an enforceable contract in which the parties generically agree to modify another contract that has definite terms."[51] However, "where such a modification is agreed upon, the terms thereof govern the rights and obligations of the parties under the contract, and any pre-modification contractual rights which conflict with the terms of the contract as modified must be deemed waived or excused."[52] "The party claiming the modification bears the burden of showing that a meeting of the minds occurred."[53]

Nathan Hanks has failed to show there is no dispute of fact on whether the parties agreed to modify the Agreement to allow him to defer payments for more than five years. He introduces no evidence of his intent at the time, omitting any testimony on whether he believed the emails allowed him to pause payments indefinitely. Mike Anderson has testified that it was not his belief that payments would be paused for an extended period, but only for a few months. Additionally, Mike Anderson argues that his response to the email exchange, "Looks good to me Nate," does not clearly establish that he agreed to pausing payments for over five years.[54] There is a genuine dispute on the material fact of whether the Agreement was modified and whether the purported modification allows for the extended pause in payments. This factual disagreement precludes summary judgment on Mike Anderson's breach of contract claim.

II. **Breach of the Implied Covenant of Good Faith and Fair Dealing**

Nathan Hanks argues he is entitled to summary judgment on Mike Anderson's claim for breach of the implied covenant of good faith and fair dealing. Mike Anderson alleges that Nathan Hanks purposefully diverted revenue from RS Equity to a different entity in which Mike

---

[51] *Osmond v. Litton Loan Servicing, LLC*, No. 1:10-CV-11, 2011 WL 1988403, at *2 (D. Utah May 20, 2011).
[52] *Rapp v. Mountain States Tel. & Tel. Co.*, 606 P.2d 1189, 1191 (Utah 1980).
[53] *Tech Center 2000, LLC v. Zrii, LLC*, 2015 UT 281, 363 P.3d 566, 571 (citing *Richard Barton Ent., Inc. v. Tsern*, 928 P.2d 368, 373 (Utah 1996)).
[54] Mem. in Opp. to Mot. for Part. Summ. J. against M. Anderson on the RS Equity Note 5, ECF. No. 364, filed Jan. 26, 2024.

9

Anderson has no interest, the Real Estate Investment Trust ("REIT"), so he could avoid his payment obligations under the Agreement.[55] Nathan Hanks asserts his conduct is consistent with the express provisions of the Agreement, so there has been no breach of the implied covenant of good faith and fair dealing.[56]

"An implied covenant of good faith and fair dealing inheres in every contract."[57] "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the party's rights to receive the fruits of the contract."[58] "To determine the legal duty a contractual party has under this covenant, a court will assess whether a party's actions are consistent with the agreed common purpose and the justified expectations of the other party."[59] "Extrinsic evidence may be admissible to prove a claim for breach of the covenant of good faith and fair dealing. However, extrinsic evidence is not admissible to vary the explicit terms of an agreement."[60] "A party cannot rewrite the terms of the contract to make it more favorable, using the implied covenant."[61]

The parties agree that RS Equity is no longer the main acquisition entity under the RealSource umbrella; they only dispute why this happened.[62] Mike Anderson argues RealSource,

---

[55] *Id.* at 17.
[56] Reply Mem. 5.
[57] *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, 94 P.3d 193, 197.
[58] *St. Benedict's Development Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991); see also *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, 266 P.3d 814, 817 (the duty "advances the core function of the covenant, as no one would reasonably accede to a contract that left him vulnerable to another's opportunistic interference with the contract's fulfillment.")
[59] *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, P.3d 1226, 1239 (quoting *St. Benedict's*, 811 P.2d at 200) (internal quotation marks omitted)).
[60] *KeyBank Nat. Ass'n v. Systems West Computers Resources, Inc.*, 2011 Ut App 441, 265 P.3D 107, 115 (quoting *Eggett*, 94 P.3d at 197)).
[61] *Cohen v. Wrapsol Acquisition, LLC*, 177 F. Supp 1373, 1378 (D. Utah 2016) (applying Utah law).
[62] Dep. of Jeff Hanks 13:21–25, 14:1–11, ECF No. 331-1, filed January 26, 2024 (RS Equity "was the main kind of operating entity that provided kind of the acquisition model, provided kind of all the services to go out and review, research properties and then, you know, present an executive summary to investors, and then go out and work with

led by Nathan Hanks, changed which entity it uses for acquisitions to divert revenue from RS Equity and evade payment obligations under the Agreement.[63] Nathan Hanks responds that the shift to the REIT acquisition model has enabled RealSource to raise more funds than would be possible using RS Equity, a business decision that was not made to violate the Agreement.[64]

The facts, as agreed to by both parties, support a reasonable inference that Nathan Hanks violated the implied covenant of good faith and fair dealing. Creating a new entity to do substantially the same work RS Equity had done three years into the five-year payment term may be found to be inconsistent with the purpose of the Agreement.[65] A reasonable jury could find that the change was made intentionally to deprive Mike Anderson of the fruits of the Agreement, namely, the agreed monthly payments over a period of several years. Therefore, the court denies Nathan Hanks' motion for summary judgment on Mike Anderson's claim for breach of the implied covenant of good faith and fair dealing.

## ORDER

Accordingly, the court DENIES Nathan Hanks' Motion for Partial Summary Judgment Against Michael Anderson on the RS Equity Note.[66]

---

lenders and buyers to acquire these properties.") (RS Equity now does "very little" because all of its operations have moved to other RealSource entities.)
[63] Anderson Mem. in Opp. 18.
[64] Reply Mem. 5. Nathan Hanks also claims that RealSource moved to an REIT model with Mike Anderson's knowledge and approval, however, he makes this claim without reference to the statement of facts or the record. Therefore, the claim is unsubstantiated and carries no weight in a summary judgment proceeding. *See Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1997).
[65] *Rossi v. University of Utah*, 2021 UT 43, ¶ 72, 496 P.3d 105, 118 ("we have established an inference that every contract carries a duty to perform it in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstance giving rise to their dispute.") (quoting *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 8).
[66] MSJ, ECF No. 325.

Signed September 5, 2024.

BY THE COURT

_____
David Barlow
United States District Judge