THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| NATHAN W. HANKS and REALSOURCE EQUITY SERVICES, LLC, <br><br> Plaintiffs/Counterclaim Defendant, <br><br> v. <br><br> MICHAEL S. ANDERSON, AKA PARTNERS, LC, KENT ANDERSON, MICHAEL HOWARD, and GREENFILL WOODLAND CREEK APTS, LLC, <br><br> Defendants/Counterclaim Plaintiffs. | **MEMORANDUM DECISION AND ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Case No. 2:19-cv-00999 <br><br> District Judge David Barlow |

A six-day bench trial was held between September 3 and 17, 2025, on the five remaining claims in this case: (1) Plaintiff RealSource Equity Services, LLC's trade secret misappropriation claim against defendants Michael S. Anderson, AKA Partners, LC, Kent Anderson, Michael Howard, and Greenfill Woodland Creek Apts, LLC; (2) Michael S. Anderson's breach of contract and (3) breach of the implied covenant of good faith and fair dealing claims against Nathan Hanks; (4) Kent Anderson and Michael Howard's compensation claim against Michael S. Anderson; and (5) Michael S. Anderson's indemnification claim against Nathan Hanks.

After carefully considering the evidence and arguments presented at trial, the court enters the following findings of fact and conclusions of law. Based on these findings and conclusions, the court will enter judgment against RealSource Equity Services, LLC on the trade secret claim, in favor of Michael S. Anderson on the contract claims, against Michael Howard and Kent

Anderson on the compensation claims, and against Michael S. Anderson on the indemnification claim.

## FINDINGS OF FACT

### *The Parties*

RealSource Equity Services, LLC ("RS Equity" or "RealSource") is one of several RealSource-related real estate entities[1] that invests primarily in multifamily housing projects.[2] Michael S. Anderson ("Michael Anderson")[3] is a real estate broker and investor who founded the first RealSource entity to manage property investments.[4] Throughout his time with RealSource, he was its principal broker.[5] Nathan Hanks began working with RealSource and Michael Anderson in 1999,[6] after which he and Michael Anderson formed RS Equity in 2002 as equal partners, each with 50% ownership.[7] Its purpose is to raise equity and buy property.[8] RS Equity originally generated asset management income from acquisitions, operations, and dispositions.[9] Nathan Hanks has controlled the entity's daily operations since its inception, and in 2018 he became its sole owner and manager.[10]

Kent Anderson started working as a real estate agent for RS Equity in 2002, and Michael Howard joined RS Equity as a real estate agent in 2011.[11] Both were independent contractors for RealSource, not employees.[12] In 2018, Michael Anderson helped form AKA Partners ("AKA"),

---

[1] Trial Ex. 1, Membership Interest Purchase Agreement (the "Agreement").
[2] Trial Tr. 348:18–24, ECF No. 471.
[3] Because a number of parties share first or last names, the court uses their full names throughout.
[4] Trial Tr. 47:4–7, ECF No. 451.
[5] Trial Tr. 917:21–24, ECF No. 467.
[6] Trial Tr. 341:6–7, ECF No. 471.
[7] Trial Tr. 474:17–23, ECF No. 471; Trial Tr. 818:6–13, ECF No. 467.
[8] Trial Tr. 349:14—351:17, ECF No. 471.
[9] Trial Ex. 1029 at 35.
[10] Trial Tr. 341:12–21, ECF No. 471; Trial Ex. 1.
[11] Trial Tr. 113:23—114:16, ECF No. 451; Trial Tr. 818:6–9, ECF No. 467.
[12] Trial Tr. 820:3–7, 871:18–25, ECF No. 467.

which RS Equity accuses of wrongful competition.[13] AKA first invested in "small infill projects and fix and flip homes."[14] It then mostly invested in self-storage properties.[15] Michael Howard quit working for RS Equity in the summer of 2019 and joined AKA shortly thereafter.[16] Kent Anderson was terminated from his position at RS Equity in the fall of 2019, partly because he had been working for AKA.[17]

*Trade Secret Claim*

RS Equity raises funds for its projects, in part, through investors, and asserts that it maintains lists of hundreds of past investors and potential clients (the "Client List").[18] Nathan Hanks asserts that this Client List exists on four separate platforms, including spreadsheets on RealSource's server and on web-based software including Constant Contact and IMS Database ("IMS").[19] Nathan Hanks testified that RS Equity's Client List is a collection of contact information for past, current, and potential investors.[20] Nathan Hanks testified about how the lists are maintained: potentially "hundreds" of people have login credentials to access RealSource's system that housed the spreadsheets,[21] "[v]ery few" people at RealSource have access to the IMS database,[22] and "anyone who would need" to send marketing materials, newsletters, and mailers could access Constant Contact.[23] RealSource does not have written

---

[13] Trial Tr. 60:18–20, 65:16–17, ECF No. 451; Trial Ex. 15.
[14] Trial Tr. 60:17–18, ECF No. 451.
[15] Trial Tr. 156:17—157:8, ECF No. 451.
[16] Trial Tr. 159:15–22, ECF No. 451; Trial Ex. 51.
[17] Trial Ex. 15.
[18] Trial Tr. 79:11–15, 119:8–24, ECF No. 451; Trial Tr. 343:11–25, 344:6–8, 446:17–25, 446:20–24, 467:19—468:7, 447:8–10, 456:12–16, ECF No. 471.
[19] Trial Tr. 431:7–12, 446:17–25, 467:19—468:7, ECF No. 471.
[20] Trial Tr. 344:3–8, ECF No. 471.
[21] Trial Tr. 110:14–18, ECF No. 451 (RealSource's IT Director's testimony).
[22] Trial Tr. 380:5–7, 381:5, ECF No. 471 (Nathan Hanks testifying that "around 10" individuals can access IMS).
[23] Trial Tr. 381:20—382:24, ECF No. 471. See also 454:7–9, ECF No. 471 (Nathan Hanks testifying that "until Michael Howard left, he was the only one that had access to it. After Michael Howard left, others might have had access to it.").

confidentiality agreements with its independent contractors.[24] RealSource has a confidentiality section in its employee handbook, but the handbook does not apply to independent contractors.[25] No actual Client List, either in its entirety or as excerpts, came into evidence.[26]

Michael Anderson testified that he had always had his own list of investors with whom he had been interacting, which he kept on an Excel file on his personal computer and in journal entries on Outlook.[27] When Michael Anderson's brother Kent Anderson joined RS Equity, Kent Anderson maintained the list; they were "constantly exchanging that list back and forth" as they added to and updated it.[28] Kent Anderson testified that he also cultivated a list of investors, beginning in 2003, to help him raise equity.[29] Michael Howard testified he introduced Constant Contact to RealSource and managed client campaigns for them through this platform.[30] When he left RealSource, he transferred its login information to another employee and never downloaded any email addresses from it or accessed the database when he worked with AKA.[31] Both Michael Howard and Kent Anderson lost whatever access they had to the Client List after leaving RealSource.[32] Michael Anderson also testified he never had access to Constant Contact or IMS and never told Nathan Hanks that he had received a Client List from Michael Howard.[33]

---

[24] Trial Tr. 441:3–9, 442:3–6, ECF No. 471.

[25] Trial Tr. 159:8–14, ECF No. 451; Trial Tr. 346:8–25, ECF No.471.

[26] *See id.* RealSource's counsel tried to introduce two downloaded excerpts of the client list from Constant Contact and IMS as exhibits, but they failed to produce a proper witness to lay the foundation and realized too late that the individual(s) who may have created the document were not disclosed as witnesses. Trial Tr. 358:3–368:10, ECF No. 471. The court ordered briefing on whether allowing the previously undisclosed individuals to testify would prejudice the opposing parties. ECF No. 454, Sept. 10, 2025. After considering the briefing, the court issued an order, denying RealSource's request to call those witnesses. ECF No. 459, filed Sept. 11, 2025.

[27] Trial Tr. 52:11–23, ECF No. 451.

[28] Trial Tr. 53:6—54:2, ECF No. 451.

[29] Trial Tr. 169:9–21, ECF No. 451.

[30] Trial Tr. 117:22–24, 125:13–16, 160:11–19, ECF No. 451.

[31] Trial Tr. 126:13–127:4, ECF No. 451.

[32] Trial Tr. 180:9–14, ECF No. 451; Trial Tr. 484:10–14, ECF No. 471.

[33] Trial Tr. 79:11–15, ECF No. 451 (Q: "Did you have access to RealSource's customer lists on its web-based servers?" A: "I did not." Q: "Did you ever have access to Constant Contact?" A: "I did not."); Trial Tr. 607:21–24, ECF No. 466.

On September 3, 2019, Michael Anderson sent an email to potential investors about an investment opportunity with AKA.[34] On that email, Michael Anderson had inadvertently included all the recipients' email addresses in the "to:" rather than "bcc:" line, revealing all recipients' email addresses to each other.[35] RealSource spent a considerable amount of time at trial asking Nathan Hanks and Kelly Randall[36] which email addresses in Michael Anderson's email they recognized as former or current investors with RealSource when they saw the email back in 2019.[37] Together, they recognized roughly half the emails listed.[38]

In sum, the parties presented conflicting testimony about the source of Michael Anderson's email addresses, but RealSource did not produce evidence to corroborate their claim that the email addresses listed in Michael Anderson's email was a copy of RealSource's Client List or to rebut Michael Anderson's testimony that the email addresses he used were populated from his own investor list.

*Breach of Contract Claim*

Nathan Hanks and Michael Anderson each owned a 50% interest in RS Equity until March 28, 2018, when they entered into the Membership Interest Purchase Agreement ("Agreement"), through which Nathan Hanks agreed to purchase Michael Anderson's interest in RS Equity and several other RealSource entities.[39] As part of the Agreement, Michael Anderson agreed that RealSource could use his brokerage license for up to twenty-four months after closing, and Nathan Hanks agreed that he would indemnify Michael Anderson for any claim

---

[34] Trial Tr. 71:6–23, ECF No. 451; Trial Exs. 16, 18.
[35] Trial Ex. 18; Trial Tr. 72:24—73:6–8, ECF No. 451 (Michael Anderson's email "apologizing for not putting everybody in the BCC line").
[36] Kelly Randall has held various leadership roles at RealSource, including CFO and COO. *See* Trial Tr. 194:4–7, 545:24–25, ECF No. 451.
[37] Trial Tr. 394:18—431:2, ECF No. 471 (Nathan Hanks's testimony); Trial Tr. 547:8—587:11, ECF No. 466 (Kelly Randall's testimony).
[38] Trial Tr. 394:18—431:2, ECF No. 471; Trial Tr. 547:8—587:11, ECF No. 466; Trial Ex. 18.
[39] Trial Ex. 1.

"arising out of the use" of his brokerage license during that twenty-four-month period.[40] However, the parties agreed that Nathan Hanks would not be liable for indemnification until the aggregate amount of indemnified costs exceeded $20,000.[41]

Under the Agreement, Michael Anderson also agreed not to solicit any RealSource clients with the effect or intention of diverting their business from RealSource (the "Non-Solicitation Clause") and to keep RealSource's information confidential (the "Confidentiality Clause").[42] The Agreement provides that Nathan Hanks would pay Michael Anderson a down payment and deliver a promissory note for each RealSource operating entity that Michael Anderson owned, including RS Equity.[43] Payment under the RS Equity promissory note (the "Note") was to be made monthly beginning on February 15, 2018, and continue every month until paid in full.[44]

The term of the Note was originally set for five years. However, the Agreement stated that if any of the RealSource Operating Entities had an insufficient cash flow to make a particular monthly payment to Michael Anderson on the RS Equity Note, Nathan Hanks would not be required to make the payment until sufficient funds were available (the "Deferral Clause").[45] The Note gave Michael Anderson the right "to make the entire Principal amount of the Note immediately due and payable" upon default (the "Acceleration Clause").[46] The right applied only to a default that had not been cured after sixty days following written notice of default.[47] Thus, after the cure period, Michael Anderson could "exercise the option to accelerate upon an Event of Default regardless of any prior forbearance."[48] After the Agreement was

---

[40] Agreement ¶¶ 7.6, 9.3(c).
[41] Id. ¶ 9.4(b).
[42] Id. ¶¶ 7.3, 7.4.
[43] Id. ¶ 2.3.
[44] Id. at ¶ 2.3(c).
[45] Id. at ¶¶ 2.3(b), 2.3(e).
[46] Trial Ex. 1031 (the "Note") ¶ 6.
[47] Note ¶ 6.
[48] Note ¶ 6.

executed, Michael Anderson stopped working for RealSource and lost access to its servers.[49]

Nathan Hanks made monthly payments under the Note from February 2018 to January 2019.[50]

On the issue of whether Nathan Hanks was justified in withholding payments to Michael Anderson under the terms of the contract,[51] Nathan Hanks testified he believed by the end of 2018 that he had overpaid Michael Anderson for that year based on RS Equity's profitability.[52] Consequently, he made no additional payments to Michael Anderson after January 2019 and concluded that since RS Equity's losses in 2019 were even greater, he had a "long runway" before profitability reached a level that required him to resume payments to Michael Anderson.[53] Nathan Hanks testified that he evaluated RealSource Equity Services' financial picture annually to determine whether a payment should be made.[54] RealSource's 30(b)(6) deponent testified as follows:[55]

> Q: "So when you say it was up to Nate to make that decision [to make a payment to Michael Anderson], what information did you provide him to assist him in making that determination?"
> A: "Those monthly or year-end financial statements."
> Q: "And you said generally it was year-end?"
> A: "Yes."
> Q: "How often do you recall it being monthly?"
> A: "Maybe on a quarterly basis, maybe three times a year other than year end."
> Q: "And what specifically would you present to him? Was it simply the P&L?"
> A: "Yes."
> Q: "Anything else?"
> A: "No."[56]

---

[49] Trial Tr. 180:9–14, ECF No. 451.
[50] Trial Tr. 691:12–14, ECF No. 466.
[51] Trial Tr. 1039:15—1040:3, ECF No. 473.
[52] Trial Tr. 691:12–692:4, 696:16–18, ECF No. 466.
[53] Trial Tr. 693:6–8, 696:16–23, 699:2–5, ECF No. 466.
[54] Trial Tr. 695:10—697:22, ECF No. 466.
[55] Fed. R. Civ. P. 30(b)(6) allows a party to depose an organization through an officer designated "to testify on its behalf." Here, Jeff Hanks is the designee for 30(b)(6) testimony on behalf of RealSource Equity and RealSource Properties OP, LP. *See* Trial Ex. 1029 at 4.
[56] Trial Ex. 1029 at 24:7–21.

Additionally, the assertion that Nathan Hanks reviewed only the profit and loss yearly statements is supported by one of his responses to a request for production.[57] When asked to produce "any and all documents used in making the calculation of the 'Non-Default Monthly Shortall' for each of RS Equity and RS Commercial for each month in which Hanks has not made a monthly loan payment from March 1, 2018 through the present," Nathan Hanks produced RS Equity's profit and loss statements, but no balance sheets or bank records.[58] Thus, the court finds that Nathan Hanks determined annually whether to pay Michael Anderson based on RS Equity's previous year's profit-and-loss statement.[59]

Both parties used the Deferral Clause in the Agreement to support their positions. Michael Anderson contends that because its terms allow a deferral of payment only when RS Equity has "insufficient cash flow **during such calendar month**," Nathan Hanks breached the contract by not making a monthly determination of RS Equity's cash flow.[60] Nathan Hanks emphasizes the portion that describes how the Monthly Payment "shall not be required to be made to Seller pursuant to the respective Note until such Deferring RS Operating Entity has sufficient available cash (taking into account projected costs and expenses and reserves), **as reasonably determined by the manager** of such Deferring RS Operating Entity" to assert he has discretion to withhold payment based on his reasonable assessment of the totality of RS Equity's situation.[61]

---

[57] Trial Ex. 1004 at 4–5.
[58] Trial Ex. 1004 at 4–5.
[59] Trial Tr. 697:9–18, ECF No. 466.
[60] Agreement ¶ 2.3(e); Note ¶ 5 (emphasis added).
[61] *Id.* (emphasis added).

When over a year passed without a payment from Nathan Hanks, Michael Anderson provided him with notice of his default in a letter on May 1, 2020, that stated, in relevant part, as follows:

> While we understand that you have claimed that the relevant entities have "Insufficient Cash Flow" that allows you to defer the monthly payments, we do not believe that this excuse can be justified based on information available to Anderson at this time. If you continue to rely on this excuse and fail to cure the Events of Default set forth herein by making all past due payments, **we demand that you provide all documents and information** upon which you are basing your conclusion that there has been "Insufficient Cash Flow" to make the required payments.[62]

Nathan Hanks did not cure the default within sixty days.[63] Michael Anderson then invoked the Acceleration Clause in his counterclaim,[64] filed on August 7, 2020, in which he stated that the Note provides him "the right 'to make the entire Principal amount of the Note immediately due and payable,' which right Anderson hereby invokes."[65] Michael Anderson's expert, Mr. Rondeau, testified about his calculations regarding prejudgment interest on the balance owing on the Note following the last payment in January 2019.[66]

*Breach of the Implied Covenant of Good Faith and Fair Dealing Claim*

In 2021, RealSource, then under the control of Nathan Hanks, changed the way it handled investments.[67] Michael Anderson presented evidence that RS Equity has ceased its role as the main acquisition entity under the RealSource umbrella and no longer generates asset management income or acquisition income.[68] On May 7, 2021, RealSource established a new

---

[62] Trial Ex. 1028 ("Notice of Default") (emphasis added).
[63] Trial Tr. 691:12–16, ECF No. 466.
[64] Trial Tr. 1046:6–9, ECF No. 473.
[65] *See* Michael S. Anderson's and AKA Partners, LC's Am. Answer and Countercl. ¶ 15, ECF No. 101, filed Aug. 7, 2020; Note ¶ 6.
[66] Trial Tr. 783:20—791:12, ECF No. 467.
[67] Trial Ex. 1029 at 11–14.
[68] Trial Ex. 1029 at 35:23–25; 43:22–24.

entity, RealSource Properties OP, LP ("RSPOP")[69] to acquire investment properties, taking over for RS Equity as the main operating entity for acquisitions within the RealSource umbrella of companies.[70] After this transition, RealSource stopped using RS Equity for most day-to-day operations and shifted this work to RSPOP.[71] Indeed, RS Equity now does "very little" because all its operations have moved to other RealSource entities.[72] RealSource also moved the revenue streams that would have come to RS Equity for operations and disposition fees to RSPOP.[73] When RSPOP was created, several properties were transferred into it from RS Equity.[74] RSPOP was structured to acquire fees following from those properties, including the applicable disposition fees, instead of RS Equity.[75] And, as Nathan Hanks acknowledged, "without new acquisitions, RS Equity Services will have minimal, if any, income."[76] Ever since RSPOP was created in 2021, RS Equity Services' yearly real estate income has slowed to a trickle:

---

[69] The parties often referred to this entity as the "REIT" at trial, while acknowledging it was not technically a Real Estate Investment Trust nor its actual name.
[70] Trial Tr. 711:15–17, ECF No. 466; Trial Tr. 1005:15–24, ECF No. 473; Trial Ex. 1029 at 13–14 (RealSource Equity "was the main kind of operating entity that provided kind of the acquisition model, provided kind of all the services to go out and review, research properties and then, you know, present an executive summary to investors, and then go out and work with lenders and buyers to acquire these properties." RS Equity now does "[v]ery little [b]ecause all of its operations have moved into the OP type entity.").
[71] Trial Ex. 1029 at 13:23–14:23.
[72] Trial Ex. 1029 14:8–14.
[73] Trial Ex. 1029 35:4–36:7.
[74] Trial Tr. 726:9–15, ECF No. 466 (Nathan Hanks's testimony: "more than nine" properties have been transferred into RSPOP); Trial Tr. 897:9—907:15, ECF No. 466 (Kelly Randall's testimony about eleven properties that have been acquired by RSPOP: Antero Apartments, the Park at Midtown, the Park at Oak Ridge Apartments, Autumn Ridge, Alkire Glen, Steepleway Downs, Lake St. James, Belle Grove, the Mill at Georgetown, Timber Hollow Apartments, and Morgan Ridge).
[75] Trial Exs. 1025, 35, 1017; Trial Tr. 729:12–14; 737:6–24, ECF No. 466; Trial Tr. 856:8–12, ECF No. 467.
[76] Trial Tr. 724:25—725:2, ECF No. 466.

| RS Equity's Yearly Real Estate Income (1-Acquisitions, 2-Operations, 3-Dispositions, and 4-Asset Management) | | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 | 2025* |
| 1 | $555,000.00 | $0 | $811,900.00 | $0 | $0 | $0 | $0 |
| 2 | $277,878.18 | ?** | ?** | $0 | $0 | $0 | $0 |
| 3 | $395,000.00 | $809,960.00 | $744,881.92 | $38,600.00 | $0 | $0 | $0 |
| 4 | $242,644.13 | $470,867.95 | $417,678.41 | $385,174.69 | $90,411.18 | $85,962.43 | $40,756.84 |
| **Total** | **$1,470,522.31** | **$1,280,827.95** | **$1,974,460.33** | **$423,774.69** | **$90,411.18** | **$85,962.43** | **$40,756.84** |

(Data in the chart is pulled from Trial Exs. 35 & 1025.)
\* January–June                ** No "Operations" category is listed for these years

Thus, the court finds that the evidence clearly shows RSPOP's detrimental effect on RS Equity's real estate income.[77] Nathan Hanks testified he did not set up RSPOP to stop payment on the RS Equity note to Michael Anderson.[78] Instead, he claimed RSPOP was created to combat a slowing market and to raise money more competitively.[79] Taken at face value, this assertion supports Michael Anderson's argument that RS Equity will never be profitable enough to trigger repayment to him because RSPOP competes with RS Equity for investor dollars—more effectively, according to Nathan Hanks.[80] And although Nathan Hanks also testified that "our hopes are that we can turn that machine back on again," referring to RS Equity, it is unsupported by the evidence.[81]

---

[77] Trial Exs. 1025, 35 (RS Equity's profit and loss statements for 2017–2021 and 2023–June 2025).
[78] Trial Tr. 751:14–17, ECF No. 466.
[79] Trial Tr. 725:13–15, ECF No. 466. *See also* Trial Tr. 751:18—752:8, ECF No. 466 ("A REIT is much more liquid" and can "spread risk").
[80] Trial Ex. 35, 1025 (RS Equity's profits and losses before and after RSPOP's formation).
[81] Trial Tr. 724:25–725:4; 780:16–20, ECF No. 466.

*Compensation Claims*

Kent Anderson and Michael Howard claim they are entitled to unpaid compensation for their work with RealSource.[82] Neither party disputed at trial that there never was a written agreement of any kind about their compensation arrangement.[83] Instead, they had a variety of conversations at various times with various combinations of persons.

Kent Anderson raised equity for RS Equity because he has "a great deal of experience and desire in working with clients."[84] Kent Anderson testified that from 2002 until 2019 he chose to be an independent contractor, rather than an employee, of RS Equity so he could receive real estate commissions on the deals for which he helped raise equity.[85] He testified that at the beginning of his employment with RS Equity, he "sat down with all of the members," including Nathan Hanks and Michael Anderson, and discussed how they would allocate the income from deals.[86] Initially, the compensation arrangement allocated the first 50% to "the house," which was RealSource, and the remainder would be equally shared among the "pool members," including Kent Anderson.[87] During the discussion, Kent was never told that he would no longer receive the fees if he left RealSource.[88] Kent Anderson also testified about many conversations he had over the years with his brother Michael Anderson about compensation.[89] Michael Anderson testified that he had no written agreement with Kent Anderson about his

---

[82] Trial Tr. 1086:2–25, ECF No. 473.
[83] Trial Tr. 920:9. (Michael Anderson's testimony: "There was nothing in writing."), ECF No. 467.
[84] Trial Tr. 818:14–22, ECF No. 467.
[85] Trial Tr. 818:6–7, 820:3–13, 850:19–20; ECF No. 467.
[86] Trial Tr. 820:19—821:5, ECF No. 467.
[87] Trial Tr. 821:19–23, 823:10–15, ECF No. 467.
[88] Trial Tr. 833:18–21, ECF No. 467.
[89] Trial Tr. 853:15–20, ECF No. 467.

compensation.[90] Kent Anderson testified at length about his calculation of the damages he believes he and Michael Howard are owed by RS Equity.[91]

When Michael Howard approached Michael Anderson about working for RS Equity, Michael Anderson twice referred him to Nathan Hanks for those discussions.[92] Michael Howard was an independent contractor for RS Equity.[93] Michael Howard's work for RS Equity focused on finding, analyzing, underwriting, and managing properties.[94] Initially, RealSource paid Kent Anderson and Michael Howard acquisition, operations, and disposition fees.[95] Michael Howard, likewise, testified that Michael Anderson told him he did not have to be with RealSource to receive the fees he had "already earned."[96] Michael Howard also testified about the compensation he believes he is owed, although less extensively.[97]

In 2011, however, Nathan Hanks changed the arrangement so that pool members' distributions were no longer equal but based, instead, on each member's contribution to the deal.[98] Evidence at trial established that Michael Anderson never had authority to decide "who got paid anything out of RS Equity Services for any services rendered."[99] As he testified, "I never had that control. I never was the signer on the accounts."[100] Michael Anderson was also asked at trial, "And did you ever have any agreement that you, as the broker, would pay [Kent Anderson and Michael Howard] anything?" To which he replied, "As the broker, no."[101]

---

[90] Trial Tr. 920:9, ECF No. 467.
[91] Trial Tr. 823:21—867:1, ECF No. 467.
[92] Trial Tr. 869:18–22, 870:5–11, ECF No. 467.
[93] Trial Tr. 887:1–14, ECF No. 467.
[94] Trial Tr. 874:23–25, ECF No. 467.
[95] Trial Tr. 821:12—835:25, 871:8–11, ECF No. 467.
[96] Trial Tr. 886:6–15, ECF No. 467 (Q: "What did Michael say to you? . . . Did he ever tell you that you had to be working for RealSource in order to obtain that money?" A: "He specifically said the opposite. You did not have to be there, it was already earned.").
[97] Trial Tr. 872:19—873:5, ECF No. 467.
[98] Trial Tr. 843:3–22, ECF No. 467.
[99] Trial Tr. 918:14–21, ECF No. 467.
[100] Trial Tr. 918:17–18, ECF No. 467.
[101] Trial Tr. 920:20—921:8, ECF No. 467.

Additionally, both sides referenced Kent Anderson's termination email from Nathan Hanks:

> When we came to an agreement in February that RS would pay you significantly more each month, we did so in reliance on your representation and promise that you would not perform services for AKA while you were performing services for RS. . . . When confronted about you performing services for AKA from March through August, you initially denied your conduct for several days until eventually confessing that you had been lying to us and working for AKA all along. To be clear, that is a breach of our agreement and fraud on your part.[102]

Kent Anderson did not dispute that he was terminated from his relationship with RS Equity in 2019 because after promising not to work for his brother's new firm, AKA Partners, he did so anyway, denied doing so when confronted, and then eventually recanted.[103]

### *Indemnification Claim*

Neither party presented witnesses on this claim.[104] The parties stipulated to the Agreement being entered in as evidence.[105]

## CONCLUSIONS OF LAW[106]

### I.    Defend Trade Secret Act Claim

To establish a claim under the Defend Trade Secret Act "(DTSA)", the owner of a trade secret must show: "(1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by

---

[102] Trial Ex. 15, ¶ 5; Trial Tr. 356:11—358:2; 483:6—485:19, ECF No. 471.
[103] Trial Ex. 15, ¶ 5.
[104] Trial Tr. 955:11—956:17, ECF No. 467.
[105] Trial Tr. 955:16—25, ECF No. 467.
[106] Any Conclusion of Law denominated as a Finding of Fact shall be deemed a Conclusion of Law and any Finding of Fact denominated as a Conclusion of Law shall be deemed a Finding of Fact. To reduce redundancy, the court has not cross-listed all fact findings.

improper means."[107] "The threshold inquiry into a claim of the misappropriation of trade secrets is whether a trade secret even exists."[108] Thus, the court first addresses whether RealSource established the existence of the trade secret at issue here before addressing whether it was misappropriated.

### A.    Existence of a Trade Secret

The DTSA[109] defines a trade secret as "all forms" of information that "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) [that] derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."[110] "The plaintiff bears the burden of proving the existence of a trade secret, and there is no presumption in its favor."[111]

The court begins with this burden, noting that a "plaintiff must substantiate more than vague and unsupported allegations as to unknown trade secrets in order to satisfy its burden."[112] RealSource claims the trade secret is a Client List or collection of contact information for hundreds of investors who participate in RealSource's investments in real estate.[113] RealSource's

---

[107] *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210 (D. Utah 2023) (quoting *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1175 (D. Colo. 2019)).

[108] *Farm Bureau Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178, 1185 (D. Utah 2007).

[109] 18 U.S.C. §§ 1831 to 1839.

[110] *Id.* § 1839(3).

[111] *Bimbo Bakeries USA, Inc. v. Sycamore*, 39 F.4th 1250, 1262 (10th Cir. 2022). The analysis in cases brought under the Uniform Trade Secrets Act is applied by the court because the elements are substantially similar to those brought under the DTSA. *Applied Predictive Techs., Inc. v. MarketDial, Inc.*, No. 2:19-cv-496, 2024 WL 3759894, at *6 (D. Utah 2024) ("As a general matter, because of their substantial similarities, the federal trade secrets statute and state uniform secrets statutes are often considered in tandem. This, in part, stems from the fact that the federal statute was expressly modeled on the uniform trade secrets statute."); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (considering claims brought under the federal trade secrets statute together with a state uniform trade secrets act "because the elements are substantially similar").

[112] *Utah Med. Prods., Inc. v. Clinical Innovations Assocs., Inc.*, 79 F. Supp. 2d 1290, 1312 (D. Utah 1999).

[113] ECF No. 389. Earlier in this litigation, defendants argued the Client List did not qualify as a trade secret because it was not a single compilation. But a "trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret." *Meyer Grp., Ltd. v. Rayborn*, 695 F. Supp.

evidence of the list amounts to referential testimony. Nathan Hanks testified that there are spreadsheets with client information maintained in databases, that "there was four separate ways we kept track of all of our clients and their information," and that RS Equity is the owner of the "four databases."[114] Yet when Nathan Hanks was asked whether a list exists "as a standalone thing within either Constant Contact or IMS," he did not know and conceded he was "not able to confirm it right now without asking the person who runs" the programs.[115] He believes "there is a list that says here are the specific RealSource investors," but has never seen that list and is "relying on somebody else telling [him] that it exists."[116] Two of those databases, Constant Contact and IMS, are from third-party providers with specialized functions, such as email distribution and financial management.[117] Michael Howard testified that he ran Constant Contact at RealSource and would "periodically" receive a list from a coworker that he would upload into Constant Contact when RealSource "wanted to run a campaign."[118] He clarified that Constant Contact is not an email management system, but an "email broadcast system."[119] Finally, RealSource's damages expert, Mr. Townsend, testified that he was provided with "RealSource's client list" that he used to compare names on AKA's list of investors.[120]

However, RealSource failed to enter into evidence any portion of the Client List or any client-related data.[121] RealSource did not produce data from the servers described in testimony.

3d 39, 63 (D.D.C. 2023); *see also IHS Glob. Ltd. v. Trade Data Monitor, LLC*, No. 2:18-cv-01025, 2021 WL 2134909, at *7 (D.S.C. 2021). And courts have established six factors to determine if a compilation is a trade secret. *See Bimbo Bakeries USA*, 29 F.4th at 641 (quoting Restatement of Torts § 757 cmt. b (1939)). Regardless, the court need not decide whether the Client List qualifies as a compilation trade secret because the existence of the Client List was not established at trial.

[114] Trial Tr. 344:6–8, 446:17–25, 446:20–24, 467:19—468:7, 447:8–10, 456:12–16, ECF No. 471.
[115] Trial Tr. 470:4–20, ECF No. 471.
[116] Trial Tr. 470:22–471:7, ECF No. 471.
[117] Trial Tr. 120:3–6, ECF No. 451; Trial Tr. 379:14–25, ECF No. 471.
[118] Trial Tr. 117:22—125:16, ECF No. 451.
[119] Trial Tr. 120:3–6, ECF No. 451.
[120] Trial Tr. 246:2–7, ECF No. 452.
[121] *See* Trial Tr. 446:20–24, 467:19—468:7, ECF No. 471.

Instead, RealSource offered two exhibits that purportedly contained summaries, or excerpts, of the Client List into evidence.[122] Although these summaries, unlike the underlying client data, had already been produced in discovery, they were not admitted into evidence because RealSource failed to produce the proper witness to introduce them.[123] RealSource then attempted to call previously undisclosed witnesses, but the court denied the request under Federal Rules of Civil Procedure 26(a) and 37(c)(1).[124]

In sum, the existence and content of the Client List or lists have not been established by the preponderance of the evidence. While RealSource undoubtedly has contact information for its clients and potential clients, more is required to prove the existence of a trade secret. For whatever reason, RealSource did not produce the actual information that would comprise its Client List. The record evidence does not show exactly what information is kept on the Client List, how the clients' information was obtained, when each client was added to the list, or how many clients are on the list. Testimony about how client information was maintained at RealSource does not suffice to prove the existence of a confidential Client List.[125]

Having failed to produce the Client List and data themselves, RealSource elicited testimony from Nathan Hanks and Kelly Randall about many dozens of email addresses they recognized as belonging to RealSource investors on an email from Michael Anderson on behalf of AKA Partners. But Michael Anderson's mass email sent on behalf of AKA to potential investors that included email addresses of individuals or entities who had been RealSource investors does not establish the existence of RealSource's confidential Client List.

---

[122] Trial Tr. 358:3—368:10, ECF No. 471.

[123] *Id.*

[124] Fed. R. Civ. P. 26(a), 37(c)(1).

[125] Trial Tr. 117:22—125:16 (Michael Howard testifying how he ran Constant Contact at Real Source and would "periodically" receive a list when they wanted to run a campaign" that he would upload into Constant Contact.); Trial Tr. 446:17–25; 447:8–10, ECF No. 471. (Nathan Hanks testifying about spreadsheets with client information maintained in databases).

Therefore, RealSource failed to meet its burden of proving by the preponderance of the evidence the existence of a RealSource confidential Client List it claims is a trade secret.[126]

*Reasonable Measures to Keep Information Secret*

Assuming the Client List had been produced and received into evidence, the next question is whether RealSource proved by a preponderance of the evidence that reasonable measures were taken to keep the information secret.

The DTSA only protects information that its owners have taken reasonable measures to keep secret.[127] "Reasonable efforts does not mean all conceivable efforts, nor are heroic measures required. Thus, a plaintiff can meet this requirement even though a defendant manages to point out aspects of plaintiff's procedures that could have been stronger."[128] But "indispensable to an effective allegation of a trade secret is proof that the matter is, more or less, secret."[129]

RealSource failed to show that reasonable measures were made to keep the Client List secret. First, RealSource does not have written agreements with its independent contractors requiring confidentiality.[130] Kent Anderson and Michael Howard never signed confidentiality agreements with RealSource.[131] Nor was any evidence presented that they were asked to sign

---

[126] *Bimbo Bakeries USA*, 39 F.4th at 1262.

[127] 18 U.S.C. § 1839(3)(A).

[128] *Graystone Funding Co., LLC v. Network Funding, LP*, No. 2:19-cv-00383, 2021 WL 4460113, at *3 (D. Utah Sept. 29, 2021) (quoting *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1296–97 (D. Utah 2020) (internal citations omitted); *see also First United Bank Ins. Sols., Inc. v. Inservices, LLC*, No. civ-22-682-R, 2023 WL 1483138, at *3 (W.D. Okla. Feb. 2, 2023)).

[129] *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1109 (10th Cir. 2009) (citation omitted).

[130] Trial Tr. 441:3–9, 442:3–6, ECF No. 471.

[131] Trial Tr. 159:8–14, ECF No. 451 (Michael Howard's testimony he was never provided "with an employee handbook or employee manual" or asked to sign one while at RS Equity);169:24–25, ECF No. 451 (Kent Anderson: "I was an independent contractor [with RealSource] from December 2, 2002, until October 16th of 2019."); Trial Tr. 871:18–25, 887:1–11, ECF No. 467 (testimony about Michael Howard being an independent contractor with RealSource); Trial Tr. 348:9–11, ECF No. 471. (Nathan Hanks's testimony that he is "not aware" of any independent contractors signing the employee handbook).

any confidentiality agreement. RealSource's *employee* handbook has a confidentiality section, but the handbook entered into evidence does not apply to *independent contractors*.[132] Additionally, the RealSource employee handbook postdates the events at issue.[133] Nathan Hanks testified that "from 2017 forward," a similar confidentiality provision existed in the employee handbook, but RealSource failed to offer into evidence the confidentiality provision itself or elaborate on how that provision was "similar" to the one promulgated later.[134]

Second, the only evidence about security regarded the IMS database and Constant Contact, which are third-party software programs. Nathan Hanks testified that access to the Client List was on a "need-to-know basis," but no clear evidence was presented about exactly who accessed the lists or when they were accessed.[135] Additionally, it is undisputed that for a period of years Michael Howard, an independent contractor who was not bound by any confidentiality provision, had access to one or both of these programs. Finally, while Nathan Hanks described the client information at issue as residing in four programs, almost nothing was said about the two non-IMS and non-Constant Contact sources, including any security features.

For all of these reasons,[136] RealSource did not establish, by a preponderance of the evidence, that it took reasonable measures to protect the secrecy of its client information.[137] Therefore, the Client List fails to satisfy this element of a trade secret.

---

[132] Trial Tr. 346:8–25, ECF No. 471; Tr. Ex. 2 (the employee handbook states it was "revised 3/01/2020").
[133] *Id.*
[134] Trial Tr. 347:13–22, ECF No. 471.
[135] Trial Tr. 347:5–12, ECF No. 471.
[136] Michael Anderson also argued that RS Equity fails on this element because the Client List has been used on behalf of an entity other than RS Equity. Since 2020, RS Equity has "shared and continues to share information regarding [RSPOP] to its client list to invite these clients to invest in RSPOP." Trial Tr. 461:9–12; 461:24—462:8, ECF No. 471. Because this element fails on other grounds, the court chooses not to address this argument.
[137] Trial Tr. 379:9—384:3, ECF No. 471.

*Independent Economic Value from Secrecy*

Even if the other factors were met, RealSource has not demonstrated the Client List's independent economic value from being kept secret.

To qualify as a trade secret under the DTSA, information must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."[138] "Thus, the essence of a trade secret is that it derives its value from secrecy."[139] "This element requires proof not just of value, but of value specifically tied to secrecy."[140] "Proof of value untethered to value derived from secrecy does not show an alleged trade secret's independent economic value."[141]

RealSource did not make this showing because it did not present supporting evidence or rebut contradicting evidence. RealSource offered no specific evidence about the efforts, time, or other resources spent on developing the Client List. Evidence of the "amount of effort or money expended in obtaining and developing the information" is a hallmark of a trade secret claim.[142] Yet RealSource offered no evidence that it expended considerable time and effort over the years to curate a list of existing and potential investors that it claimed to be invaluable for raising equity.

Instead, RealSource argued throughout trial that AKA could not have closed on its properties without RealSource investors, claiming that "there's no suggestion that they had

---

[138] 18 U.S.C. § 1839(3)(B).
[139] *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004).
[140] *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 771 (4th Cir. 2023).
[141] *Id.* at 772 (citing *Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996)).
[142] *Hertz. v. Luzenac Grp.*, 576 F.3d 1103, 1108 (10th Cir. 2009) (cleaned up).

alternative investors available."[143] According to RealSource's theory, an entity such as AKA "buy[s] the apartment building for 10 million, and you can finance 70 percent of it, but you have to raise . . . $3 million through investors. Well, none of those numbers would have been met without the RealSource customer list."[144] This argument, however, holds no weight in the court's analysis because it was unsupported by the evidence.[145] At most, RealSource attempted during closing argument to connect evidence from its damages expert's report about the specific investors in each AKA project with the testimony about RealSource investors in Michael Anderson's email to calculate what percentage of AKA's investors had invested with RealSource.[146] But RealSource failed to produce evidence that any of those investors had actually diverted their investment dollars from RealSource. Without such evidence of actual diversion, RealSource's theory is based on mere speculation. Furthermore, closing argument is not evidence and theories must be tethered to facts admitted into evidence.[147]

Second, RealSource failed to rebut defendants' evidence that such lists of potential investors are readily available to the public and that the primary value of the Client List was in the underlying relationship with the clients, not in the secrecy of the list.[148] Kent Anderson testified that AKA purchased a list of 42,000 high-net-worth contacts for 16 cents apiece from an online company, and that "[m]any" title companies provide free lists of such names.[149] And Michael Howard testified that he did not think it would be "a big deal" if one of his competitors

---

[143] Trial Tr. 992:13–14, ECF No. 473.

[144] Trial Tr. 992:11–22, ECF No. 473.

[145] *See, e.g.*, *Fed. Deposit Ins. Corp. v. Palermo*, 815 F.2d 1329, 1338 (10th Cir. 1987) ("A party is only entitled to instructions on those theories of his or her case that are supported by competent evidence.").

[146] Trial Tr. 981:1—983:7, ECF No. 473.

[147] *See United States v. O'Neal*, 796 Fed. App'x 513, 517 (10th Cir. 2019) ("Closing arguments are not evidence."). It is worth noting that there were names mentioned by Nathan Hanks and Kelly Randall that Mr. Townsend did not identify as being RealSource investors, which highlights flaws in the data underlying its expert's report. *See* Trial Tr. 1019:21—1020:11, ECF No. 473.

[148] Trial Tr. 141:22–25, ECF No. 451.

[149] Trial Tr. 188:18—189:20, ECF No. 451.

had his customer list because "[t]hose names are available anywhere."[150] He explained, "It's not about the list. It's about the relationship you have with the name."[151] Kent Anderson, likewise, testified that "the important part" of his list was not the contact information but "the relationship itself."[152] It stands to reason that individuals are more willing to invest with an acquaintance than with a stranger. But more importantly, RealSource left this evidence unrebutted. In sum, the absence of sufficient evidence about the list's "independent economic value, actual or potential, from not being generally known" and the unrebutted evidence to the contrary, RealSource did not establish by a preponderance of the evidence that client information "derives its value from secrecy."[153]

Accordingly, the Client List does not qualify as a trade secret under these elements.

### B.    Acquisition of the Trade Secret by Improper Means

If the Client List were a trade secret, RealSource would still need to show acquisition by improper means. "To establish the acquisition of a trade secret, a plaintiff must show that the trade secret was 'acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.'"[154]

That acquisition must have occurred "without express or implied consent by a person who used improper means, such as misrepresentation or a breach of a duty to maintain secrecy, 'to acquire knowledge of the trade secret.'"[155] RealSource's claim fails on this element because

---

[150] Trial Tr. 141:17–24, ECF No. 451.
[151] Trial Tr. 141:14–25, ECF No. 451.
[152] Trial Tr. 171:5–7, ECF No. 451.
[153] *Stromback*, 384 F.3d at 305.
[154] *Big Squid, Inc. v. Domo, Inc.*, No. 2:19-cv-193, 2019 WL 3555509, at *12 (D. Utah Aug. 5, 2019) (quoting 18 U.S.C. § 1839 (5)(B)(ii)(II))).
[155] *Rapid Enters., LLC v. U.S. Postal Serv.*, No. 2:22-cv-00627, 2023 WL 5979999, at *11 (D. Utah Sept. 14, 2023) (quoting 18 U.S.C. § 1839(5)(B)(i)).

the record does not show that defendants acquired the alleged trade secret, let alone did so without consent by improper means.

First, RealSource has not established by a preponderance of the evidence that defendants acquired RealSource's Client List. That Nathan Hanks and Kelly Randall recognized many investors' email addresses in Michael Anderson's email seeking investments for AKA does not prove that defendants obtained client contacts from RealSource's lists. What the record does show is that Michael Anderson did not have access to the databases containing the client information, and Kent Anderson may have had his own list of investors dating back to 2003.[156] Kent Anderson testified that his "job was just to raise equity, and so [he] started th[e] list for that purpose" and "added to it over the years as [he would] get more referrals and introductions.[157] There was no evidence that RealSource paid Kent Anderson for creating the list. On the contrary, Kent Anderson stated that he was not "salaried for the purpose of creating data for RealSource" or asked to create a list of accredited investors.[158] He testified that he simply did so as an independent contractor to help him raise investor funds.[159] Having said that, Kent Anderson also did not offer into the evidence the investor list he said he created. As for Michael Howard, he had access to Constant Contact until he left RealSource, but RealSource did not establish that he used that access to pass along client information to Michael or Kent Anderson.[160]

In fact, Nathan Hanks acknowledged RealSource made no efforts to try and determine who allegedly accessed their databases at the relevant times.[161] Despite RealSource's concern that defendants improperly obtained its confidential Client List, it failed to conduct an audit of its

---

[156] Trial Tr. 180:2–21, ECF No. 451.
[157] Trial Tr. 180:2–8, ECF No. 451.
[158] Trial Tr. 181:4–9, 23–25, ECF No. 451.
[159] *Id.*
[160] Trial Tr. 453:16—455:23, ECF No. 471. (Nathan Hanks acknowledging RealSource made no efforts to try and determine who accessed their databases at the relevant times).
[161] Trial Tr. 453:16—455:23, ECF No. 471.

systems to see if defendants actually accessed them. Nathan Hanks conceded that RealSource could have determined who logged in and what logins occurred with Constant Contact and IMS but RealSource did not make any such effort.[162] Thus, while there was testimony that Nathan Hanks or Kelly Randall recognized approximately half of the addresses from Michael Anderson's fundraising email as belonging to RealSource investors, this was insufficient to establish that Michael Anderson's email list was a copy of RS Equity's confidential Client List or even derived from it.

Second, RealSource failed to show improper means or lack of consent. The evidence does not establish that Michael Anderson violated the Agreement's Non-Solicitation Clause, which states in relevant part as follows:

> During the Restricted Period, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients of or investors in any RS Entity or potential clients of or investors in any RS Entity **with the intention of diverting their business or services from any RS Entity or for any other purposes the effect of which is to divert their business or services from any RS Entity**.[163]

RealSource presented no direct evidence that Michael Anderson violated this provision.[164] RealSource seemingly assumed that anyone who had ever invested with it would necessarily invest with RealSource—and only RealSource—in future investments. But critically,

---

[162] Trial Tr. 454:11—455:23, 484:21—485:6, ECF No. 471.

[163] Agreement p 7.4(c) (emphasis added).

[164] As described above, Nathan Hanks and Kelly Randall identified several dozen emails of RealSource investors on Michael Anderson's email to potential AKA investors. But this exercise failed to establish misappropriation. RealSource conceded Michael Anderson never had access to Constant Contact or IMS, so the overlap of investor emails could easily imply Michael Anderson obtained the names from somewhere other than the databases that stored RealSource's confidential Client List(s). RealSource tried to rebut Michael Anderson's testimony that he populated the email list from his own information with Nathan Hanks's testimony that some of the names on Michael Anderson's email became investors with RealSource after he left in 2018. *See* Trial Tr. 495:1–11, ECF No. 471. Yet neither Nathan Hanks nor Kelly Randall testified where the new investors' names came from or foreclosed the possibility that Michael Anderson had not already become acquainted with those investors. Thus, the testimony RealSource did present about emails matching RealSource investors did not establish misappropriation of the Client List.

it failed to produce evidence that any of the individuals or entities who invested with AKA would have invested additional funds with RealSource if AKA had not approached them.

Michael Anderson, on the other hand, produced evidence that he told potential AKA investors that they could not invest if doing so would divert investments from RealSource. Michael Anderson communicated this requirement in a disclaimer at the end of emails to potential investors: "Please note that you should not divert any funds that you plan to invest with RealSource to any projects that I am discussing herein or otherwise. Due to contractual obligations I can't, and would not, accept such funds."[165] Furthermore, the evidence shows that Michael Anderson required potential AKA investors to sign non-diversion letters, which state in relevant part as follows:

> The undersigned hereby represents to the Anderson Parties and the RS Parties that any investment that the undersigned makes now or in the future with any of the Anderson Parties will not divert any business, investment funds or other services to/from any of the RS Parties. The undersigned covenants not to do any business with any of the Anderson Parties in the future that would negatively impact or in any way result in a diversion of any business, investment funds or other services to/from any of the RS Parties.[166]

The Agreement's Non-Solicitation clause did not outright prohibit Michael Anderson from soliciting investors generally or RealSource investors specifically. Instead, it barred only solicitation that diverted or was intended to divert money from RealSource.[167] Michael Anderson alerted potential investors of this, both through email disclaimers and non-diversion letters.

---

[165] Trial Ex. 20.
[166] Trial Ex. 1166.
[167] Agreement p 7.4(c). "During the Restricted Period, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients of or investors in any RS Entity or potential clients of or investors in any RS Entity **with the intention of diverting their business or services from any RS Entity or for any other purposes the effect of which is to divert their business or services from any RS Entity**." (emphasis added).

Thus, Michael Anderson's conduct regarding RealSource clients does not violate the Agreement, so even if RealSource could prove the other elements, it cannot show the Client List was used "without express or implied consent."

Nevertheless, there was limited testimony received that Michael Anderson may have felt that his actions could have damaged RealSource. Nathan Hanks testified that he met with Michael Anderson at his home one evening in the wake of the previously discussed AKA Partners email that was sent to numerous individuals, many of whom also had invested with RealSource. According to Nathan Hanks, Michael Anderson "said he felt bad about it, he felt sorry, that they really needed to raise these funds for this project, but that I was supposed to let him know whatever the damages were and he would pay them."[168] While this testimony is notable, it does not, of course, establish the existence of trade secret, show that reasonable measures were taken to protect it, establish that the Agreement itself was violated,[169] or prove that the client contact information used must have come from RealSource as opposed to mutually known information kept by the independent contractors, Mike Howard and Kent Anderson.

Finally, as independent contractors, Kent Anderson and Michael Howard were under no confidentiality agreements during their employment with RealSource.[170] In sum, this element fails because the record does not show that defendants acquired the Client List or used it without consent.

---

[168] Trial Tr. 389:8-11, ECF No. 471.
[169] In closing argument, Nathan Hanks's counsel argued that when Michael Anderson sent out his email to numerous individuals who had invested with RS Equity and thereby exposed their email addresses to each other "that is a breach of confidentiality." Trial Tr. 975:20–976:1, ECF No. 473. Counsel did not explain how using the email addresses in an inadvertently unblinded fashion amounted to a violation of the confidentiality provision of the Purchase Agreement. Nor was evidence received about what damages would have flowed from any such breach.
[170] Trial Tr. 441:3–9, 442:3–6, ECF No. 471.

### C.    Injury Resulting from Use of the Trade Secret

Because RealSource has not established any elements of the DTSA claim, the court does not consider damages.

In sum, the DTSA claim fails because RealSource has not met its burden to establish the elements.

## II.    Breach of Contract Claim

Utah law applies to Michael Anderson's contract claims.[171] On his breach of contract claim, Michael Anderson must prove (1) the existence of a contract, (2) his own performance under the contract, (3) breach of the contract by the other party, and (4) damages.[172] The parties are in clear agreement that there is an enforceable contract between them.[173] However, Nathan Hanks disputes the remaining elements, contending that Michael Anderson did not perform as required by the contract, that he did not breach the relevant contracts or that his nonpayment was excusable, and that damages should not be awarded.[174] Thus, the court considers each of those elements in turn.

### A.    Performance

There is no dispute that Michael Anderson transferred his interest in RealSource entities to Nathan Hanks.[175] Although Nathan Hanks argues that Michael Anderson violated a provision

---

[171] "A federal court exercising supplemental jurisdiction over state-law claims 'applies the substantive law . . . of the forum state.'" *Cornelius v. Oracle Am., Inc.*, 2:24-cv-00850, 2025 WL 2161146, *4 n.5 (D. Utah July 30, 2025) (quoting *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999)); *see also* Agreement ¶ 10.9(a) (stating that the "Agreement shall be governed by and construed in accordance with the internal laws of the State of Utah").

[172] *Accesslex Inst. v. Philpot*, 2023 UT App 21, ¶ 25, 526 P.3d 1282 (quoting *Am. W. Bank Members, LC v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224).

[173] That contract was received into evidence and contains the material provisions of the parties' agreement. Trial Ex. 1.

[174] Trial Tr. 342:5–7, ECF No. 471; Trial Tr. 691:4–6. ECF No. 466; Mot. for Partial Summ. J. Against Michael Anderson on the RS Equity Note 2–3, ECF No. 325, filed Nov. 17, 2023.

[175] Trial Tr. 685:2–13, ECF No. 466.

of the Agreement by soliciting investors for AKA projects, the court has already found that

Michael Anderson did not violate the Agreement.[176] Therefore, Michael Anderson has met this

element and his performance under the Agreement is established.

### B.    Breach

"The essence of a breach of contract claim is that one party violated the terms of a

contract while the other party complied with them."[177] Under the terms of the Agreement,

Nathan Hanks agreed to pay Michael Anderson $683,757 for his interest in RS Equity and to pay

that amount in sixty equal monthly installments of $11,396.[178] The monthly payments are

predicated upon RS Equity having sufficient cash flow to pay Nathan Hanks "at least equal to

twice" the $11,396.[179] If it is determined that said condition is not met, the Agreement allows

Nathan Hanks to defer payment to Michael Anderson as outlined in the Deferral Clause, which

states in relevant part as follows:

> . . . in the event that if any of the RS Operating Entities cannot make a Distribution to Buyer at least equal to twice the full Monthly Payment that Buyer must make to Seller related to such RS Operating Entity (the "Deferring RS Operating Entity") **as a result of insufficient cash flow during such calendar month** (any such shortfall, a "Non-Default Monthly Shortfall"), an amount equal to one-half (1/2) of the Non-Default Monthly Shortfall in such Monthly Payment allocated to such RS Operating Entity (only) (the "Deferred Monthly Payment") shall not be required to be made to Seller pursuant to the respective Note until such Deferring RS Operating Entity has sufficient available cash (taking into account projected costs and expenses and reserves), **as reasonably determined by the manager** of such Deferring RS Operating Entity . . . .[180]

The alleged conflict in the Deferral Clause arises from the bolded language. Michael

Anderson contends that because the Deferral Clause allows a deferral of payment only when RS

---

[176] *See supra* Section I.B.
[177] *Storey v. Seipel*, 2:22-cv-00486, 2024 WL 4436609, at *8 (D. Utah Oct. 24, 2024).
[178] Note ¶ 2.
[179] Agreement ¶ 2.3(e); *see also* Note ¶ 5.
[180] *Id.* (emphasis added).

Equity has "insufficient cash flow **during such calendar month**," Nathan Hanks breached the contract by not making monthly determinations of RS Equity's cash flow.[181]

For his part, Nathan Hanks invokes the language in the Deferral Clause that describes how the Monthly Payment "shall not be required to be made to Seller pursuant to the respective Note until such Deferring RS Operating Entity has sufficient available cash (taking into account projected costs and expenses and reserves), **as reasonably determined by the manager** of such Deferring RS Operating Entity" to assert he has discretion to withhold payment based on his reasonable assessment of the totality of RS Equity's situation.[182]

"When we interpret a contract we first look at the plain language of the contract to determine the parties' meaning and intent."[183] "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language and the contract may be interpreted as a matter of law."[184]

"A contract is facially ambiguous if its terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[185] "A 'reasonable interpretation' is one 'that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended.'"[186]

Here, the parties' different positions do not stem from ambiguity in the Deferral Clause because its terms are capable of only "one reasonable interpretation."[187] The Deferral Clause

---

[181] Agreement ¶ 2.3(e); Note ¶ 5 (emphasis added).
[182] *Id.* (emphasis added).
[183] *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 (internal quotations omitted).
[184] *Id.* (quoting *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599).
[185] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (citations omitted).
[186] *Meade Recovery Servs. LLC v. Davidson*, 2025 UT App 97, ¶ 10, 575 P.3d 228 (quoting *Brady*, 2019 UT 16, ¶ 55).
[187] *Mind & Motion*, 2016 UT 6, ¶ 24 (citations omitted).

states that "if any of the RS Operating Entities cannot make a Distribution to Buyer at least equal to twice the full Monthly Payment that Buyer must make to Seller related to such RS Operating Entity (the "Deferring RS Operating Entity") **as a result of insufficient cash flow during such calendar month**," then the Monthly Payment "shall not be required to be made to Seller pursuant to the respective Note until such Deferring RS Operating Entity has sufficient available cash . . . ."[188] The Agreement and Note clearly create a monthly payment plan: "The Principal Amount shall be due and payable in sixty (60) equal monthly installments of $11,396."[189] "The first payment under each of the Notes shall be payable on February 15, 2018 to Seller or his successors and assigns, and thereafter equal payments shall be made on the fifteenth (15th) day of each calendar month . . . ."[190] The Agreement conditions those monthly payments on RS Equity's ability to pay Nathan Hanks twice the Monthly Payment each month.

In other words, the Deferral Clause plainly required Nathan Hanks to determine whether RS Equity had sufficient cash flow on a *monthly* basis.[191] If he did not do so, he would have no basis for deferring any particular monthly payment and would be in breach of the contract by withholding the payment.[192] Sufficient cash flow is defined in the Agreement "as at least equal to

---

[188] Agreement ¶ 2.3(e) (emphasis added); *see also* Note ¶ 5.
[189] Note ¶ 2.
[190] Agreement ¶ 1.2(c).
[191] *Id.* ("[I]f any of the RS Operating Entities cannot make a Distribution to Buyer at least equal to twice the full Monthly Payment that Buyer must make to Seller related to such RS Operating Entity (the "Deferring RS Operating Entity") as a result of insufficient cash flow **during such calendar month** . . . ."). Nathan Hanks was asked if he understood "that every month you're required to make the payment unless you reasonably determine that RS Equity Services could not make a distribution to you of $22,792?" to which he answered, "Correct." Trial Tr. 693:16–20, ECF No. 466.
[192] Regarding Nathan Hanks's other potential justifications for withholding payments, at trial there was testimony that on February 10, 2019, Nathan Hanks asked Michael Anderson if he could pause payments under the Note until RS Equity's acquisitions picked back up, something he assured Michael Anderson would happen soon. Trial Tr. 701:19—702:22, ECF No. 466; Trial Ex. 1012. Nathan Hanks testified that he "also called and we discussed it." Trial Tr. 701:23–24, ECF No. 466. Then, on February 15, 2019, Nathan Hanks emailed Michael Anderson stating that "per our discussion and the previous email" he would "hold the monthly RS Equity Service payment until some additional acquisitions are made." Trial Ex. 1012. Nathan Hanks testified that he was "not sure if this is a modification or not. I mean, it is in writing, and it looks like both parties have agreed to it." Trial Tr. 703:23–25, ECF No. 466. The email exhibit itself does not include any response indicating agreement by Michael Anderson, notwithstanding Nathan Hanks's testimony that both parties had agreed to it. Trial Ex. 1012; *see also* Trial Tr.

twice the full Monthly Payment that Buyer must make to Seller," meaning that Nathan Hanks needed to make a monthly determination of whether RS Equity could pay him at least $22,792 before he could defer the monthly payment to Michael Anderson for his interests in RealSource.[193] If he made that determination for a given month, then such payment would become a "Deferred Monthly Payment."[194]

Any particular "Deferred Monthly Payment" then would be deferred until RS Equity had "sufficient available cash (taking into account projected costs and expenses and reserves), **as reasonably determined by the manager** of such Deferring RS Operating Entity . . . ."[195] In other words, once a monthly payment had been deferred by meeting the conditions of the preceding paragraph, that particular payment would not need to made until the manager, Nathan Hanks, reasonably determined there was sufficient available cash to do so.

At trial, the preponderance of the evidence showed that Nathan Hanks made an *annual* determination of whether to pay Michael Anderson, based on RS Equity's previous year's profit-and-loss statement.[196] This annual determination violates the terms of the Deferral Clause and renders the "**as a result of insufficient cash flow during such calendar month**" section

---

703:12–19, ECF No. 466 (Michael Anderson's attorney asked Nathan Hanks: "Well, do you understand that that's a legal theory that has been advanced in this case, that this email and Mike responding to it created a modification of the agreement?" Nathan Hanks responded "If what you're saying is that this did create a modification, then great, it created it. I'm not – you know, it sounds like a legal situation."). Michael Anderson was not asked and did not testify on this issue. When Nathan Hanks was asked whether he told Michael Anderson that the Agreement gave him the "right to pause payments," he responded, "I was just being – you know, we had been friends and partners for 20 years at this point in time. So it was the kind way of asking. And then I followed up a few days later saying, "I'm doing this, so . . ." Trial Tr. 702:23—703:3, ECF No. 466. Nathan Hanks did not pursue a theory of modification of the contract's payment terms at closing. *See generally* ECF No. 473; *see also* Trial Tr. 1041:20—1042:3, ECF No. 473. In any event, the evidence at trial does not support a modification.
[193] Agreement ¶ 2.3(e).
[194] *Id.*
[195] *Id.* (emphasis added); *see also* Note ¶ 5.
[196] Trial Tr. 697:9–18, ECF No. 466.

meaningless.[197] If Nathan Hanks wished to invoke the Deferral Clause to delay making a

monthly payment, he was required to make a monthly determination.[198]

  Nathan Hanks produced no evidence to establish how this determination was made every

month since February 2019.[199] Instead, the totality of evidence suggests that this was not done.

Nathan Hanks's initial trial testimony referred only to reviewing annual profit and loss

statements. He repeatedly testified that his process was to look at the profit and loss statements

each year and determine whether he owed Michael Anderson any payments. After he made the

first year's payments, he considered that he had overpaid Michael Anderson because RS Equity

had not made an annual profit, and he never made any additional payments. When asked whether

he determined each month if the monthly payment to Michael Anderson was deferrable, he

candidly answered, "Nope."[200] He testified that he did not think the contract required him to do

so. He reviewed RS Equity's ability to pay on "an annual basis."[201] He reasoned that because RS

Equity had a net loss in 2018, "we're already 200,000 in the hole, so we have to come out of that

hole before any payment would be due."[202] That might have been a sensible way to think from a

business perspective, but it was not what the Agreement specified. As noted above, if Nathan

Hanks sought to defer any particular monthly payment, he needed to make the monthly

determination set forth in the Deferral Clause. Once properly deferred, any such deferred

monthly payment would not become due until RS Equity had "sufficient available cash" as

reasonably determined by its manager. In short, Nathan Hanks confused the terms of the contract

---

[197] Agreement ¶ 1.2(e) (emphasis added).
[198] *Id.*
[199] Trial Tr. 691:12–14, ECF No. 466. (Nathan Hanks's last payment to Michael Anderson was in January 2019.)
[200] Trial Tr. 695:13–15, ECF No. 466. *See also* Trial Tr. 697:21–22, ECF No. 466 ("The analysis did not become on a monthly basis, no.").
[201] *Id.*
[202] Trial Tr. 695:19–21, ECF No. 466.

on when he could defer any particular monthly payment with the terms of when a properly deferred payment ultimately would be due.

On further examination, Nathan Hanks's counsel asked him whether he sometimes looked at monthly bank statements when deciding whether to pay Michael Anderson.[203] Nathan replied, "For many of those months, I would look monthly at the bank statement."[204] But no particular months were specified. Even if the statement were credited, it would be unusable for purposes of determining which monthly payments, if any, were properly deferred. And no documentary evidence was submitted documenting these reviews. Taken as a whole, the evidence strongly suggests that Nathan Hanks either always or generally made annual determinations about whether RS Equity would make any payments to Michael Anderson.[205] This was insufficient for purposes of the contract's Deferral Clause.

And, indeed, the record evidence shows that even if a monthly review had occurred, it would not have been possible to meet the Deferral Clause's terms for every month in the period at issue. From February 2019 until June 2025, RS Equity had four months in which its monthly net income apparently would not have supported deferring a monthly payment.[206] Accordingly, Nathan Hanks was in breach because the preponderance of the evidence shows that he failed to conduct the monthly review required to meet the terms of the Deferral Clause and because there were multiple months when, if he had done the required monthly assessment, he could not have deferred the monthly payment.[207]

---

[203] Trial Tr. 752:16–18, ECF No. 466.
[204] Trial Tr. 752:23–25, ECF No. 466.
[205] Trial Tr. 705:21–25, ECF No. 466 (Nathan Hanks confirming that the annual "profit and loss statements" were the basis on which he decided whether to make payments to Michael Anderson.)
[206] *See* Trial Ex. 1025 (RS Equity's Profit and Loss Statements 2017–2021) (showing net income for Aug. 2019 as $372,606.08, March 2020 as $688,112.73, May 2020 as $390,578.12, and Dec. 2021 as $1,422,672.98).
[207] Trial Ex. 1025.

### C.    Damages

Under Utah law, "breach of contract damages are limited to the 'express terms of the contract.'"[208] And "when two agreements are executed substantially contemporaneously and are clearly interrelated, they must be construed as a whole and harmonized if possible."[209] Here, because the Note and the Agreement were executed together and relate to the same transaction, the court "construe[s] them as a whole."[210]

Turning to the terms of the Agreement and the Note, the court accepts Michael Anderson's damages calculations that are based on the premise that Nathan Hanks has been in breach every month since February 2019.[211] Although in most months RS Equity apparently did not have sufficient monthly cash flow to trigger Michael Anderson's monthly payment, Nathan Hanks was still in breach for every month that he deferred Michael Anderson's payment but failed to do the monthly review that the Note and Agreement required.[212] Consequently, Nathan Hanks has been in breach every month since February 2019.[213]

But the damages analysis does not end there. In the event of a default, the Agreement also contains an Acceleration Clause that allows Michael Anderson to "make the entire Principal Amount of the Note immediately due and payable."[214] This right applies only to a default that has not been cured after sixty days following written notice.[215]

---

[208] *Taylor v. State Farm Fire & Cas. Co.*, 2024 WL 4043535, at *5 (D. Utah Sept. 4, 2024) (quoting *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 466–67 (Utah 1996).

[209] *Tretheway v. Furstenau*, 2001 UT App 400, ¶ 9, 40 P.3d 649 (citation and internal quotation marks omitted).

[210] *Id.* (quoting *Winegar v. Froerer Corp.*, 813 P.2d 104, 109 (Utah 1991)).

[211] *See* Trial Ex. 1027 (RS Equity Note-Balance Due Assuming Prejudgment Interest Only on ½ Payments Due).

[212] *See* Trial Ex. 1025 (RS Equity's Profit and Loss Statements 2017–2021); Trial Ex. 35 (RS Equity's Profit and Loss Statements 2023 to June 2025).

[213] Trial Tr. 691:12–14, ECF No. 466. (Nathan Hanks's last payment to Michael Anderson was in January 2019.)

[214] Agreement ¶ 1.2(e).

[215] *Id.*

On May 1, 2020, Michael Anderson provided such notice in a letter.[216] After the sixty-day cure period passed with no response from Nathan Hanks, he invoked the Acceleration Clause in his counterclaim on August 7, 2020, by stating, "The Notes grant Anderson the right 'to make the entire Principal amount of the Note immediately due and payable,' which right Anderson hereby invokes."[217] The terms of the clause allow Michael Anderson to "exercise the option to accelerate upon an Event of Default regardless of any prior forbearance." Thus, even if his written notice that did not invoke the right to demand immediate full payment were viewed as forbearance, it did not preclude him from invoking the right in his counterclaim. And as previously mentioned, the right applies only to a default that has not been cured after sixty days following written notice.[218] That is, of course, what happened here.

Therefore, Michael Anderson exercised his right "to make the entire Principal amount of the Note immediately due and payable" when he filed his counterclaim on August 7, 2020, specifically invoking the right.[219] The sixty-day cure period ended on October 6, 2020, so the remaining balance of the Note's Principal became due then.[220]

Michael Anderson's expert, Mr. Rondeau, testified about his calculations regarding prejudgment interest on the balance owing on the Note following the last payment in January 2019,[221] which the court has found to be the first month of Nathan Hanks's breach. Mr. Rondeau's calculations spanned three schedules.[222] Mr. Rondeau correctly identified the prejudgment interest rate of 10% on all three schedules, and his calculations are generally

---

[216] Trial Ex. 1028.
[217] *See* Michael S. Anderson's and AKA Partners, LC's Amended Answer and Counterclaim, ¶ 15, ECF No. 101, filed Aug. 7, 2020.
[218] Agreement ¶ 1.2(e).
[219] *See* Michael S. Anderson's and AKA Partners, LC's Amended Answer and Counterclaim, ¶ 15, ECF No. 101.
[220] Note ¶ 6.
[221] Trial Tr. 783:20–791:12, ECF No. 466.
[222] Trial Ex. 1027.

consistent with the theory that prejudgment interest should be calculated differently for the installment payments that were due and owing prior to the cure period and the prejudgment interest that should be applied to the February 15, 2019 balance of $547,005 beginning on the date the cure period ended and the acceleration period began.[223] While Mr. Rondeau's calculations in Schedule 2 fail in their specifics for incorrect assumptions about the installment payment amount owed and the date the cure period ended, his methodology is otherwise sound.[224]

Accordingly, the court awards prejudgment interest as follows: For the pre-cure period of February 15, 2019 through October 6, 2020, the court applies the prejudgment interest rate of 10% to the monthly payment amount of $11,396 divided by 365 days multiplied by the number of days from the date the payment was due on February 15, 2019 through the end of the cure period on October 6, 2020. This results in pre-acceleration period pre-judgment interest of $19,550.61. Added to that is prejudgment interest calculated on the unpaid balance of $547,005.00 multiplied by the 10% prejudgment interest rate divided by 365 days, which is then

---

[223] Trial Ex. 1027. Schedule 3, however, was simply incorrect. There, Mr. Rondeau's calculation represented a 10% interest rate on the balance of $547,005 owing as of the due date of the first missed payment, February 15, 2019, multiplied by the number of days prior to judgment. This calculation is incorrect because the total unpaid balance of $547,005 did not become due and payable until the loan accelerated on October 7, 2020 after the expiration of the cure period.

[224] In Mr. Rondeau's Schedule 1 calculation, he applied a 10% prejudgment interest rate to one half of the original monthly payment of $11,396 (specifically, to $5,698) divided by 365 days multiplied by the number of days from the date the payment was due on February 15, 2019 through the anticipated termination date of the contract, or December 31, 2023 (1,780 days) to obtain a daily interest amount. Trial Ex. 1027. From there, Mr. Rondeau testified that the daily interest amount from February 15, 2019, the first day of missed payments, through June 30, 2020, which he believed to be the end of the cure period, resulted in prejudgment interest owing in the amount of $40,813.20, which he carried over to the top of Schedule 2. Id.; Trial Tr. 786:19—787:8, ECF No. 466. On cross-examination, Mr. Rondeau was challenged about the basis for him using one half of the monthly payment in his Schedule 1 calculation. Trial Tr. 788:11—791:7, ECF No. 466. When directed to paragraph 2 of the Promissory Note that refers to a "Non-Default Monthly Shortfall," Mr. Rondeau testified, "That's why I calculated the – half of the payment to the event." Trial Tr. 790:6–12, ECF No. 466. Mr. Rondeau's understanding of the Promissory Note's "Non-Default Monthly Shortfall" is incorrect. A "Non-Default Monthly Shortfall" does not result in half of the monthly installment payment becoming due and owing. Default prior to the cure period, as the court found here, results in the full installment payment becoming due and owing.

multiplied by the number of days from the start of the acceleration period (October 7, 2020) to the date of the judgment (November 21, 2025), or 1871 days.

| | |
|---|---|
| Pre-cure period prejudgment interest: | $19,550.61 |
| Post-cure period prejudgment interest: | + $280,396.26 |
| Total prejudgment interest: | **$299,946.87** |
| Unpaid balance of note: | +$547,005.00 |
| <u>Total Judgment:</u> | **$846,951.87** |

The court awards prejudgment interest in the amount of $299,396.26 plus the balance of $547,005 owing on the note for a total judgment of $846,951.87. In addition, the Note provides that in the "Event of Default," Nathan Hanks agreed to pay "reasonable attorneys' fees and all costs of suit and preparation for such suit whether incurred with or without litigation, on appeal or otherwise."[225] The court therefore awards reasonable attorneys' fees and costs. Michael Anderson may file a motion seeking such fees and costs.

### III.    Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

Because Michael Anderson prevails on his breach of contract claim, the court need not address his alternative implied covenant of good faith and fair dealing claim. But given that the claim was fully developed in briefing and at trial, the court deems it appropriate to use its discretion to consider the alternative argument's merits.[226]

Michael Anderson contends that Nathan Hanks violated the implied covenant of good faith and fair dealing by purposely diverting RS Equity's revenue to a different entity in which Michael Anderson has no interest so he could avoid his payment obligation under the Agreement.[227]

---

[225] Trial Ex. 1031.
[226] *See United States v. Leon*, 80 F.4th 1160, 1170 (10th Cir. 2023) ("We have discretion, however, to 'consider alternative arguments to affirm if the record is adequately developed.'") (quoting *United States v. Gaines*, 918 F.3d 793, 800 (10th Cir. 2019)).
[227] Trial Tr. 1046:21–1050:4.

"An implied covenant of good faith and fair dealing inheres in every contract."[228] "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the party's rights to receive the fruits of the contract."[229] "Such a duty advances the core function of the covenant, as no one would reasonably accede to a contract that left him vulnerable to another's opportunistic interference with the contract's fulfillment."[230]

"The implied covenant of good faith and fair dealing performs a significant but perilous role in the law of contracts."[231] Its import rests in "its function of inferring as a term of every contract a duty to perform in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstance giving rise to their dispute."[232] "No such covenant may be invoked, however, if it would create obligations 'inconsistent with express contractual terms.'"[233] "To determine the legal duty a contractual party has under this covenant, a court will assess whether a party's actions are consistent with the agreed common purpose and the justified expectations of the other party."[234]

Michael Anderson succeeded at trial in "establishing a basis for a judicially imposed covenant of good faith."[235] It is undisputed that at some point after Nathan Hanks acquired Michael Anderson's interests in RS Equity, he began moving revenue streams that had been flowing to RS Equity to RSPOP, an entity in which Michael Anderson had no legal interest. At a minimum, this included moving 10 or 11 previously acquired properties from RS Equity to the

---

[228] *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, 94 P.3d 193, 197.
[229] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991).
[230] *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 9, 266 P.3d 814.
[231] *Id.* ¶ 8.
[232] *Id.*
[233] *Id.* ¶ 10.
[234] *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 43, P.3d 1226 (quoting *St. Benedict's*, 811 P.2d at 200) (internal quotation marks omitted)).
[235] *Young Living Essential Oils, LC*, 2011 UT 64, ¶ 12.

newly created RSPOP.[236] The result of these transfers is that RS Equity no longer received property management income from these properties and would not receive the disposition income upon their eventual sale.[237] Some of the impact of these transfers is reflected in the profit and loss statements, which show no acquisitions or dispositions after RSPOP's creation in May 2021 and total asset management income precipitously falling after May 2021 from seven-digit figures (from 2017 through 2020) to just over $40,000 in the first half of 2025.[238] The largest part of the impact would come from loss of the disposition income, which does not show up in the RS Equity profit and loss statements precisely because that large revenue source was removed from it.

But the shift in the property management income and disposition income from RS Equity to RSPOP is not the only change that was made. After Michael Anderson sold his ownership interest in RS Equity to Nathan Hanks, RS Equity simply ceased its role as the main acquisition entity under the RealSource umbrella.[239] In fact, after Michael Anderson sold his interest in RS Equity, RS Equity never again acquired any new property.[240] The result is that RS Equity no longer generates new property acquisition income, asset management income, or disposition income.[241] Indeed, RS Equity now does "very little" because virtually all its operations have moved to other RealSource entities.[242]

Testimony was received about why RSPOP instead of RS Equity is now the entity that acquires new properties. Nathan Hanks testified that he created RSPOP to combat a slowing

---

[236] Trial Tr. 726:9–15, ECF No. 466; Trial Tr. 897:9–907:15, ECF No. 466.
[237] Trial Ex. 1029 35:4–36:7.
[238] Trial Ex. 35, 1025 (RS Equity's profits and losses before and after RSPOP's formation).
[239] Trial Ex. 1029 at 35:23–25; 43:22–24.
[240] Trial Ex. 35, 1025.
[241] Trial Ex. 1029 at 35:23–25; 43:22–24.
[242] Trial Ex. 14:8–14.

market and to raise money more competitively.[243] He opined that REITs are generally superior to the previous model of single-property syndication used by RealSource.[244] Assuming that was his good faith view, that testimony still does not explain why the property management revenue and disposition income from previously acquired properties were moved from RS Equity, the source of payments to Michael Anderson, to RSPOP. In other words, even if it made sense to consider a new acquisition vehicle going forward, there was no explanation for why income from prior RS Equity acquisitions needed to move from the entity that acquired those properties (RS Equity) to a new entity (RSPOP). It is obvious that moving those revenue streams from RS Equity to RSPOP greatly increased the likelihood that RS Equity would lack sufficient funds to pay Michael Anderson. The natural result is RS Equity likely never would have sufficient funds to pay the debt to Michael Anderson, making that debt uncollectible and thereby depriving Michael Anderson of the fruits of his agreement.

Nathan Hanks was aware of this. He acknowledged that "without new acquisitions, RS Equity Services will have minimal, if any, income."[245] And while there was testimony about a single effort made to have RS Equity acquire a new property, no evidence was provided of any other efforts or that a single acquisition would have changed the state of affairs. Nathan Hanks also testified, "But our hopes are that we can turn that machine back on again."[246] However, the record does not support this claim.[247] No evidence was received of any specific current efforts or plans to turn "that machine back on." There was no testimony or other evidence that RS Equity was staffing up, vetting specific investment opportunities, or soliciting funds. The "turn the

---

[243] Trial Tr. 725:13–15, ECF No. 466. *See also* 751:18—752:8 ("A REIT is much more liquid" and can "spread risk").
[244] Trial Tr. 751:6–15, ECF No. 466.
[245] Trial Tr. 724:25—725:2, ECF No. 466.
[246] Trial Tr. 724:25—725:4; 780:16–20, ECF No. 466.
[247] *See, e.g.*, Trial Ex. 1029 at 14 (Jeff Hanks testifying that RS Equity does "[v]ery little" ever since the REIT was formed); Trial Ex. 1025 (RS Equity's Profit and Loss Statements 2017–2021).

machine back on" testimony also is undermined by the testimony that RSPOP was superior and was needed to be competitive.[248] No explanation was provided for why the allegedly inferior syndication model offered by RS Equity would all of a sudden be viable again. And, of course, an asserted intent to "turn that machine back on" means that the machine was turned off, an intentional and purposeful act.[249]

In sum, Nathan Hanks intentionally took actions that necessarily would deprive RS Equity of the ability to make the agreed upon payments to Michael Anderson. Under his direction, 10 or 11 properties previously acquired by RS Equity for its investor group were moved to RSPOP, depriving RS Equity of ongoing property management fees and the eventual disposition fees. Additionally, Nathan Hanks "turned off" RS Equity so that it did very little and so could earn very little. The result of these actions was that RS Equity seldom had enough net income to make the monthly payments Michael Anderson was owed. It also virtually guaranteed that if there were any properly deferred payments, they would never come due, because there would never be enough income to reasonably pay them. This would have been obvious to anyone. By so doing, he "intentionally or purposely [did something] which will destroy or injure the party's rights to receive the fruits of the contract."[250]

Therefore, the court finds in the alternative that Michael Anderson established by the preponderance of the evidence that Nathan Hanks breached the implied covenant of good faith and fair dealing by diverting RS Equity's income streams to RSPOP.

---

[248] Trial Tr. 751:6–15, ECF No. 466.
[249] Trial Tr. 725:5–7, ECF No. 466 (exchange between Michael Anderson and Nathan Hanks about his statement he hopes "to turn that machine back on" Q: "When did you turn it off?" A: "It's never—I mean, we slowed it down since—but now we're in the process of selling the REIT."). *See also* Trial Tr. 726:2–8, ECF No. 466 (discussing the lack of acquisitions by RS Equity since the formation of RSPOP).
[250] *St. Benedict's Dev. Co.*, 811 P.2d at 199.

## IV.    Compensation Claims

In Utah, individuals with real estate licenses must be affiliated with a principal broker.[251] Throughout their time with RealSource, Kent Anderson's and Michael Howard's real estate licenses were associated with Michael Anderson, who was the principal broker of RealSource from its formation until the end of 2020.[252] Under the Licensing Act, "[a] sales agent or associate broker . . . may not sue . . . for the recovery of . . . compensation or services as a sales agent or associate broker unless the action is against the principal broker . . . ."[253] Thus, as the court previously held, Kent Anderson and Michael Howard's compensation claims must be asserted against Michael Anderson, not RealSource.[254]

At trial, Kent Anderson and Michael Howard contended that they had an oral agreement with Michael Anderson and with RS Equity about the compensation amounts they would receive for their independent contractor work.[255] They argue that they were promised that they would be paid a fixed percentage of all acquisition, management, and disposition fees on any property they helped RS Equity acquire. Importantly, they contend that their agreements contained a provision that they would be paid these fees indefinitely into the future even if they quit or were fired.

As noted earlier, under Utah law, "[t]he elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[256] "'An enforceable contract . . . consists of the terms of a bargained-for exchange between the parties. And the terms of the bargain are defined

---

[251] Utah Code § 61-2f-302.
[252] Trial Tr. 819:3–24, 871:21—872:3, 914:23—915:25, ECF No. 467.
[253] Utah Code § 61-2f-409(2).
[254] Trial Tr. 1069:15–23, ECF No. 473.
[255] The parties submitted trial briefs in lieu of opening arguments. *See* Defendants Kent Anderson, Michael Howard, AKA partners, LC and Greenfill Woodland Creek Apartments, LLC's Trial Brief, ECF No. 438, filed Aug. 25, 2025 (discussing the "agreement with RealSource and Mike"). *See also* Trial Tr. 1069:14–15; 1071:11–14, 19–20; 1073:2–3, ECF No. 473 (This is a "breach of contract claim").
[256] *Am. W. Bank Members, LC,* 2014 UT 49, ¶ 15 (cleaned up).

by the meeting of the minds of the parties—through an offer and acceptance upon consideration.'"[257] "A binding contract exists where it can be shown that the parties had a meeting of the minds as to the integral features of the agreement and that the terms are sufficiently definite as to be capable of being enforced."[258] "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous."[259] "An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer."[260] As for damages, a plaintiff must prove both the fact of damages and the amount of damages. "The level of persuasiveness required to establish the fact of loss is generally higher than that required to establish the amount of a loss."[261] But "there still must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages."[262]

### A.    There Was No Agreement with Michael Anderson.

The initial question is whether Kent Anderson and Michael Howard established that they had an agreement with their broker, Michael Anderson, as opposed to an agreement with RS Equity. The preponderance of the evidence suggests that they did not.

For starters, Michael Anderson unequivocally denied that he made any such agreement.[263] He testified that he never had an agreement as a broker with Kent Anderson or

---

[257] *Bear v. LifeMap Assurance Co.*, 2021 UT App 129, ¶ 29, 503 P.3d 507 (quoting *Rossi v. Univ. of Utah*, 2021 UT 43, ¶ 31, 496 P.3d 105).
[258] *Syme v. Symphony Grp. LLC*, 2018 UT App 212, ¶ 13, 437 P.3d 576 (cleaned up).
[259] *Lebrecht v. Deep Blue Pools & Spas Inc.*, 2016 UT App 110, ¶ 13, 374 P.3d 1064 (cleaned up).
[260] *Id.* (cleaned up).
[261] *Atkin, Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985); *Mrs. Fields Franchising, LLC v. MFGPC, Inc.*, No. 2:15-cv-00094, 2021 WL 3783272, at *3 (D. Utah Aug. 26, 2021).
[262] *Salt Lake City Corp. v. Erm-West, Inc.*, No. 1:11-cv-1174, 2015 WL 4276357, at *1 (D. Utah July 14, 2015) (quoting *TruGreen Cos., LLC v. Mower Bros., Inc.*, 2008 UT 81, ¶ 15, 199 P.3d 929).
[263] Trial Tr. 920:6—921:8, ECF No. 467.

Michael Howard.[264] Their agreement was with RS Equity, not him. Indeed, Michael Anderson never made any payments to Kent Anderson or Michael Howard. He "never had that control."[265]

This testimony went unrebutted. For their part, neither Kent Anderson nor Michael Howard presented any evidence that their agreement was with their real estate broker, Michael Anderson. Kent Anderson testified about what he understood the agreement with RS Equity to be in 2002 and 2011.[266] And while he also testified about conversations he claims he had with his brother Michael Anderson about certain terms, he did not testify or provide any evidence that his agreement was with his brother as opposed to RS Equity.[267]

The same is true for Michael Howard. He testified that Michael Anderson referred him to Nathan Hanks, twice, for discussions about doing work for RS Equity.[268] Michael Howard was always an independent contractor for RS Equity.[269] RS Equity, not Michael Anderson, paid him.[270]

For these reasons, the court concludes that Kent Anderson and Michael Howard failed to demonstrate, by a preponderance of the evidence, that they had a compensation agreement with their broker, Michael Anderson. Because they did not, their claim fails.[271]

### B.    Kent Anderson and Michael Howard Failed to Show RS Equity Breached an Agreement with Them and the Amount of Any Damages.

Even if Kent Anderson and Michael Howard could assert a claim against RS Equity, it would fail. None of the parties dispute that Kent Anderson worked as an independent contractor

---

[264] Trial Tr. 921:1–8, ECF No. 467.
[265] Trial Tr. 918:17–18, ECF No. 467.
[266] Trial Tr. 821:12–835:25, 843:3–22, ECF No. 467.
[267] Trial Tr. 853:15–20, ECF No. 467.
[268] Trial Tr. 869:18–22, 870:5–11, ECF No. 467.
[269] Trial Tr. 887:1–14, ECF No. 467.
[270] Trial Tr. 887:1–6, ECF No. 467.
[271] "[W]e are making a claim under the statute for breach of contract." Trial. Tr. 1071:19–20, ECF No. 473.

for RS Equity from 2002 until 2019.[272] The parties also agree that Michael Howard worked as an

independent contractor for RS Equity from 2011 until 2018.[273] The parties also do not dispute

that, remarkably, there never was a written agreement about their arrangement.[274] And the parties

all agree that both Kent Anderson and Michael Howard now work at AKA Partners, which Kent

Anderson's brother Michael Anderson founded shortly after he sold his interest in RS Equity, and

which RS Equity accuses of wrongfully competing against it.[275] Michael Howard began working

for AKA Partners after he stopped working for RealSource.[276] Kent Anderson secretly began

working for AKA Partners while he was still working for RS Equity.[277]

    In terms of compensation back in 2002, there was testimony about how fees would be

split among members of a "pool."[278] According to Kent Anderson, in December 2002, the

original agreement was that RS Equity would get the first 50% of any income and the pool

members would share equally in the remaining 50%.[279] The income would come from

acquisition, operations, and disposition fees.[280]

    But the deal then changed in 2011, when Nathan Hanks became president of RS

Equity.[281] According to Kent Anderson, the new agreement with RS Equity was that the

compensation for pool members "was going to be allocated based on what they perceived was

the contribution of each member to the closing of the deal."[282] In other words, RS Equity would

determine what each person received based on what it felt the person earned. Kent Anderson

---

[272] Trial Tr. 818:6, 850:19–20, ECF No. 467.
[273] Trial Tr. 871:18–25; 884:19—885:1, ECF No. 467.
[274] Trial Tr. 920:9, ECF No. 467.
[275] Trial Tr. 60:18–20, 65:16–17, ECF No. 451; Trial Ex. 15.
[276] Trial Tr. 159:15–22, ECF No. 451; Trial Ex. 15.
[277] Trial Ex. 15.
[278] Trial Tr. 820:19—824:21, ECF No. 467.
[279] Trial Tr. 820:19—821:23, ECF No. 467.
[280] Trial Tr. 820—824, ECF No. 467.
[281] Trial Tr. 843:3–13, ECF No. 467.
[282] Trial Tr. 843:9–11, ECF No. 467.

thought RS Equity would assign him a certain percentage of every deal for his acquisition efforts, and he would then receive that same percentage for management and disposition fees. In his view, "those percentages were locked on that deal so that any time we received income for that deal whether it was operating distributions or disposition income those percentages still remained locked as of the date that the percentages were initially calculated at the acquisition of the property."[283] In his trial testimony, Mr. Howard took a similar position, though he provided much less detail, agreeing with a series of his attorney's statements about what he believed was going to happen:

> Q.    So did you believe you were going to get a cut of any acquisition that you participated in?
> A.    Yes.
> Q.    All right. Did you believe that from your discussion with Mr. Hanks that you were going to receive a cut of what you said [sic] distribution cashflows going forward?"
> A.    I did.
> Q.    Did you, from that discussion, believe you would receive a cut of any disposition, sale, or refinance fee?
> A.    Absolutely.[284]

As noted earlier, none of the foregoing was reduced to a written agreement.[285]

Additionally, little testimony was received about the specific percentages or amounts of each deal RS Equity (as opposed to Kent Anderson or Michael Howard) "perceived was the contribution of each member."[286] In other words, there was almost no direct evidence about what RS Equity said it would pay Kent Anderson and Michael Howard for their efforts on any particular deal. Instead, the focus primarily was on two voluminous exhibits from Kent Anderson that he created over a period of many years from many different sources.

---

[283] Trial Tr. 843:23–844:4, ECF No. 467.
[284] Trial Tr. 872:19—873:5, ECF No. 467.
[285] Trial Tr. 920:9, ECF No. 467.
[286] Trial Tr. 843:9–11, ECF No. 467.

Kent Anderson testified that he created certain documents that he felt demonstrated the amounts of money he and Michael Howard were owed by RS Equity.[287] The source materials for these documents were varied. Some of the sources were certain company documents about past performance and future projections.[288] Another source was information about what Kent Anderson was paid over the years.[289] Yet another source was information Michael Howard "provided" after he quit.[290] Additional sources included litigation materials, like depositions.[291] Finally, he included information gleaned at unidentified times from "an e-mail," "doing research," "different online resources," and "conversations [] with others."[292] From these various sources and materials, Kent Anderson then made certain calculations about what fees might have been received or expected, what percentages he felt he and Michael Howard were owed, and an average percentage he calculated and imputed to certain projects where he lacked data.[293] His efforts to create some of these documents reportedly began in "mid 2003,"[294] other document collection and curation occurred "about 2011-2012 through June of 2019,"[295] and the final efforts on these documents ended on an unknown date long after this litigation began.[296]

---

[287] Trial Tr. 836:3–25; 840:3–17, ECF No. 467; Trial Ex. 1120.

[288] Trial Tr. 840:21—841:11, ECF No. 467 (Discussing using past income and expenses to "forecast future results with assumptions").

[289] *See, e.g.*, Trial Tr. 836:19–22, ECF No. 467 ("I took his worksheet that he e-mailed to me and I just simply copied or well moved his – the worksheet into my worksheet where I kept each one of those."); Trial Tr. 837:21–23, ECF No. 467 (Agreeing with his attorney that he would then "summarize the document in summary tables.").

[290] Trial Tr. 847:2–7, ECF No. 467 ("He let me know what he was making on each one of these deals."); Trial Tr. 877:11–16, ECF No. 467.

[291] Trial Tr. 859:15–25, 860:1–3, ECF No. 467.

[292] Trial Tr. 857:2–25, 858:1–5, ECF No. 467.

[293] Trial Tr. 848:21–24, ECF No. 467 (Agreeing with his attorney that he was "able to get a percentage, an average I should say, a percentage, of how much [he was] paid on different deals?"); Trial. Tr. 849:4–12, ECF No. 467 (Discussing that "projections [were] helpful to [him] in understanding what monies [he] could receive.").

[294] Trial Tr. 836:15–17, ECF No. 467. The court notes that while Kent Anderson agreed with his attorney's statement that he prepared these materials "as part of the ordinary course of [his] independent contractor work," there was no evidence that RS Equity asked him to prepare materials tracking fees *for himself* and no benefit to RS Equity for Kent Anderson to be preparing materials documenting what he felt he was owed. *See* Trial Tr. 836:23–25, ECF No. 467.

[295] Trial Tr. 849:21–25, 850:1–3, ECF No. 467.

[296] Specifically, whenever the unidentified depositions would have been taken in this case.

The documents Kent Anderson created, together with his testimony regarding them, are critical to Kent Anderson and Michael Howard's efforts to show the terms of the agreement, breach, and damages. But the court does not find them reliable or persuasive, for a number of reasons.

First, the documents are a hodgepodge of numerous kinds of different source material. According to Kent Anderson's own testimony, they represent his selections from certain company documents, information he added about his own compensation, whatever Michael Howard told or provided him about his compensation, data from depositions, information he saw in online sources, things he was told by his brother and unidentified others, and information he read in one or more emails. It was also unclear whether or what part of this information was entered into these documents contemporaneously with its acquisition over the years. While no objection was made to the documents being offered into evidence,[297] this patchwork quilt of bits and parts of different company records, bank account information, unknown online materials, litigation sources, and things certain people purportedly said, is neither reliable nor persuasive.

Second, not only is the amalgamated source material unreliable and unpersuasive, it also is further tainted by the projections, assumptions, and calculations contained in those documents. These were never fully spelled out and explained, but both the testimony and the documents themselves make it clear that they play an important role. While Kent Anderson testified at some length, he never walked through the exhibits in a methodical way that persuaded the court that either the sources or the projections, assumptions, and calculations involving those sources were reliable.

---

[297] Trial Tr. 838:13–19, ECF No. 467.

Third, it is unclear what portion of the underlying materials were produced in discovery or entered into evidence at trial, further undermining the usefulness of the materials. Because no way was identified for the voluminous calculations and data to be checked, the court is not persuaded of their accuracy.

Fourth, Kent Anderson provided no evidence at trial that he ever told RS Equity before he was terminated that he was owed any specific amount of additional income. It would be unexpected for someone who was meticulously tracking what they were owed—and whose calculations allegedly showed they were owed money from 2014-2019—to have said little or nothing about the supposed shortfalls until years later in litigation. At trial, no evidence on this issue was offered by Kent Anderson.[298] Whether that was a strategic decision—because such evidence might show that there was no real meeting of the minds—or whether it was an oversight, it was telling.

For his part, Michael Howard testified about a single experience where he clearly felt he was paid less than he was expecting.[299] However, he did not testify, or provide any other useful evidence, of the amount he felt he was owed or evidence of what that higher expected amount might have been.

In summary, Kent Anderson and Michael Howard's compensation claims largely turn on two voluminous documents that Kent Anderson created over many years, including after he was terminated and while the litigation was pending, from numerous other documents and people, some identified and others not. For all of the foregoing reasons, the court does not believe the

---

[298] And his testimony on the issue was far from clear. See Trial Tr. 835:21—836:2 ("Q: Were you paid, as you went forward from 2002, were you paid initially on three areas of income as described as you have described? [sic] A: Yes. I was always paid from these three sources of income from the time I started and through October of 2019.").
[299] Trial Tr. 876:7—877:6, ECF No. 467.

documents to be reliable and is not persuaded that they or the testimony related to them reasonably establish any of the breach of contract elements.

As a final matter, the court notes that the overwhelming majority of the damages sought by Kent Anderson and Michael Howard depend on a finding that they would be entitled to fees even after they had left employment with RS Equity. But the evidence presented does not establish this.

According to Kent Anderson, on unidentified dates, he had countless discussions with his brother Michael ("too many to count") that once the work was done and the deal closed he had "earned the income for that property going forward."[300] Kent Anderson's attorney suggested that this entitlement to income would persist even if Kent left RealSource, and Kent agreed.[301] Similarly, Michael Howard testified that Michael Anderson told him at some point that as far as the three sources of income "you absolutely earn it when the deal closes and that never changes" and "[w]hen the deal closes the money is earned, period."[302] Michael Howard also reports that Michael Anderson stated that he did not need to be working for RealSource to continue being paid.[303]

But there are many layers of problems with this testimony. First, no dates were provided for the "too many to count" meetings where Kent Anderson's brother Michael Anderson assured him and Michael Howard they would get paid even if they left RS Equity.[304] The dates clearly matter, because for an offer to "create a valid and binding contract, its terms must be definite and unambiguous."[305] If these discussions were not part of the offer and acceptance process, but

---

[300] Trial Tr. 853:13–14, 20, ECF No. 467.
[301] Trial Tr. 833:18–25, ECF No. 467.
[302] Trial Tr. 885:25—886:8, ECF No. 467.
[303] Trial Tr. 885:7—886:15, ECF No. 467.
[304] Trial Tr. 853:13–14, 20, ECF No. 467.
[305] *Lebrecht*, 2016 UT App 110, ¶ 13.

instead came later, then Michael Anderson's expressed views are not likely terms of the agreement.

Second, no evidence was received or argument made that Michael Anderson had the authority to bind RS Equity on the dates relevant to these claims. Since 2002, he was merely a 50% owner.[306] No evidence was received that he could unilaterally bind RS Equity to continue making payments to an independent contractor who had quit or been fired. If anything, the testimony seemingly suggested that Nathan Hanks played that role, since the agreement changed in 2011 when Nathan Hanks became president.[307] Around that same time, when Michael Howard talked with Michael Anderson about working with RS Equity, Michael Anderson repeatedly told him to talk with Nathan Hanks.[308] When they did speak, Nathan Hanks provided no "specifics" other than to mention compensation in three areas.[309] The lack of specificity was not troublesome to Michael Howard because he believed "you look somebody in the eye and you shake their hand and you have a deal and then you move forward in good faith."[310]

Third, no evidence was received that RS Equity and Nathan Hanks agreed with Kent Anderson and Michael Howard that they would continue to receive payments even if they left RS Equity or were fired.[311] Because the evidence did not even establish when Michael Anderson allegedly made such assurances or that he had the authority to do so when he did, the failure to provide evidence that Nathan Hanks or anyone else with the required authority did so matters.

---

[306] Trial Tr. 818:6–13, ECF No. 467.
[307] Trial Tr. 843:3–13, ECF No. 467.
[308] Trial Tr. 869:18–22, 870:5–11, ECF No. 467.
[309] Trial Tr. 872:11–12, ECF No. 467.
[310] Trial Tr. 872:15–18, ECF No. 467.
[311] This position also does not fully square with Kent Anderson and Michael Howard's averment in their counterclaim that they would be owed the compensation "as long as they did not voluntarily terminate their services to the RealSource Parties." ECF No. 168 at 8.

Kent Anderson and Nathan Hanks could have compelled testimony from Nathan Hanks as a witness on their compensation claims but elected not to do so.

Fourth, Kent Anderson's "too many to count" conversations with his brother about getting paid no matter his employment status are problematic all by themselves, even if the conversations occurred, occurred at the right time, and Michael Anderson had authority to bind RS Equity. If there truly were a meeting of the minds between RS Equity and Kent Anderson that he would be paid even if he were fired or left, why would Kent Anderson need to have numerous conversations with his brother about the issue? In other words, if that term were definite and unambiguous and the parties' minds had met on it, as the law requires, why would Kent Anderson have the conversation over and over again countless times? And why was Nathan Hanks not included in those conversations between the brothers and Michael Howard? If he was, no evidence was provided at trial. Also, no testimony was provided about any of the details of the conversations: the when, where, and why are all absent. No context of any kind was provided.

Fifth, no written evidence was offered that would corroborate the alleged conversations. That all by itself is remarkable. Instead, written evidence was received in the form of an email from Nathan Hanks to Kent Anderson firing him and stating that "company policy has always been that a person received compensation in 3 areas and the person has to be currently working for RS to earn and be paid this compensation. When Joe Mackey left RS, his pool share of acquisition fees, ongoing cash flow, and backend disposition proceeds all stopped to him."[312] While both sides discussed parts of the email and some of its implications, Kent Anderson and

---

[312] Trial Ex. 15, ¶ 6.

Michael Howard presented no written evidence—contemporaneous or otherwise—disputing this statement.

Finally, there is another credibility issue to be addressed. Michael Anderson testified that he retired from RS Equity in 2018 because of his poor health, including his "obviously failing memory."[313] His admitted failing memory was on display at various times through the trial. He regularly struggled to recall basic things, like the year he sold the companies he founded to Nathan Hanks, the relatively small number of entities he had sold, or even what all the names of those entities he had created were.[314] He also struggled to remember when his brother joined RealSource or AKA Partners.[315] These admitted and demonstrated memory issues greatly decrease the weight the court, sitting as fact finder, assigns to his testimony. As for the claimants, Kent Anderson and Michael Howard, in addition to the obvious incentive to remember and interpret conversations from many years earlier in ways favorable to their claims, the numerous difficulties with their testimony that supplies the basis of their multimillion-dollar oral agreement claims have been outlined above.

For all of these reasons, singly and together, the court concludes that Kent Anderson and Michael Howard failed to show, by a preponderance of the evidence, that post-employment payments were an agreed-upon term of their agreement with RS Equity.[316] And as noted earlier, they failed to show the other terms necessary to their claims, breach, and damages.

---

[313] Trial Tr. 87:15–20, ECF No. 451.
[314] Trial Tr. 48:4–7, 49:13–20, ECF No. 451.
[315] Trial Tr. 61:11–14, 95:4–7, 11–13, ECF No. 451.
[316] In its opening and closing arguments, RealSource also urged the court to find that Michael Anderson, Kent Anderson, and Michael Howard had a Mary Carter or related agreement. Trial Tr. 1011–12, ECF No. 473. While the evidence shows the Anderson brothers and Michael Howard have joined together at AKA Partners, and it was plain from their demeanor and interactions at trial that they are close and aligned in their testimony and general litigation strategy, no evidence was received that they had entered into any Mary Carter agreement.

### C.      Kent Anderson Did Not Establish His Performance.

Utah law also requires a party alleging breach to demonstrate their own performance.[317] Kent Anderson and Michael Howard did not argue in closing how they met this requirement. It does not appear to be at issue for Michael Howard, but the record suggests that it is for Kent Anderson. The previously mentioned email terminating Kent Anderson states as follows:

> When we came to an agreement in February that RS would pay you significantly more each month, we did so in reliance on your representation and promise that you would not perform services for AKA while you were performing services for RS. . . . When confronted about you performing services for AKA from March through August, you initially denied your conduct for several days until eventually confessing that you had been lying to us and working for AKA all along. To be clear, that is a breach of our agreement and fraud on your part.[318]

Again, while both sides referenced parts of this email,[319] Kent Anderson did not dispute that he was terminated from his relationship with RS Equity because after promising not to work for his brother's new firm, AKA Partners, he did so anyway, denied doing so when confronted, and then eventually recanted.[320] He could have challenged any of these things if he thought they were untrue but did not.

In short, Kent Anderson's contract claim fails for the additional reason that, despite bearing the burden, he did not address either the element of his own performance or the unrebutted evidence suggesting that he did not fully perform.

---

[317] *See, e.g.*, *Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1177 (10th Cir. 2000) (applying Utah law) (stating that to prevail on a breach of contract claim, a plaintiff must "show the existence of a contract, [plaintiff's] performance and [defendant's] nonperformance under the contract terms").
[318] Trial Ex. 15, ¶ 5.
[319] Trial Tr. 356:11–358:2; 483:6–485:19, ECF No. 471.
[320] Trial Ex. 15, ¶ 5.

## V.    Indemnification Claim

The Agreement states that Nathan Hanks shall indemnify Michael Anderson for any claim "arising out of the use by RS Brokerage of the Principal Brokerage Licenses during the Brokerage Transition Period."[321] The Brokerage Transition Period is the twenty-four-month period after the closing, from January 2018 to January 2020.[322]

Michael Howard and Kent Anderson first asserted their compensation claims against Nathan Hanks and RealSource in 2019, which was during the Brokerage Transition Period.[323] As mentioned above, Utah law mandates that Kent Anderson and Michael Howard assert their compensation claims against Michael Anderson, not RealSource.[324] Thus, Michael Anderson's indemnification claim against Nathan Hanks hinges on Kent Anderson and Michael Howard's compensation claims.

"Generally, a cause of action for indemnity does not arise until the liability of the party seeking indemnity results in his damage, either through payment of a sum clearly owed or through the injured party's obtaining an enforceable judgment."[325] Because Kent Anderson and Michael Howard's compensation claims fail, Michael Anderson's indemnification claim must likewise fail.

But even if Kent Anderson and Michael Howard's compensation claims had been successful, Michael Anderson did not establish that any of those claims arose out of the use of his Principal Broker Licenses from January 2018 to January 2020. Because no effort was made

---

[321] Agreement ¶ 9.3(c).
[322] *Id.* ¶ 7.6.
[323] Trial Tr. 1053:24—1054:3, ECF No. 473.
[324] Utah Code § 61-2f-409(2).
[325] *Salt Lake City Corp. v. Kasler Corp.*, 855 F. Supp. 1560, 1573 (D. Utah 1994).

to connect Kent Anderson and Michael Howard's claims to any use of Michael Anderson's license during the relevant time period, this claim for indemnification necessarily fails.

## ORDER

Based on its findings of fact and conclusions of law, the court finds in favor of Michael Anderson on his contract claims and against all other parties on the remaining claims. The court awards damages in the amount of $846,951.87 plus attorney fees and costs and will enter judgment.

Signed November 21, 2025.

BY THE COURT

_____
David Barlow
United States District Judge